UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

HUBERT P. VIDRINE, JR., ET AL.                    CASE NO. 6:07-CV-1204

VERSUS                                            JUDGE DOHERTY

UNITED STATES OF AMERICA                          MAGISTRATE JUDGE KAY

**FINAL RULING OF THE COURT ISSUED IN CONJUNCTION
WITH FINAL JUDGMENT IN THIS MATTER**

I.      **Background**

This matter involves claims brought by plaintiffs, Hubert P. Vidrine, Jr. and Tammy J.

Vidrine, against defendant, the United States of America, pursuant to the Federal Tort Claims Act

("FTCA"), 28 U.S.C. § 2671, *et seq.*  Hubert Vidrine asserts a claim for malicious prosecution; his

wife, Tammy Vidrine, asserts a claim for loss of consortium.[1]  The claims are based on the actions

of investigative and law enforcement officers of the U.S. Government, acting in the scope of their

employment.  Trial of this matter was to the bench, commencing on June 7, 2011, and closing

arguments being heard on June 24, 2011.[2]

Plaintiffs claim on September 5, 1996, agents of the Federal Bureau of Investigation, the

Environmental Protection Agency, the United States Marshal Service, the United States Coast

Guard, and the Louisiana State Police executed a search warrant on Canal Refining Company, a

---

[1]Plaintiffs originally asserted additional claims for assault and battery, false arrest, abuse of
process, intentional infliction of emotional distress and defamation.  Those claims were dismissed
pursuant to a motion to dismiss filed by the government. [Docs. 45, 57]

[2]Counsel were additionally instructed to provide the Court with quantum studies regarding
emotional/mental damages by June 26, 2011; a note of evidence, also, was allowed as to motion by
plaintiff on a discovery matter and motion for sanctions and cost.

facility for which Mr. Vidrine acted as manager.  On December 14, 1999 (more than three years after execution of the search warrant),  Mr. Vidrine was indicted on one count of knowingly storing hazardous waste on the property of Canal Refining Company, in violation of 42 U.S.C. § 6928(d)(2). Shortly thereafter, Mr. Vidrine was taken into custody and subsequently released on bond.  On September 17, 2003 (almost four years after the return on the indictment, more than seven years after the execution of the search warrant, and one month before the criminal trial was scheduled to commence), the Government filed a motion to voluntarily dismiss the indictment against Mr. Vidrine, stating, "Developments in this matter since the Indictment have revealed facts and circumstances which, in the interest of justice, warrant dismissal of the Indictment."  *See U.S. v. Trinity Marine Baton Rouge, Inc., et al*, W.D.La. (J. Melançon), Docket No. 6:99-cr-60053, Document No. 157.  On September 18, 2003, the motion was granted by Judge Tucker Melançon, who presided over the criminal proceedings.[3]

On July 23, 2007, plaintiffs filed this civil suit in this Court, based upon the foregoing events; extensive and acrimonious discovery ensued before the magistrate judge, a vigorous motion practice was pursued, and, ultimately, almost three weeks of testimony and over 15,000 documents were referenced or presented to the Court in one manner or another.  Having heard all testimony, arguments of counsel, and reviewed all evidence, this Court now makes the following Ruling.

## II.    Jurisdiction

Jurisdiction in this matter is premised upon 28 U.S.C. § 1346(b)(1) ("United States as defendant"), which provides in pertinent part:

> "[T] district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, . . . for injury or loss of property, or

---

[3]A detailed time line of the pertinent events in this matter is contained in the appendix.

personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

## III.    Stipulations and Admissions

Plaintiffs admit their damages cannot exceed $5,180,929.18, as that is the amount of damages asserted in their administrative claim. [*See e.g.* Doc. 244, p. 5] Additionally, at the trial of this matter, plaintiffs affirmed in open court that their claims for damages are limited to only those damages incurred between the years 2000 and 2010; thus, plaintiffs are not pursuing any claim for damages before 2000 or after 2010.  Prior to and during trial, plaintiffs affirmed that although there likely existed probable cause to investigate whether or not a criminal offense had occurred or was occurring at Canal Refinery, at no time did there exist probable cause to indict Hubert Vidrine. Additionally, at the pretrial conference, all counsel stipulated the first three of the necessary six elements of a malicious prosecution claim, as identified by the applicable Louisiana law, had been met in this matter.  *See* Sec. IV(B) ("Malicious Prosecution), *infra*.  At trial, the Plaintiffs stipulated Plaintiffs incurred $127,000.00 in attorney fees and costs in the defense of the underlying criminal prosecution.  Finally, the parties stipulated to the following facts prior to trial [Doc. 244, p.16]:

A.    Plaintiffs are husband and wife.  They live at 1375 Hwy 178, Opelousas, Louisiana, 70570, and thus are residents of the Western District of Louisiana.

B.    The claims herein are brought against the United States pursuant to the Federal Tort Claims Act (28 U.S.C. §2671, *et seq*.) and 28 U.S.C. §§1346(b)(1), for money damages.

C.    Agents Phillips and Barnhill, and their immediate supervisors during the course of the events at issue in this case, were federal officers who investigated and assisted in the prosecution of Hubert Vidrine were employees of the United States Government, and the conduct at issue occurred while they were acting within the scope of their offices and employment.

D.    Venue is proper in that all, or a substantial part of the acts and omissions forming the basis of these claims occurred in the Western District of Louisiana, and arose from the filing and prosecution of charges of criminal conduct against Mr. Vidrine by the United States Government and its agents, in *United States v. Trinity Marine Baton Rouge,Inc., et al*, Western District of Louisiana Case No. CR 99-60053.

E.    Plaintiffs fully complied with the provisions of 28 U.S.C. §2675 of the Federal Tort Claims Act, as a precondition to filing these claims.

F.    This suit was timely filed, in that Plaintiffs timely served  notice of their claims on both The Environmental Protection Agency and The United States Department of Justice on or about September 15, 2005.

G.    The U.S. Department of Justice assumed responsibility for processing the claim on behalf of both agencies.

H.    By July 23, 2007, when the Government had still not completed its review of the claim, Plaintiffs proceeded to file their Original Complaint in this Court.

I.    On August 13, 2007, after being served a copy of the Complaint, the government sent Plaintiffs a letter denying Plaintiffs' claims.

J.    This case is brought under the Federal Tort Claim Act for malicious prosecution by agents of the federal government.  That claim for relief is governed by the underlying State Law of the State of Louisiana, where the alleged malicious prosecution took place.

K.    The EPA-CID and FBI agents whose conduct is at issue, including Ivan Vikin, Keith Phillips, and Ekko Barnhill were at all relevant times "investigative or law enforcement officers" within the meaning of 28 U.S.C. §2680(h), and were employees of the United States Government, acting within the scope of their offices and employment.

L.    Hubert Vidrine was indicted and prosecuted for violating 42 U.S.C. § 6928(d)(2) between June 17, 1996 and September 5, 1996, in his capacity as refinery manager of Canal Refinery in Church Point, Louisiana, for knowingly storing hazardous waste, described as "an oily like" waste material contaminated with chlorinated solvents, in Tank 402 at Canal Refinery, without a Federal or State permit to store, treat, or dispose of hazardous waste under specified federal and state statutes and regulations.

M.    With respect to those charges, there is no genuine issue that the following material facts were true between the dates alleged in the indictment:

4

       1.      Mr. Vidrine was performing the role of refinery manager.

       2.      Canal Refinery was located in Church Point, Louisiana.

       3.      Canal did not have a permit to store or process "hazardous waste."

N.      The government moved to dismiss all charges [in the underlying criminal matter] in September, 2003.  The court [Judge Tucker Melancon] granted the Motion.

O.      The Parties at trial will not ask any government witness to confirm or deny whether any individual served as a confidential witness or informant during the Environmental Protection Agency's and the Federal Bureau of Investigation's investigation of plaintiff Hubert Vidrine.

[Doc. 244, pp. 16-18]

**IV.    Applicable Law**

    **A.    Federal Tort Claims Act**

"As the sovereign, the United States is immune from suit unless, and only to the extent that, it has consented to be sued." Truman v. United States, 26 F.3d 592, 594 (5th Cir.1994)(citing Fed. Deposit Ins. Corp. v. Meyer, 510 U.S. 471 (1994)).  One of the vehicles by which the United States has waived its sovereign immunity is the Federal Torts Claims Act.  Williamson v. U.S. Dept. of Agriculture, 815 F.2d 368, 374 (5th Cir. 1987).  Through the FTCA, the United States has consented to suits "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his [or her] office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

One notable exception to the FTCA is the "intentional tort" exception, which excludes from the FTCA "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious

prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h). Although the FTCA contains an "intentional tort" exception (which excludes from the FTCA "[a]ny claim arising out of . . . malicious prosecution . . ."), that same provision then waives sovereign immunity for certain intentional torts, including malicious prosecution, committed by "investigative or law enforcement officers of the United States Government."  28 U.S.C. § 2680(h); *see also* <u>Castro v. U.S.</u>, 560 F.3d 381, 386 (5th Cir. 2009). "'[I]nvestigative or law enforcement officer' means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violation of Federal law." <u>Id.</u>[4]

As noted, "[s]tate substantive law applies in suits brought under the FTCA, . . . and we apply the law of the state in which the suit arises . . . ." <u>Cleveland ex rel. Cleveland v. U.S.</u>, 457 F.3d 397, 403 (5th Cir. 2006); *see also*  28 U.S.C. § 1346(b)(1), *supra*.  However, certain categories of damages are prohibited under the FTCA, regardless of whether or not they are recoverable pursuant to state law.  *See* 28 U.S.C. § 2674 ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.")

## B.    Malicious Prosecution

Louisiana recognizes a civil cause of action, "based on fault under C.C. 2315, in favor of one

---

[4]"[P]rosecuting attorneys are not 'law enforcement officers' within the meaning of this section." <u>Vander Zee v. Reno</u>, 100 F.3d 952, *4, n.2 (5th Cir. 1996)(unpublished)(citing <u>Bernard v. United States</u>, 25 F.3d 98, 104 (2nd Cir. 1994); <u>Ware v. United States</u>, 838 F.Supp. 1561, 1563-64 (M.D.Fla. 1993); <u>Dirienzo v. United States</u>, 690 F.Supp. 1149, 1158, n.8 (D.Conn. 1988)).  No claim is before the Court for any alleged conduct of the "prosecuting attorney, i.e. the AUSA who handled the criminal prosecution.  Rather the claims alleging conduct of the EPA agent[s] and FBI agent involved in the criminal matter form the basis of plaintiffs' claims.

'whose liberty has been interfered with in an unwarranted manner'"; stated more simply, Louisiana

recognizes the tort of "malicious prosecution." Jones v. Soileau, 448 So.2d 1268, 1271 (La. 1984).

> "Like any other delict under C.C. 2315, such an 'interference' must be based on fault
> of the defendant which causes the damage complained of in order for the plaintiff to
> recover." Id. The elements for a claim of malicious prosecution pursuant to Louisiana
> law are as follows: (1) the commencement or continuance of an original criminal or
> civil judicial proceeding[5]; (2) its legal causation by the present defendant in the
> original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4)
> the absence of probable cause for such proceeding; (5) the presence of malice therein;
> and (6) damage conforming to legal standards resulting to plaintiff."

Jones v. Soileau, 448 So.2d 1268, 1271 (La. 1984); see also Miller v. East Baton Rouge Parish

Sheriff's Department, 511 So.2d 446, 452 (La.1987). As noted, at the pre-trial conference, all

counsel stipulated elements 1-3 are met, leaving only elements (4) the absence of probable cause for

the criminal proceeding, (5) the presence of malice, and (6) damages. [Doc. 249, p.1]

Pursuant to Louisiana law, a grand jury is to indict an individual when the jurors find that the

evidence would justify a conviction absent an explanation or contradiction. La.C.Crim. Proc. Art

443. This has been cited as a "more stringent" standard, which requires "stronger proof" than a

finding of probable cause for arrest. State v. Huff, 392 So.2d 1046 (La. 1980).

The Louisiana Supreme has defined probable cause for arrest, in the context of a malicious

prosecution case, as follows:

---

[5]Louisiana is among the few states in which the tort of "malicious prosecution" encompasses the
commencement *or continuation* of a prosecution, whereas the majority of states recognize claims for
malicious prosecution premised solely upon the *commencement* of a prosecution, terminating with the
indictment. *See* e.g. Parks v. Winnfield Life Ins. Co., 336 So.2d 1021, 1029 (La. 3rd Cir.
1976)("Defendants also argue that a malicious prosecution action cannot be maintained against them
after an indictment has been returned against the plaintiff. There is no merit in this argument. By raising
the issue of the grand jury indictment, defendants are simply attempting to prove that there was probable
cause to institute the proceedings. A grand jury indictment is not conclusive evidence of probable cause
and any presumption which may arise as a result of it can be rebutted by proof that the indictment was
obtained by false testimony or by proof that defendants failed to make a full and complete statement of
the facts to the grand jury"); Knapper v. Connick, 668 So.2d 465, 468 (La. 4th Cir. 1996), *rev'd on other
grounds* ("Our courts have rejected a presumption of probable cause based upon indictment").

>    Probable cause for arrest exists when facts and circumstances within the knowledge
>    of the arresting officer and of which he has reasonable and trustworthy information
>    are sufficient to justify a man of average caution in the belief that the person to be
>    arrested has committed or is committing an offense.
>
>    The appearances must be such as to lead a reasonable person to set the
>    criminal process in motion; unfounded suspicion and conjecture [sic] will not suffice.
>    Verification may be required to establish probable cause where the source of the
>    information seems unworthy, or where further information about a serious charge
>    would be readily available. The reputation of the accused, his opportunity to offer
>    explanation, and the need for prompt action, if any, are all factors in determining
>    whether unverified information furnishes probable cause.

Miller v. East Baton Rouge Parish Sheriff's Dept., 511 So.2d 446, 452 (La. 1987)(citations omitted).

The crucial determination for determining probable cause is whether the investigative or law

enforcement officers "had an honest and reasonable belief in the guilt of [the accused] at the time

[they] pressed charges." Jones at 1272 (citations omitted); *see also* Smith v. State Through Dept.

of Admin, 694 So.2d 1184, 1188 (La. 1st Cor. 1997).  "In applying these principles, a court may take

into account events subsequent to the filing of the criminal charge.  These are, however, simply

additional pieces of evidence which comprise the entirety of the circumstances which it is the court's

duty to review." Jones at 1272.

>    With regard to malice, Louisiana courts have stated:
>
>    [M]alice does not submit readily to definition. . . .  Any feeling of hatred, animosity,
>    or ill will toward the plaintiff, of course, amounts to malice. But it is not essential to
>    prove such ill will. Malice is found when the defendant uses the prosecution for the
>    purpose of obtaining any private advantage, for instance, as a means to extort money,
>    to collect a debt, to recover property, to compel performance of a contract, to "tie up
>    the mouths" of witnesses in another action, or as an experiment to discover who
>    might have committed the crime. Malice may be inferred from the lack of probable
>    cause or inferred from a finding that the defendant acted in reckless disregard of the
>    other person's rights.

Miller at 453 (citations omitted).

Of importance to this matter, Louisiana jurisprudence provides that when charges against an individual are dismissed "prior to trial, lack of probable cause and malice are presumed and the burden is on the defendant to prove he acted with probable cause and without malice." <u>Zerbe v. Town of Carencro</u>, 884 So.2d 1224, 1231 (La. 3rd Cir. 2004).[6]  In this matter, all counsel agree under the facts, the presumption operates and the government has the burden of showing it acted on probable cause and without malice.

Finally, pursuant to Louisiana law, "Damages are "presumed when the other five elements are established." <u>Jones</u> at 1273; *see also* <u>Cleveland</u>, 457 F.3d at 403; 28 U.S.C. § 1346(b)(1); 28 U.S.C. § 2647.

### C.    Law Applicable to the Underlying Criminal Proceeding

The Indictment issued against Mr. Vidrine in the criminal proceeding alleged in pertinent part as follows:

> Between on or about approximately June 17, 1996, and on or about September 5, 1996, in the Western District of Louisiana and elsewhere, HUBERT PAUL VIDRINE, JR., defendant herein in his capacity as refinery manager for "Canal" at Church Point, Louisiana, did knowingly store hazardous waste, namely an oily like waste material contaminated with chlorinated solvents, including but not limited to, Chloroform, 1,2- Dichloroethane, Carbon Tetrachloride, and Tetrachloroethene, at storage Tank 402 on the property of "Canal" at Church Point, Louisiana, a location facility which did not have a Federal or a State permit to store, treat, or dispose of hazardous waste under Title 42, United States code, Sections 6925 or 6926.
>
> All in violation of Title 42, United States Code, Section 6928(d)(2). [42 U.S.C. § 6928(d)(2)].

---

[6]*See also* <u>Hope v. City of Shreveport</u>, 862 So.2d 1139, 1143 (2nd Cir. 2003) (quoting <u>Robinson v. Rhodes</u>, 300 So.2d 249, 251 (La. 2nd Cir. 1974)("the rule that where a committing magistrate, without a trial, has discharged the accused, or the prosecuting officer has dismissed the charge, or where a grand jury has returned a no bill, there is a presumption of want of probable cause with the result that, in a suit for malicious prosecution based on that discharge, the burden of showing that he acted on probable cause and without malice is upon the defendant."); <u>Keppard v. AFC Enterprises, Inc.</u>, 802 So.2d 959 (La. 4th Cir. 2001).

According to the Government's Response in Partial Opposition to Motion for Bill of Particulars:

> Between on or about approximately June 17th 1996, and September 5th 1996, defendants herein, **Trinity Marine Baton Rouge, Inc. and Frederick E. McKenzie**[7], did knowingly transport and cause the transportation of hazardous waste solvents without a uniform hazardous waste manifest to an unpermitted facility and defendant, **Hubert Paul Vidrine, Jr., did knowingly store** or caused to be stored hazardous waste at the Canal Refinery facility, Church Point, Louisiana, **on the following dates: 8/13/96; 8/14/96; 8/16/96; 8/16/96; 8/20/96; 8/23/96; 8/26/96; 8/26/96; 8/29/96; 8/29/96; 8/30/96; 8/31/96; 9/3/96; 9/4/96**. (Emphasis added)

[Pl. Ex. 024, at 666][8]  Thus, according to the government, the alleged criminal conduct *of Hubert Vidrine*, for which he was indicted began on **August 13,1996** and continued to September 4, 1996.

[Pl. Ex. 024, at 666]

> **Title 42, United States Code, Section 6928** provides in pertinent part as follows:
> . . . .
>
> (d) Criminal penalties
>
> Any person who--
>
> . . . .
>
> > (2) knowingly treats, stores, or disposes of any hazardous waste identified or listed under this subchapter--
> >
> > > (A) without a permit . . .

---

[7]McKenzie was the manager of the barge cleaning operation for Trinity. [P023 at 649; D64 at USA1016] McKenzie was indicted, along with Trinity and Vidrine; all charges against McKenzie and Trinity were, also, dismissed.

[8]Trinity is a barge cleaning operation that accepts and collects used oil from generators of used oil in the marine transportation industry.  Trinity then stores the used oil until it accumulates enough to sell a load to a buyer, and the buyer will then process or re-refine the used oil. [P023 at 649-49; testimony of Romanowsky].  According to the Indictment, Canal's business involved re-refining used oil and alternative feedstock into gasoline, kerosine and diesel fuel. [P023 at 647] Canal Refinery was not indicted; Trinity was indicted with Hubert Vidrine and all charges against Trinity Marine, also, were dismissed.

shall, upon conviction, be subject to a fine of not more than $50,000 for each day of violation, or imprisonment not to exceed two years (five years in the case of a violation of paragraph (1) or (2)), or both.[9]

Stated more simply, Mr. Vidrine was indicted for knowingly storing hazardous waste on the Canal Refinery site without a hazardous waste permit between August 13, 1996 and September 4, 1996. It is undisputed that neither Mr. Vidrine, nor Canal Refinery, had the necessary permit to store hazardous waste during the relevant time frame.  What is particularly relevant in this matter is: (1) whether Mr. Vidrine was storing "hazardous waste" at all, and (2) if so, whether Mr. Vidrine was *knowingly* storing such hazardous waste.[10]

### 1.      Used Oil vs. Hazardous Waste

Complicating this matter somewhat are the RCRA regulations themselves, particularly as they pertain to whether or not the alleged substance, in Canal Refinery Tank 402, was "hazardous waste," as the government argues, or "used oil," as plaintiffs argue, the differing categories invoking different regulations and different statutory application. [11]

---

[9]It should be noted that the statute cited above, 42 U.S.C. § 6928, additionally grants authority to the Administrator to assess civil penalties of up to $25,000 per day, for violations of federal law governing hazardous waste management, *without the requirement of a "knowing" violation*. Id. at 6928(a)-(c).

[10]The term "knowingly," as used in § 6928, is defined as that which "means no more than that the defendant knows factually what he is doing - storing, what is being stored, and that what is being stored factually has the potential for harm to others or the environment, and that he has no permit - and it is not required that he know that there is a regulation which says what he is storing is hazardous under the RCRA." *See e.g.* United States v. Baytank, 934 F.2d 599, 611-613 (5th Cir. 1991).  In other words, mistake of law (*i.e.* ignorance of the regulations) is not a defense to the "knowledge" prong of § 6928; however, mistake of fact is a defense to the knowledge aspect of this crime.  Id. at 612.

[11]The EPA has acknowledged "there are situations where it is difficult to tell if a waste is used oil or a hazardous waste."  50 FR 49164-01, p. 175.  This statement is particularly true in this case, as the evidence suggests an internal debate among EPA employees, as well as a debate between EPA and Louisiana DEQ as to whether or not the material in Tank 402 constituted "used oil" or "hazardous waste."  *See e.g.* P031, pp. 815-817 (correspondence from Sue Brauer, EPA used oil expert, to Keith Phillips); P025 (correspondence between EPA and Louisiana DEQ).  The Court additionally notes there are certain statements made by the EPA in its correspondence to DEQ which seem to ignore or gloss over

> The RCRA is a regulatory statute intended to protect public health and as such, it should be construed to effectuate its regulatory purpose. United States v. Johnson & Towers, Inc., 741 F.2d 662, 666 (3rd Cir.1984). Congress enacted the RCRA, 42 U.S.C. §§ 6901–6991, to regulate the treatment, storage, and disposal of hazardous wastes by monitoring wastes from their creation until their permanent disposal. Matter of Commonwealth Oil Refining Co., 805 F.2d 1175, 1177 (5th Cir.1986). The purpose of the RCRA regulatory scheme is to provide "nationwide protection against the dangers of improper hazardous waste disposal." H.R.Rep. No. 1491, 94th Cong., 2d Sess. 11, reprinted in 1976 U.S.Code Cong. & Admin.News 6238, 6249.

U.S. v. Sellers, 926 F.2d 410, 416, n.2 (5th Cir. 1991).

In 1980, RCRA was amended by **The Used Oil Recycling Act** ("UORA"). The UORA "was intended to increase safe recycling and reuse of used oil." 55 FR 11798-01. The UORA "established that it is in the national interest to recycle used oil in a manner that both protects public health and the environment and conserves energy and materials." Id. Section 7 of the UORA authorized the EPA to regulate recycled oil, *whether or not the Agency classifies such oil as hazardous under subtitle C of RCRA. 42 U.S.C. § 6935(a)*. In 1985, the EPA proposed to list most types of used oil, including recycled used oil, as a hazardous waste. Id. However, the following year, EPA determined it would not list used oil as a hazardous waste, because the EPA "believed that the listing would discourage recycling of used oil and could result in an increase in the amount of used oil that is disposed of or illegally dumped." Id. In 1990, the EPA revised subtitle C of RCRA, subjecting additional wastes to regulatory control, and provided the following summary pertaining to its treatment of used oil:

**Under today's rule, used oil will be regulated as a hazardous waste only:**

---

E.P.A.'s own RCRA regulations.  *See e.g.* P025, p. 673 ("The analytical data of Tank 402 and the tanker trailer support the position that the materials brought to Canal from the facilities identified above, cannot be used as they were intended (a feed stock for diesel) due to contamination. . . . Consequently, the materials have been used . . . ."); *id.*  ("Because the spent or contaminated hydrocarbon and chlorinated mixture was sent to Canal to be used to produce diesel fuel, the material would meet the definition of recycled in 40 C.F.R. 261.2(c)(2)(B); thus establishing the position that the material was discarded.")

**(1) If it exhibits one or more of the hazardous waste characteristics defined in subpart C of 40 CFR part 261 (including the TC as finalized today) _and_ (2) if it is disposed of (rather that recycled). On the other hand, used oil that exhibits one or more of the hazardous waste characteristics and is recycled is exempt from regulation. . . .**

55 FR 11798-01 (emphasis added) (a distinction that is quite relevant to the arguments presented to this Court).  In 1992, the EPA stated, *"The regulations in part 279 ["Standards for the Management of Used Oil"] apply to all used oils, regardless of whether or not they exhibit a hazardous waste characteristic."*  57 F.R. 41566-01 (emphasis added).  In part, this is because the EPA has found, on multiple occasions, *"that used oil is frequently found to contain hazardous halogenated spent solvents."*  50 F.R. 49164-01 (emphasis added), p. 175; *see also* Id. at 176 ("Since hazardous halogenated compounds - many of them hazardous waste - are frequently found in used oil. . . .")[12]  The EPA further declared Part 279 *"cover[s] all used oil handlers and all types of used oils."*  Id.(emphasis added).  Furthermore, the *"EPA presumes that all used oils are recyclable either as a fuel or a feedstock."*  Id. (emphasis added).

RCRA, itself, defines "**hazardous waste**" (as pertinent to the issues before this Court) as follows:

(a) A solid waste[13], as defined in § 261.2, is a hazardous waste if:

(1) It is not excluded from regulation as a hazardous waste under § 261.4(b); and

---

[12]It is undisputed Canal Refinery, at which Hubert Vidrine was manager, was in the business of re-refining used oil into diesel fuel.

[13]The statute defines solid waste as "Any garbage, refuse, sludge . . . *and other discarded material*, *including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities. . . ."*  42 U.S.C. § 6903(27)(emphasis added).  "A solid waste is any *discarded material* that is not excluded [under Part 261]."  40 C.F.R. § 261.2 (emphasis added).

(2) It meets any of the following criteria:

(I) It **exhibits any of the characteristics of hazardous waste** identified in subpart C of this part. However, any mixture of a waste from the extraction, beneficiation, and processing of ores and minerals excluded under § 261.4(b)(7) and any other solid waste exhibiting a characteristic of hazardous waste under subpart C is a hazardous waste only if it exhibits a characteristic that would not have been exhibited by the excluded waste alone if such mixture had not occurred, or if it continues to exhibit any of the characteristics exhibited by the non-excluded wastes prior to mixture. Further, for the purposes of applying the Toxicity Characteristic to such mixtures, the mixture is also a hazardous waste if it exceeds the maximum concentration for any contaminant listed in Table 1 to § 261.24 that would not have been exceeded by the excluded waste alone if the mixture had not occurred or if it continues to exceed the maximum concentration for any contaminant exceeded by the nonexempt waste prior to mixture.

. . . .

(v) **Rebuttable presumption for used oil**. Used oil containing more than 1000 ppm total halogens is presumed to be a hazardous waste because it has been mixed with halogenated hazardous waste listed in subpart D of part 261 of this chapter. Persons may rebut this presumption by demonstrating that the used oil does not contain hazardous waste (for example, to show that the used oil does not contain significant concentrations of halogenated hazardous constituents listed in appendix VIII of part 261 of this chapter). . . .

40 C.F.R. § 261.3 (emphasis added)("Definition of hazardous waste,") that same subpart of the

hazardous waste regulations (i.e. Subpart A) goes on to list certain requirements for hazardous

wastes that are to be recycled.  *See* 40 C.F.R. § 261.6.  The same section then states as follows:

**Used oil that is recycled and is also a hazardous waste solely because it exhibits a hazardous characteristic** is not subject to the requirements of parts 260 through 268 of this chapter, but is regulated under part 279 ["Standards for the Management of Used Oil"] of this chapter. Used oil that is recycled includes any used oil which is reused, following its original use, for any purpose (including the purpose for which the oil was originally used). Such term includes, but is not limited to, oil which is re-refined, reclaimed, burned for energy recovery, or reprocessed.

14

40 C.F.R. § 261.6(a)(4) (emphasis added).

As the Fifth Circuit has explained, "In general, part 279 governs the transportation and management of used oil and used oil residue." Canal Barge Co. v. Torco Oil Co., 220 F.3d 370, 378 (5ᵗʰ Cir.2000). "It excludes used oil that is to be used for energy recovery and certain other purposes from the hazardous waste regulations of part 261." Id. (citing § 279.10). **If used oil is intended for energy recovery, it is regulated by Part 279.  If, however, used oil is solid hazardous waste, it is regulated by Part 261**. Canal Barge at 378. "Solid waste may include discarded material, which is material that has often been abandoned." Id. (citing § 261.2).  If a solid waste contains certain characteristics set forth in § 261.3, it is deemed hazardous waste.  Id. (explaining, "For example, solid waste that contains a certain level of contaminants, such as a benzene level greater than .5 ppm, constitutes hazardous waste. See id. § 261.24.")[14]

**"Used oil"** is defined as "any oil that has been refined from crude oil, or any synthetic oil, that has been used and as a result of such use is contaminated by physical or chemical impurities." 40 C.F.R. § 279.1; see also 42 U.S.C.A. § 6903.[15]  Consequently, by definition "used oil is contaminated by physical or chemical impurities."  **Part 279** provides in pertinent part:

This section identifies those materials which are subject to regulation as used oil

---

[14]In Canal Barge, the Fifth Circuit upheld the trial court's finding that a sludge product that remained on a tank barge was hazardous solid waste, rather than used oil subject to the regulations found at part 279, **where the material had been discarded or abandoned,** the material was solid, and the material was hazardous due to its benzene level.  Id. at 378 (emphasis added); see also U.S. v. Sims Bros. Const., Inc. 277, F.3d 734 (5ᵗʰ Cir. 2001)(canisters of methyl bromide discovered on property where grocery store was to be built, which had been left by the person owning the property prior to the person who sold the property to the grocery store owner, were hazardous waste, as they were "waste" when grocery store owner purchased the property.)

[15]"The term 'recycled oil' means any used oil which is reused, following its original use, for any purpose (including the purpose for which the oil was originally used.)  Such term includes oil which is re-refined, reclaimed, burned, or reprocessed." 42 U.S.C.A. § 6903.  It is undisputed Canal Refinery was in the business of re-refining used oil.

15

under this part. This section also identifies some materials that are not subject to regulation as used oil under this part, and indicates whether these materials may be subject to regulation as hazardous waste under parts 260 through 266, 268, 270, and 124 of this chapter.

(a) Used oil. EPA presumes that used oil is to be recycled unless a used oil handler [here, such as Canal] disposes of used oil, or sends used oil for disposal [which did not occur]. Except as provided in § 279.11, the regulations of this part apply to used oil, and to materials identified in this section as being subject to regulation as used oil, *whether or not the used oil or material exhibits any characteristics of hazardous waste identified in subpart C of part 261 of this chapter.*

(b) **Mixtures of used oil and hazardous waste–**

   (1) Listed hazardous waste.

   (i) **Mixtures of used oil and hazardous waste that is listed in subpart D of part 261 of this chapter ["Lists of Hazardous Wastes"] are subject to regulation as hazardous waste under parts 260 through 266, 268, 270, and 124 of this chapter, rather than as used oil under this part**.

   (ii) **Rebuttable presumption for used oil. Used oil containing more than 1,000 ppm total halogens is presumed to be a hazardous waste because it has been mixed with halogenated hazardous waste listed in subpart D of part 261 of this chapter. Persons may rebut this presumption by demonstrating that the used oil does not contain hazardous waste (for example, by showing that the used oil does not contain *significant concentrations of* halogenated hazardous constituents listed in appendix VIII of part 261 of this chapter). . . .** [16]

   (2) Characteristic hazardous waste.

   **Mixtures of used oil and hazardous waste** that solely exhibit one or more of the hazardous waste characteristics identified in subpart C of part 261 of this chapter ["Characteristics of Hazardous Waste"] and mixtures of used oil and hazardous waste that is listed in subpart D solely because it exhibits one

---

[16]Of note, this is the same rebuttable presumption contained at 40 C.F.R. 261.3, *infra* at p. 14, and very similar to the rebuttable presumption contained at 40 C.F.R. § 279053, *supra* at pp. 21-22.

or more of the characteristics of hazardous waste identified in subpart C[17] are subject to:

> (i) Except as provided in paragraph (b)(2)(iii) of this section, regulation as hazardous waste under parts 260 through 266, 268, 270, and 124 of this chapter rather than as used oil under this part, if the resultant mixture exhibits any characteristics of hazardous waste identified in subpart C of part 261 of this chapter; or
>
> (ii) Except as specified in § 279.10(b)(2)(iii) regulation as used oil under this part, if the resultant mixture does not exhibit any characteristics of hazardous waste identified under subpart C of part 261 of this chapter.
>
> (iii) Regulation as used oil under this part, if the mixture is of used oil and a waste which is hazardous solely because it exhibits the characteristic of ignitability (e.g., ignitable-only mineral spirits), provided that the resultant mixture does not exhibit the characteristic of ignitability under § 261.21 of this chapter.

40 C.F.R. § 279.10 ("Applicability")(emphasis added).  In other words, although in no way clearly stated by the regulations, it would appear, mixtures of used oil and a listed hazardous waste are regulated as a hazardous waste under Part 260; mixtures of used oil and a characteristic hazardous waste are regulated as a hazardous waste only if they continue (subsequent to mixing) to exhibit one or more of the following characteristics: ignitability, corrosivity, reactivity, and/or toxicity - however, mixtures of used oil and a solid waste that exhibits solely the characteristic of ignitability are regulated as used oil, as long as the mixture does not also exhibit the characteristic of ignitability.

---

[17]Subpart D ("Lists of Hazardous Wastes") requires the Administrator to indicate his basis for listing the classes or types of wastes by employing one or more of the following Hazard Codes: Ignitable Waste (I); Corrosive Waste (C); Reactive Waste (R); Toxicity Characteristic Waste (E); Acute Hazardous Waste (H); Toxic Waste (T).  40 C.F.R. §§ 261.30 - 261.31. Subpart C ("Characteristics of Hazardous Waste") provides that a solid waste is deemed a hazardous waste if it exhibits any of the following characteristics: ignitability, corrosivity, reactivity, toxicity.  40 C.F.R. §§ 261.20 - 261.24. Accordingly, 40 C.F.R. § 279.10(b)(2), *supra*, applies to mixtures of used oil and characteristic hazardous waste, or mixtures of used oil and listed hazardous wastes, provided the listed hazardous waste has been listed on the basis that it is ignitible waste, corrosive waste, reactive waste and/or toxic characteristic waste.

Id.; *see also* June 16, 2011 testimony of Romanowsky.

It must, additionally, be noted that plaintiffs argue (and support with directives issued by the EPA Office of Solid Waste and Emergency Response ("OSWER")) that the term "mixture," as used in the RCRA regulations, *requires an intentional act of mixing, rather than contamination resulting from normal industry practices.*[18]   In other words, plaintiffs therefore argue used oil which contains

_____

[18]*See* Report of Romanowsky, Ex. K (EPA OSWER Directive 9592.1994(08) (Sep. 12, 1994) ("[P]resumption that used oil that contains greater than 1000 ppm total halogens has been mixed with hazardous waste can be successfully rebutted by documenting the source of the halogens i.e., by showing that the halogens are not attributable to intentional mixing of used oil and hazardous waste."); *id.* at Ex. L (EPA OSWER Directive 9592.1994(03) (Apr. 8, 1994) (Person may rebut the presumption "by documenting the source of the halogens i.e., by showing that the halogens are not attributable to intentional mixing."). The Court has found further support for this interpretation as well. *See e.g.* EPA OSWER Directive 9592.1994(10), 1994 WL 903995; 50 F.R. 49614-01, p. 175 ("EPA indicated that there are situations where it is difficult to tell if a waste is used oil or a hazardous waste. The difficulty is in determining whether a used oil was mixed with a hazardous waste, or whether the oil became contaminated during its (the oil's) use. The legislative history of the Used Oil Recycling Act indicates clearly that used oil that is contaminated during use is to be classified as used oil and, if recycled, be subject to regulation under section 3014. See H.R. Rep. No. 96-1415 at 6."); City of Chicago v. Environmental Defense Fund, 511 U.S. 328, 340-41 (1994)(Although discussing a different portion of RCRA, the Supreme Court appears to define mixing, pursuant to RCRA, as an intentional act: "Household waste is regarded as nonhazardous when it is first discarded and, as long as it is not mixed with hazardous waste, it retains that characterization during and after its treatment and disposal. Even though it contains some materials that would be classified as hazardous in other contexts, and even though its treatment may produce a residue that contains a higher concentration of hazardous matter than when the garbage was originally discarded, such waste is regulated as nonhazardous waste under Subtitle D. See ante, at 1590-1591. Thus, an incinerator that burns nothing but household waste might 'generate' tons of hazardous residue, but as a statutory matter it still is deemed to be processing nonhazardous waste and is regulated as a Subtitle D, rather than Subtitle C, facility."); 50 F.R. 49164-01, p.175 ("Thus, under this rule, mixtures of hazardous waste and used oil ordinarily are classified as hazardous waste. It is not always possible, however, to prove—or even to be sure—that such mixing has occurred, particularly when no one has observed the act of mixing."); Id. at 178 ("The rebuttable presumption is not a measure of when regulation is necessary, but a measure of when mixing can be presumed to have occurred. Used oil containing halogens at less than the presumption level could still be regulated as hazardous waste, but the burden would be on EPA to prove that such used oil is a hazardous waste by virtue of mixing with a listed hazardous waste. *See* 50 FR 1692, n. 22. EPA's burden would not automatically be satisfied by showing evidence of halogen levels in the used oil."). *See also* Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 413-14 (1945)("Since this involves an interpretation of a regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt. . . . [T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation. . . . In this case the only problem is to discover the meaning of certain portions of Maximum Price Regulation No. 188. Our only tools, therefore, are the plain words of the regulation and any relevant interpretations of the Administrator.")

a listed hazardous waste, or used oil containing a characteristic hazardous waste, should be regulated as used oil under Part 279, *unless* it can be shown that the hazardous waste was *intentionally mixed* with a hazardous waste, as opposed to having become contaminated during the oil's use.[19]  Under this argued interpretation of the word "mixture," if used oil is contaminated with more than 1000 ppm of a listed hazardous waste, plaintiffs argue, EPA will presume the oil was intentionally mixed with the hazardous waste,[20] but if the oil is contaminated with less that 1000 ppm a different result

_____

[19]Plaintiffs argue it follows then, that if used oil contains less than 1000 ppm of a listed hazardous waste, as did the material in this case, the EPA should have presumed that the oil became contaminated during its use, and, thus, would not be subject to the hazardous waste regulations with which Vidrine was charged, unless there was evidence of intentional mixing.  *See* note 17, *supra*.

[20]When Part 279 was first enacted, the EPA explained that the way it would distinguish used oil from hazardous waste would be through the rebuttable presumption (for a discussion of this presumption and its application and operation see 50 C.F.R. 49164-01):

> We discuss below how we apply the principles for distinguishing between used oil and hazardous waste to: Used oil containing halogenated wastes; used oil containing hazardous waste generated by small quantity generators; and used oil that exhibits a characteristic of hazardous waste.

> 1. Used Oil Containing Halogenated Wastes. Today's rule, like the proposed rule, reiterates the principle found in § 261.3(a)(2) of the existing regulations that a hazardous waste mixed with a solid waste is a hazardous waste. Thus, under this rule, mixtures of hazardous waste and used oil ordinarily are classified as hazardous waste. *It is not always possible, however, to prove—or even to be sure—that such mixing has occurred, particularly when no one has observed the act of mixing. Used oil containing small amounts of hazardous halogenated compounds is an example where there may be uncertainty.*

> *Since hazardous halogenated compounds—many of them hazardous waste—are frequently found in used oil* (see Table 1 in the proposal (50 FR 1686)), the Agency believes (and virtually all commenters agreed) *that a simple, objective test is needed to determine when used oil has been mixed* with hazardous spent halogenated solvents (or other halogenated hazardous waste) *in order to avoid case-by-case confusion as to when mixing has occurred, and to aid in consistent enforcement of the regulation. To this end, EPA proposed, and is adopting today a rebuttable presumption as to when mixing with hazardous wastes has occurred.*

> a. The Rebuttable Presumption: The Standard and Means of Rebuttal. Today's rule establishes a rebuttable presumption that used oil containing more than 1,000 ppm total halogens has been mixed with hazardous spent halogenated solvents (i.e., EPA

Hazardous Waste No's. F001 and F002) or other hazardous halogenated wastes and, therefore, is a hazardous waste under provision of the "mixture rule" of 40 CFR 261.3 (i.e., a mixture of a listed hazardous waste and other material is a hazardous waste unless delisted under provisions of 40 CFR 260.20).

In response to comment that EPA clarify the available means of rebutting this presumption, the final rule states that the presumption can be rebutted by demonstrating to enforcement officials that the oil is not mixed with hazardous waste. *One such approach in making this demonstration is to show that the used oil does not contain significant levels of halogenated hazardous constituents*. See § 266.40(c). *Thus, the presumption can be rebutted successfully even if some hazardous halogenated compounds are present in the oil*. We believe that oil containing less than on the order of 100 ppm of any individual hazardous halogenated compound listed as a hazardous spent solvent (i.e., EPA Hazardous Waste Numbers F001 and F002) should not be presumed to be mixed with spent solvent. [The material in Tank 402 contained less than 200 ppm total halogens at every level tested.  P039 at 1348.]  As the Agency stated at proposal (50 FR 1691) and as confirmed by a number of comments, when these compounds are present at such low levels, it is difficult or impossible to pinpoint the source of the contamination. Such low levels found at the generator's site certainly do not indicate deliberate mixing with solvents. Both used oil and hazardous halogenated solvents are frequently generated by the same facility, and some incidental contamination is probably inevitable. *It should be noted that burning used oil with such levels of solvent will not pose significant risk from emissions of either incompletely burned solvents or hydrochloric acid*.

. . . .

3. Used Oil that Exhibits a Characteristic of Hazardous Waste. Used oil itself might be a hazardous waste if it exhibits a characteristic of hazardous waste. The most likely possibility is ignitability. As discussed at proposal (see 50 FR at 1693), EPA intends that used oil that is a hazardous waste solely because it exhibits a characteristic of hazardous waste be regulated as used oil fuel (where so recycled), provided that it is not mixed with a hazardous waste. Ignitable used oil is regulated as used oil under today's rule and is prohibited from burning in nonindustrial boilers when its flash point is less than that of commercial fuel (i.e., 100 °F).

. . . .

Commenters asked whether used oil known to be mixed with a characteristic hazardous waste is regulated as used oil fuel or hazardous waste fuel if the mixture exhibits a characteristic. As discussed above, used oil mixed with hazardous waste is regulated as hazardous waste fuel.[FN52] It is only when we are uncertain that mixing has occurred that we give the benefit of doubt (e.g., low flash point used oil and used oil containing less than 1000 ppm total halogens) and do not presume that mixing has occurred. Thus, when used oil has been mixed with a characteristic hazardous waste, the mixture is regulated as hazardous waste fuel if it continues to exhibit a characteristic. If the resultant mixture no longer exhibits a characteristic of hazardous waste, it is regulated as

20

should flow.  Id. at § 279.10(b)(1)(ii).

The government argues, in essence, the used oil did not become contaminated during its "use", but rather, it became contaminated during its storage at Trinity Marine, as the result of poor housekeeping at that barge cleaning facility.  Under those circumstances, the government argues, the argued rebuttable presumption, either does not apply at all, as other regulations apply, or it has been shown "mixing" - with the, disputed, requisite degree of intent or purpose - occurred at Trinity sufficient to justify the application of the statue with which Vidrine was indicted.  Again, plaintiff, on the other hand, argues the presumption does apply and no samples showed over 1000 ppm of halogens, and thus, Vidrine should not have, if for no other reason than this, been indicted.

It should be noted, the rebuttable presumption for used oil is additionally incorporated by reference in Subpart F of Part 279, which addresses **Standards for Used Oil Processors and Re-Refiners**, and states as follows:

> (a) To ensure that used oil managed at a processing/re-refining facility is not hazardous waste under the rebuttable presumption of § 279.10(b)(1)(ii), **the owner or operator of a used oil processing/re-refining facility must determine whether the total halogen content of used oil managed at the facility is above or below 1,000 ppm**.
>
> (b) **The owner or operator must make this determination by**:[21]

---

used oil.[FN53] This is merely a statement of the "mixture rule" in § 261.3.

> FN53 It should be noted that mixing a characteristic hazardous waste with another material to render the waste nonhazardous constitutes treatment of hazardous waste subject to applicable standards under 40 CFR Parts 264-265 and 270, and the notification requirements of section 3010 of RCRA.

50 FR 49164-01 (footnotes omitted).

[21]The government argues Hubert Vidrine, as manager at Canal, did not make that determination and, thus, stands at risk under the applicable law; plaintiff, Hubert Vidrine argues notwithstanding any alleged failure to test for halogens, the facts establish the material for which he was indicted, which was

(1) Testing the used oil; or

(2) Applying knowledge of the halogen content of the used oil in light of the materials or processes used.

(c) **If the used oil contains greater than or equal to 1,000 ppm total halogens, it is presumed to be a hazardous waste because it has been mixed with halogenated hazardous waste listed in subpart D of part 261 of this chapter. The owner or operator may rebut the presumption by demonstrating that the used oil does not contain hazardous waste (for example, by showing that the used oil does not contain significant concentrations of halogenated hazardous constituents listed in appendix VIII of part 261 of this chapter). . . .**

40 C.F.R. § 279.53 (emphasis added).

As complex and unclear as the drafting and interplay of these regulations may appear, as will be discussed below, the issue at hand in not truly governed by these regulations.

### 2.    Civil vs. Criminal Law

First, it should be noted civil violations could have been pursued under the civil enforcement division of the EPA or Louisiana DEQ.  However, the government chose <u>not</u> to pursue civil penalties against Canal Refinery, but rather, chose to criminally prosecute Hubert Vidrine, the manager at Canal Refinery, ***which requires knowledge on his part*** – the civil penalties do not require knowledge.  As the law clarifies, this requisite knowledge, is *factual* knowledge; a mistake of or ignorance *of the law* not being a defense to a criminal prosecution under this statute.  It is this pivotal *legal distinction* that defines the inquiry before this Court.  Consequently, whether or not the used oil provisions or the hazardous waste provisions would have applied in Hubert Vidrine's criminal case is not determinative to the inquiry before *this* Court.  Whether or not Hubert Vidrine *might have, erroneously or not, believed* the used oil regulations with their 1000 ppm presumption applied

actually sampled and tested by the EPA, was, in fact, far under the 1000 ppm threshold, thus, he is proven not to be at risk.

or not, is not determinative of the issue before this Court: the jurisprudence is clear mistake *of law*, is not a defense; *a mistake of fact*, or ignorance of fact, could be a defense to the criminal proceedings.[22]

Consequently, the true threshold inquiry before this Court *is a factual one*; i.e., did Hubert Vidrine <u>knowingly</u> store material that could be found to be hazardous waste, *under either set of regulations*. Hubert Vidrine argues he did not, and further argues the government bears the burden of proof on this issue, and the government cannot carry its burden to show he did. The government argues Hubert Vidrine did know, or should be found to have known, as he engaged in "deliberate ignorance," a legal nuance the government argues could have been employed to find probable cause within the criminal context.

## VI.    Findings of Fact

At the outset, this Court notes determining the facts in this case has been complicated by conflicting testimony and the absence of a certain key witness upon whom the government relied in plaintiff's underlying criminal prosecution.[23]  The Court's findings of fact are based upon a careful consideration of the various testifying witnesses' credibility, the extensive documentary evidence placed into the record, the degree to which the latter corroborated the former, and the reasonable inferences drawn from the established facts.

---

[22]Plaintiff argues the government cannot carry their burden to show Hubert Vidrine had knowledge or sufficient knowledge under the applicable law, that he was storing a "mixture," or storing hazardous waste, that is, that he was receiving and storing anything other than used oil, and used oil that was to be re-refined, and, thus, the oil had never been abandoned or disposed of or a "waste." Hence, the hard fought debate as to which regulations actually would be found to apply to the facts in this case, although, perhaps relevant as to malice, is not controlling as to probable cause, if the government cannot lift the matter beyond a possible civil violation on Canal Refinery's part, into the criminal realm of a "knowing" storing of oil which poses the requisite risk as determined by the policy choices made and illustrated within the history of the applicable regulations, as previously discussed above.

[23]Mike Franklin, who allegedly provided key information to the government is deceased.

As already noted, all agree the government bears the burden to overcome the presumption that  probable cause was lacking, as well as the inference of malice, and depending on the findings of this Court on those two prongs, an additional presumption as to damages might or might not apply.

Consequently, this Court will first turn its attention to the first prong, the applicable presumption that probable cause did not exist in this matter.

### A.      Probable Cause

As all parties agree a presumption exists in this matter that there was a "lack of probable cause," which the government must overcome[24], therefore, the question before this Court becomes what evidence, if any, has the government put forth to establish the existence of probable cause as to the particular crime for which Hubert Vidrine was indicted.

The allegations contained in the Indictment regarding Mr. Vidrine are found in Count III. Count III alleges (as quoted earlier) that from June 17, 1996 to Sept. 5, 1996, Mr. Vidrine:

> [D]id knowingly store hazardous waste, namely oily like waste material contaminated with chlorinated solvents, including, but not limited to Chloroform, 1, 2-Dichloroethane, Carbon Tetrachloride and Tetrachlorethane, at storage Tank 402 and on property of Canal, which did not have a federal or state permit to store . . . hazardous waste under Title 42, U.S.C. § 6925 or 6926.

> All in violation of 42 U.S.C. 6928(d)(2), Title 30, La. R.S. 2183(F)(1).[25]

However, by way of the "Partial Response to Motion for Bill of Particulars," the government provided further specificity of the charges against Vidrine:

(a.)      **Between on or about approximately June 17th, 1996 and September 5th, 1996**, defendants herein, **Trinity Marine** Baton Rouge, Inc. and Frederick

---

[24]Zerbe, 884 at 1231.

[25]P023 at 652-53

E. McKenzie, **did knowingly transport and cause the transportation of hazardous waste solvents without a uniform waste manifest to an unpermitted facility** and **defendant,** *Hubert Paul Vidrine, Jr., did knowingly store or caused to be stored hazardous waste at the Canal Refinery facility, Church Point, Louisiana, on the following dates: 8/13/96; 8/14/96; 8/16/96; 8/16/96; 8/20/96; 8/23/96; 8/26/96; 8/26/96; 8/28/96; 8/29/96; 8/29/96; 8/30/96; 8/31/96; 9/3/96; 9/4/96.*

. . . .

(f.)    . . . The **process generating chlorinated solvents as solid waste was Trinity's barge cleaning operation**.  These chlorinated solvents are discarded commercial chemical products **no longer useful for their original intended purposes**.[26]

Accordingly, in the criminal proceedings, the allegations against Mr. Vidrine were that he knowingly stored hazardous waste (originating from Trinity Marine) at Canal Refinery, without a permit, on the following dates: 8/13/96; 8/14/96; 8/16/96; 8/16/96; 8/20/96; 8/23/96; 8/26/96; 8/26/96; 8/28/96; 8/29/96; 8/29/96; 8/30/96; 8/31/96; 9/3/96; 9/4/96.

At the civil trial before this Court, the determination of whether or not probable cause existed to indict Hubert Vidrine revolved around two issues: (1) whether or not the material Vidrine stored was properly characterized by the government as "hazardous waste"; and (2) if the material was hazardous waste, was there probable cause to believe Hubert Vidrine had *knowingly* stored such hazardous waste.

_____

[26]Exhibit P024 at 666, 667 (emphasis added). As noted by the government in Section I of its Bill of Particulars:

> The purpose of a Bill of Particulars is to inform the defendant of the charges against him with sufficient precision to enable him to prepare a defense, to avoid or minimize the danger of unfair surprise at trial, and to enable him to plead double jeopardy in the event of a subsequent prosecution for the same offense. Wong Tai v. United States, 273 U.S. 77 (1927); United States v. Perez, 489 F.2d 51, 70-71 (5th Cir. 1973).

Id. (emphasis added).

### 1. Whether the material stored in Canal Refinery's Tank 402 constituted hazardous waste.

Both plaintiffs and defendant devoted much argument to the debate over which portion of the RCRA regulations applied in the criminal context.  As will be discussed, Antifreeze Inc., and its owner John Broussard - with whom Canal and Trinity had done business around the time of the events contained in the Indictment against Mr. Vidrine, *et al* - were indicted and convicted of crimes involving hazardous waste, which were wholly unrelated to the charges contained in the Indictment issued against Mr. Vidrine, Mr. McKenzie, and Trinity Marine.  At trial before this Court, the government argued Broussard, i.e. Antifreeze, Inc., was, in effect, laundering hazardous waste in the following manner: Broussard would receive non-hazardous waste, have it sampled, often provide those clean samples to his customers, and once a customer agreed to purchase the product, Broussard (who presumed, as was customary in this industry, his "regular" customers would not re-sample the product) would then mix hazardous waste into the product prior to delivering it to his customers. However, no evidence was presented at this trial that Trinity Marine engaged in such conduct, a fact the government's own agents admitted during their testimony.[27]

At the trial of this matter, plaintiffs' expert, Peter Romanowsky, whom this Court found credible, testified it was his opinion the hazardous waste regulations relied upon by the government require a purposeful or intentional mixing.  Agent Phillips, utilizing a tortured reading of the regulations and a highly selective application of the facts to the applicable RCRA regulations, in

---

[27]At worst, Trinity was guilty of "poor housekeeping," resulting in an unintentional mixing of a small amount of chlorinated solvents (far less than the 1000 ppm used oil threshold) with its used oil. Furthermore, the indictment against Trinity, charging it, in part, with the transportation of hazardous waste to an unpermitted facility (namely, Canal Refinery), also, was dismissed, and thus, Trinity, like Mr. Vidrine, would be presumed innocent of the charges leveled against it, and the same presumption of a lack of probable cause for the indictment likely would apply.

effect, argued poor housekeeping at Trinity equated to a purposeful mixing and thus, triggered application of the desired regulations.  Of note, even among EPA personnel, as well as between the EPA and the Louisiana Department of Environmental Quality ("DEQ"), there existed an internal debate as to whether or not the material for which Mr. Vidrine was indicted constituted  "hazardous waste," or "used oil,"[28] and thus, which regulations might apply - a debate Agent Phillips, in effect, ignored.

While this Court is of the opinion that that which the government accused Mr. Vidrine of storing should be considered  "used oil" and not "hazardous waste," it need not delve into the morass that is the RCRA regulations further than it already has, because in this matter, for the reasons that follow, the Court finds probable cause did not exist to support *knowledge* on the part of Hubert Vidrine – the lynch pin to any possible criminal prosecution at issue.  For the purposes of this Ruling, it is sufficient to note the question exists, and that the government, who must overcome the presumption that probable cause did not exist, and the presumption that malice did exist, failed to establish that this question of debate, as to the applicable law, was fairly presented by the EPA technical expert and case agent, i.e. Phillips, and later Guy Tidmore, to the Department of Justice (through the Assistant United States Attorney assigned to the case), the grand jury, or even to Agent Phillips' own co-case agent, Agent Barnhill.  This Court finds, for the reasons noted below, Phillips intentionally obscured and manipulated this legal issue.

---

[28]*Compare* P031, pp. 815-817 (correspondence from Sue Brauer, an EPA used oil expert) *with* Phillips testimony on June 7, 2011 at p. 133, to Keith Phillips); P025 (correspondence between EPA and La. DEQ); Trial Tr. Vikin vol. I, 20:11-19, 24-25, 21:1-2, 6-11, 18-23, 22:6-25, 23:1-25, 24:1-4, June 22, 2011.

1.      **Whether Hubert Vidrine _knowingly_ stored the purported hazardous waste.**

The Court will now turn its attention to the pivotal element in the *criminal* prosecution of Hubert Vidrine - knowledge - and whether the government overcame the presumption that probable cause did not exist that Hubert Vidrine *knowingly* stored any purported hazardous waste.[29] "The word 'knowingly,' . . . means that the act was done voluntarily and intentionally, not because of mistake or accident."[30] For the reasons that follow, the Court finds the government did not overcome that presumption, and addresses below the strongest evidence presented by the government on that issue.

a.      **Vikin's investigation**

The government relies heavily on the testimony of Agent Vikin, whom the Court found to be credible and competent, as well as the interviews and investigation he conducted, in support of their showing probable cause existed as to the crime for which Hubert Vidrine was indicted.[31] However, for the reasons that follow, this Court finds that reliance to be misplaced.

---

[29]Again, this Court notes the regulations allow for civil penalties, which include substantial fines, *without the necessity of a knowing violation* of the RCRA regulations.  However, the government did not choose that path, and therefore, knowledge on the part of Hubert Vidrine was a critical element of the criminal prosecution.

[30]Fifth Circuit Pattern Jury Instruction 1.37 - Criminal, 2001 ed.

[31]The one issue undercutting the reliability of Agent Vikin's testimony at trial was his trust in, and reliance upon, the information provided to him by Keith Phillips.  While this is not unexpected - presumably an EPA agent should be able to rely upon information provided to him by another employee of the EPA who is charged with having expertise over that subject matter - unfortunately it did play a role in creating and fostering an environment which allowed a malicious prosecution to continue for almost four years.  Furthermore, once Agent Phillips' interpretation of the RCRA regulations became the subject of debate even among various EPA experts (*i.e.* Sue Brauer, a "used oil" expert for the EPA, and Agent Phillips, a "Technical and Regulatory" expert for the EPA), closer scrutiny should have been applied to Agent Phillips' interpretation of the applicable law, particularly when Agent Vikin testified that at that time, he had a very limited, introductory understanding of the RCRA regulations.  However, this Court, also, notes Agent Vikin exited the scene before then EPA technical and regulatory expert Phillips took over the case as the Agent in Charge.

28

i.      AFI[32]/Broussard

Before discussing the purposes for which the government put forth AFI/Broussard evidence, a bit of background is in order.  Canal Refinery first came onto the EPA's radar during the investigation of AFI and John Broussard.  At trial before this Court, EPA agents testified John Broussard, the owner of AFI, was, in effect, laundering hazardous waste, by mixing hazardous waste with other "clean" products, and thereafter, selling off the mixture represented as the "clean" product.  EPA Agent Ivan Vikin was the lead agent in that investigation.  FBI Agent Ekko Barnhill, then EPA Technical and Regulatory Expert Keith Phillips, and EPA Agent Rick Langlois were also involved in the investigation, including the execution of a search warrant at AFI.[33]

On May 7, 1996, while executing a search warrant at AFI, the government found documentation (namely, bills of lading with designations such as "fuel oil" and "petroleum distillates"), which the government believed indicated Canal had purchased product which was this Broussard hazardous waste mixture, disguised as alternative feedstock ("AFS"), from AFI and John Broussard. Additionally, when the warrant at AFI was executed, a tanker truck was at AFI, being filled with AFI product, and the truck "was destined for Canal Refinery."  Obviously, this piqued the government's interest, as it gave rise to the possibility that Canal was receiving hazardous waste, and perhaps was aware AFI and Broussard were laundering hazardous waste, and therefore, perhaps, Canal was potentially complicit in AFI and Broussard's illicit scheme.[34]

---

[32]Antifreeze, Incorporated, hereinafter referred to as AFI.

[33]AUSA Howard Parker was assigned as the prosecutor to the AFI/Broussard prosecution, as well as the prosecution of Hubert Vidrine.

[34]On October 10, 1996 (approximately one month after the search warrant was executed at Canal), AFI and John Broussard were indicted for environmental crimes, wholly unrelated to this matter. On January 15, 1997, AFI and Broussard pleaded guilty to "transportation of hazardous waste to an unpermitted facility, its transportation without a manifest, and its storage without a permit." U.S. v.

Consequently, on September 1, 1996, Agent Vikin executed a "Case Opening Checklist" on Canal Refining; there is no mention of Hubert Vidrine in that document.  On September 4, 1996, Agent Vikin obtained a search warrant for Canal Refining Company, on the basis that he had "evidence of treatment, storage, and disposal of hazardous waste identified or listed under RCRA, without a permit."[35]  The application for the warrant states that Agent Vikin had "probable cause to believe that Canal and its employees violated RCRA by accepting and receiving hazardous waste without a uniform hazardous waste manifest **from Anti-Freeze Inc. and Tiger Shipyard**."[36]  In the section entitled "Facts Establishing Probable Cause" (within the application  for a search warrant for Canal), Agent Vikin stated that on May 7, 1996, a search warrant was executed **at AFI**.  During the course of the search warrant, as well as during subsequent interviews of AFI employees, agents learned that AFI had sold "material" to Canal, and AFI had made 5 to 10 deliveries of material to Canal, beginning in 1995.[37]  According to the AFI employees, the bills of lading accompanying the shipments of material from AFI to Canal represented the materials as fuel oil.[38]  Agent Vikin further attested, "During the search warrant executed **at AFI**, on May 7 - 10, 1996, a tanker trailer at AFI

---

Broussard, 140 F.3d 1038, *1 (5th Cir. 1998); Minutes of Change of Plea Hearing, U.S. v. Broussard, et al, No. 96-cr-60041 (W.D.La. Jan. 14, 1997), ECF No. 18.

[35]Exhibit D1 at 00001. Counsel for Mr. Vidrine agrees that although the evidence uncovered during the search of AFI gave the government probable cause *to investigate* Canal Refinery, he argues it did not at any time give rise to the existence of probable cause *to indict* Hubert Vidrine.

[36]Id. at 00004 (emphasis added).  At trial, Mr. Vidrine testified that to his knowledge, Canal did not buy any product directly from Tiger Shipyard.  However, Canal may have purchased Tiger product at some point in time through a third party broker.  P.189 June 20, 2011.

[37]Id. at 00008, 00012.

[38]Id. at 00009, 00010, 00013, 00016.

which had been loaded from tank # 14, was destined for Canal as fuel oil.[39]  No hazardous waste

manifest accompanied the tanker."[40] (emphasis added).

On September 5, 1996, the search warrant obtained by Agent Vikin was executed at Canal

Refinery.  Agent Vikin, as lead EPA agent, was in charge of the search; FBI Agent Ekko Barnhill

participated on behalf of the FBI as a cooperating agency, Keith Phillips participated as the EPA's

technical and regulatory agent, and numerous other law enforcement agents and agencies participated

as well.  It was during the execution of the search warrant at Canal, that government agents first

discovered Trinity Marine's connection to Canal.  During execution of the search warrant at Canal,

---

[39]While interviewing AFI employees, Agent Vikin learned tank # 14 was where John Broussard
would store various, unsellable hazardous waste chemicals.  Of note, even had the government been able
to prove at this trial that hazardous waste from AFI went to Canal Refinery, in addition to the fact Mr.
Vidrine was not charged with that crime, this particular incident predates the storage events set forth in
the Bill of Information.  Furthermore, Mr. Vidrine freely admitted at trial that prior to the search at AFI,
Canal did purchase some products from AFI, including not only alternative feedstock, but also, gasoline
additives (*e.g.* ethanol, MTBE, naphtha).  June 20, 2011 at 81-101.  Vidrine suggested that after the
search at AFI, if Canal had bought any product from AFI, Mr. Vidrine did not think it would have been
alternative feedstock, but stated he would have to look at the records to be certain.  Id.  (Counsel for the
government did not produce the records for his review.)

[40]Id. at 00015.  The Affidavit additionally references an incident on August 22, 1996, involving a
leaking tanker truck at a truck stop, which was suspected of carrying and leaking hazardous materials.  Id.
at 00013.  The Louisiana State Police had informed Agent Vikin that "the material was picked up at
Tiger Shipyard by Cooper Gilder Chemical Company and [was] to be delivered to Canal. . . ."  Id.  The
contents of the tanker trailer were listed as "petroleum distillates N.O.S." Id.  Field tests indicated the
leaking material was caustic, and air monitoring conducted with a "halogen meter," indicated "high
levels of halogenated compounds emanating from the tanker trailer." Id. at 00014.  At trial, the
government relied upon this incident, in part, to establish the existence of probable cause as to Hubert
Vidrine.  However, this incident in no way involved material from Trinity, and there is no evidence
Vidrine was aware of the incident.  Furthermore, the evidence presented at trial on this issue - namely,
Agent Vikin's affidavit for a search warrant, as well as his testimony - does not establish the tanker
trailer actually was carrying hazardous material; rather, government officials *believe* it was carrying
hazardous material.  (Agent Vikin testified that his statement in the Affidavit that the tanker truck was
carrying hazardous waste was based on the opinion of Keith Phillips. Testimony of Vikin, vol. II, pp.
173-174, June 23, 2011.)  Of interest, the material contained in the Cooper Guilder tanker trailer was
allowed to return to Tiger Shipyard, and was thereafter offloaded onto a barge - a strange result if indeed
the material was actually hazardous waste which was being improperly handled.  D84; testimony of
Vikin, vol. II, pp. 234-236, June 23, 2011.

a truck, which, according to the government, was carrying "pipeline interface" arrived at the refinery.[41]  Although the driver of the truck was an AFI employee, it was established the material in the truck came exclusively from Trinity Marine, and was brokered by Mel Campbell, and not John Broussard.[42]  (Mr. Campbell was a chemical broker who had some not fully identified business arrangement with Broussard and AFI, not clearly established at trial.  The evidence indicated Broussard and Campbell may have jointly had a trucking company, or Campbell may have leased tanker trucks belonging to AFI and, using an AFI driver, Campbell had the Trinity product transported to Canal.[43]) The material contained in the truck was sampled, and the sample, ultimately, was shown to contain chlorinated solvents/halogens, however, far beneath the 1000 ppm presumptive threshold for used oil.

At trial before this Court (as well as in the underlying grand jury sessions), in an attempt to show the existence of probable cause for the criminal indictment issued against Mr. Vidrine, the government, through, now, Agent Phillips, put forth an abundance of irrelevant, yet prejudicial, evidence relating to AFI and John Broussard.  The government vehemently argued that at some

---

[41] "Pipeline interface" is a mixture of two products, such as gasoline and diesel, resulting from the pipeline company changing the product being conveyed through the pipeline. Ex. D59.  No evidence was presented at trial that Trinity sold, or even possessed, "pipeline interface," and it would seem unlikely considering the nature of Trinity's business.  However, it does appear from the testimony of Agent Vikin that his understanding was that the terms "alternative feedstock" and "pipeline interface" are interchangeable.  Contrarily, in the refinery business, pipeline interface is a type (or subset) of alternative feedstock, which contains little to no sulfur.  Only high sulfur AFS - *i.e.* various AFS other than pipeline interface, such as used oil - were stored in Tank 402 at Canal Refinery.  Thus, it would seem that the material that arrived at Canal, from Trinity, on the day of the search, either was not correctly identified by the government, or was not the material destined for Tank 402.

[42] Exhibit P043 at USA002464.  Although the government suspected Broussard may have mixed his hazardous waste into the load from Trinity on this occasion and others as part of his hazardous waste laundering scheme, at trial, government agents testified no evidence was ever found to corroborate that theory.

[43] Testimony of Vidrine, June 20, 2011 at p. 81.

*unidentified* point in time, Canal *might have received* material from AFI, which the government

believed to be hazardous waste, and yet *Vidrine was at no time indicted for storing material from*

*AFI and/or John Broussard.* Ultimately, the government's suspicion regarding a possible connection

between AFI's criminal activity and Canal Refinery did not bear fruit[44], and the allegations in the

---

[44]Additionally it is noted that even a secondary scenario - that perhaps Broussard was clandestinely mixing hazardous waste into Trinity's product without the knowledge of Canal - did not bear fruit. Agent Phillips testified on this issue as follows:

> Q.  . . . Whiting made it very clear that, when he got that truck every morning, it went straight from Trinity to Canal, and it never went by Anti-Freeze, and no product in any of those deliveries ever got into that truck from Anti-Freeze, right?

> A.  I believe that's what his testimony was.

> Q.  Okay.

> A.  Or record of interview.  Not testimony.

> Q.  Right. And there never was any evidence to the contrary.  So once you checked it out, you found out that everything, just like the Bill of Particulars said, everything in those shipments from August 13th to September 4th was Trinity product, right?

> A.  That's correct.

Phillips testimony, vol V, pp. 868-869, June 13, 2011.

Andrew Hanson, an employee with Trinity Marine, testified that at some point in time, likely the summer of 1996, Trinity made a site inspection at AFI and, thereafter, explicitly prohibited any of its product from stopping at AFI before delivery.  However, to Hanson's knowledge, Trinity's product did not stop at AFI prior to the site inspection.  Ex. D63, pp. 961-965.

Frank Bourque, an employee at AFI, advised Agent Barnhill he recalled two occasions when the AFI tanker did not go directly to Canal from Trinity, but instead stopped at AFI to get "topped off." However, Bourque continued, "John Broussard used *petroleum distillates* to top off the tanker," and Bourque "*did not believe that John Broussard used chlorinated solvents to top off the tanker*," adding, "I see everything put into the tankers", or words to that effect. Exh. D65 at 1021 (emphasis added). Bourque additionally advised he was "not aware of any time when AFI loaded the tanker with any material from AFI prior to the tanker leaving for Trinity to receive a load for Canal," and on the day of the search warrant at Canal, the load from Trinity to Canal did not stop at AFI to be topped off.  Id. at 1021-1022.

Also, the AFI driver who delivered product from Trinity to Canal testified he never stopped at AFI prior to making his deliveries at Canal. [Exh. D16 at 00122]

33

indictment brought against Mr. Vidrine were limited *solely to material received from Trinity Marine, and not AFI*.  This Court notes, notwithstanding the search warrant at Canal having been executed prior to the return of the indictment against AFI, neither Hubert Vidrine nor Canal was named in that indictment.  Had the government believed sufficient evidence existed to indict Hubert Vidrine for matters relating to AFI, it could have made him a co-defendant in the case against Mr. Broussard and AFI, or included such charges in the indictment that ultimately issued against Hubert Vidrine - that did not occur.[45]  Consequently, the Court finds the government's evidence *as to AFI and John Broussard* is in no way relevant *to the existence of probable cause with regard to the crime for which Hubert Vidrine was actually indicted*.[46]

###### ii.    Vidrine's conduct during the interviews conducted on the day of the search warrant

During the execution of the search warrant at Canal, Mr. Vidrine was interviewed by Agent Vikin and then technical and regulatory expert Phillips (as well as Sgt. Chris Viator of the Louisiana State Police) over the course of many hours.[47]  The government argues Mr. Vidrine's conduct during the search warrant, and his changing story as to sampling, as reflected in Agent Vikin's notes and interview summary, as well as Vikin and Phillips' testimony, supports a finding of probable cause

---

[45]In other words, in neither the AFI nor the Vidrine prosecutions, was Vidrine indicted for any transportation, storage, etc. for any AFI or John Broussard material going to Canal, nor was AFI indicted for anything having to do with Canal.

[46]It is additionally noted that nothing on the face of the bills of lading seized at AFI, which the government believed showed sales of product from AFI to Canal, supports a finding of knowledge on the part of Hubert Vidrine, a fact even Agent Phillips conceded during his testimony at trial. Trial Tr. vol. V, pp. 889-891, June 13, 2011.

[47]EPA agents arrived at Canal between 7:30 and 8:30 a.m., and conducted a 3 or 4 hour pre-warrant interview of Mr. Vidrine.  The Agents served the search warrant after lunch, and thereafter interviewed Mr. Vidrine at least two more times.  The agents did not leave the refinery until after 10:00 p.m.  *See e.g.* Vikin, vol. I,  pp. 121-122, June 22, 2011; Vidrine, pp. 114, 115, 129, June 16, 2011.

that Hubert Vidrine knowingly stored hazardous waste.  Vikin's notes and interview summary reflect that during his interview, Mr. Vidrine told agents "every truck" that comes into Canal with pipeline interface is sampled and analyzed for the following constituents: sulfur, distillation properties, flash point, vapor pressure, and chlorinated solvents.  When asked how Canal analyzes for chlorinated solvents, Vidrine stated that draeger tubes were utilized.  According to the government, Vidrine subsequently revised his statement, clarifying that not all tanker trucks destined for Tank #402 were sampled and analyzed; regular suppliers, such as Tidewater America, who were trusted to supply pipeline interface free of chlorinated solvents, were not sampled upon every delivery.[48]  The government argues Vidrine again revised his statement by stating that the analysis of tanker truck samples were not always run immediately; tanker trucks were consistently allowed to unload their contents into Tank #402 prior to analysis. Vidrine stated "nobody in the industry has the man power to hold up a truck and sample/analyze it."[49]  Additionally, Vidrine, also, noted some samples from tanker trucks from various suppliers are composited then analyzed - *i.e.* product from several tankers is mixed together and then sampled.

At trial, Mr. Vidrine testified on this topic as follows:

Q. . . . Isn't it true that on the day of the search warrant you told Agent Vikin that every shipment of product was tested for chlorinated solvents?

A.  No.

---

[48]*See also* Exh. D16, p. 2010FBI00029 (Interview of R. Whiting, AFI truck driver)(Agent Barnhill's memorandum of her interview of Whiting states: "At CANAL, no samples were pulled from the AFI truck prior to the AFI truck off loading product in the CANAL tank. WHITING stated that at times when he, as an AFI tanker driver, trucked products in to CANAL from other facilities besides TRINITY, a sample would be pulled by CANAL prior to the product being off loaded into CANAL tanks.")

[49]Mr. Vidrine testified the testing he was referring to during his interview takes approximately four hours.

Q.  Isn't it true that on the day of the search warrant you told Agent Vikin that once product was pulled from a tanker truck it was walked over to Canal's lab which had two chemists?

       . . . .

WITNESS: I don't recall.

Q.  Do you recall revising your statement by saying that not all tanker trucks destined for Tank 402 were sampled and analyzed?

A.  I don't recall that conversation.  I recall we talked about sampling and what my procedure was for sampling.

Q.  Do you recall telling Agent Vikin that you sampled only trusted vendors?

A.  No, I don't recall that.

Q.   Do you recall admitting to Agent Vikin that tanker trucks were consistently allowed to unload their contents into Tank 402 prior to analysis?

. . . .

A. Those were not my words.  There was something close to that effect but that wasn't  - - I don't believe - - repeat what you said again, because I don't believe - -

Q.  I don't intend to give you the impression that I'm quoting you.  This is not a quote from you.  I'm simply asking, isn't it true that on the day of the search warrant you admitted that tanker trucks were consistently allowed to unload their contents into Tank 402 without testing.

A.   Yes and I'll tell you why.  When a batch is tested, when we buy a batch of product, let's say a compartment of something with several truckloads, we've got samples that are tested, and we know what the product is, and it's already been tested.  We do sample the trucks, the trucks every truck is supposed to be sampled.  Now they are not stopped, in other words, they stop, a sample is taken, bring it to the lab and the truck is allowed to unload.  Then we check the samples.  We don't let the truck sit for hours waiting.  We let them unload while we check to make sure it's consistent with the previous test that we tested of that product.

. . . .

When samples are brought in before we buy the samples, before we buy a product,

that samples is tested for quality control, our quality control specs.[50]

The government, through the testimony of Agents Vikin and Phillips, argues Vidrine's demeanor changed (*i.e.* "as if he felt like a weight came off of him"[51]) during this discussion about testing, leading the government to believe Vidrine had been caught in a deception of some kind. Although this Court found Agent Vikin to be quite credible, and will accept his observation that Vidrine's demeanor shifted at that point, Agent Phillips and Mr. Vidrine's testimony reflected that on the day of the search at Canal, there was a miscommunication between Vidrine and the government agents as to what tests were actually being run at Canal, the substances for which Canal

---

[50]Mr. Vidrine continued:

THE COURT:  **Was the sample from the Trinity material and product that was put into Tank 402 prior to the arrival of the tanker produced in this case, do you know?**

THE WITNESS:  **Yes**.

. . . .

THE COURT:  Then when those tankers arrived **another sample was taken to see if it matched up?**

WITNESS:  That's right, those trucks are sampled.  The product is first sampled and tested and then each truck coming in is then sampled and then the samples are brought to the lab and then spot checked to make sure it's consistent with the original sample that was tested.

THE COURT:  Was this done?

WITNESS:  Yes.

THE COURT:  On every tank load that went into Tank 402 prior to the arrival of the truck that arrived on the day of the search warrant?

WITNESS:  Yes.  Samples were taken from each truck and the main sample of the batch was tested before any of those trucks came in on that batch.

Vidrine testimony, pp. 170-174, June 20, 2011. (emphasis added).

[51]Vikin, vol. II, p. 218, June 23, 2011.

was actually testing, and as to which tests the questions were directed at, at any given time. The miscommunication revolved primarily around the distinction between testing for chlorinated solvents and chlorides.  This confusion, born out of chemistry, short hand references to technical matters, and conflicting understandings of the meanings attached to those references, was evident even within the testimony presented at trial, and thus, is not something which this Court finds is indicative of guilty knowledge or a deliberate attempt to deceive.[52]  Thus, a change in demeanor upon recognition of the miscommunication, during a high stress interrogation, would not be unexpected or clearly indicative of "guilty knowledge" as the government argues.

At the time of the search warrant, as freely admitted by Hubert Vidrine at trial, Canal had not yet begun testing for chlorinated solvents, and the test kits for chlorinated solvents were located in Mr. Vidrine's office. The testing that Mr. Vidrine was describing to the agents, was designed to analyze whether a given product was compatible with Canal's equipment and transformer; the test was not designed to determine whether Canal was in compliance with the regulatory chlorinated compound threshold.[53] At some point during Mr. Vidrine's interviews, Mr. Vidrine realized the officers were asking about chlorinated solvents, whereas he testified he had previously thought the agents were asking about chlorides.[54] Thus, the Court finds the government's reliance on Agent

---

[52]See e.g. Trial Tr. Vikin vol. II, pp. 198-199, 226, June 23, 2011.

[53]See e.g. D46 at 764

[54]See e.g. Vidrine testimony, Day 8, June 16, 2011 (describing how he kept responding to the agents questioning and showing them the results of Canal's chloride tests, but later realized the agents were asking about chlorine tests); Phillips testimony, Day 5, June 13, 2011 ("Q. Do you recall after extensive questioning of Mr. Vidrine about the testing he did for chlorides, as you've said, that finally, do you remember Mr. Vidrine saying, oh, you're not interested in chlorides, are you?  You're interested in chlorines? . . . [T]hen Mr. Vidrine told you, oh, no, we haven't been testing for chlorinated solvents, but we did buy the test kits and they got here and we're getting ready to do it.  Isn't that what happened? A. Yes.") The confusion over the technical terms is further illustrated by the fact that in his notes, Agent Vikin used the shorthand term "Cl⁻" to refer to "chlorinated solvents." "Cl⁻" is the chemical symbol for

Vikin's observation as to the possible change in the demeanor of Hubert Vidrine is misplaced, particularly when an equally plausible deduction is that after an excessively long interview[55], riddled with confusion and miscommunication on technical matters, when Mr. Vidrine finally realized he and the agents were speaking about two different substances, he looked "as if he felt like a weight came off of him."

In sum, the government argues Vidrine "changed his story" during his interview with Vikin and Phillips, which supports the government's showing of probable cause as to Vidrine's knowledge. However, *the government's own agent, upon whom the government now relies*, who had full knowledge of that which occurred during the interviews with Hubert Vidrine, testified, and his chronology reflects, *that notwithstanding Vidrine's conduct and/or statements during the interviews, he (Agent Vikin) did not feel he had sufficient evidence to refer Vidrine to the Department of Justice for prosecution*. **Agent Vikin did not open a case file on Vidrine after the Canal search; he did not refer Hubert Vidrine to the AUSA when he referred Canal for prosecution[56], and when**

_____

"chloride" - the substance Vidrine originally thought the agents were questioning him about. *See e.g.* Ex. D86 at USA003292; testimony of Vikin. Additionally, it should be noted Mr. Vidrine speaks with a very thick Cajun accent, is hard of hearing, and had had little or no sleep the night prior to the search warrant (which lasted over 14 hours), as he was caring for his son who was suffering with kidney stones, as corroborated by Agent Philips when he testified before the grand jury on July 14, 1999 [P033, p. 883].

[55]Agent Langlois (who has been a Resident Agent in Charge with the EPA, a Special Agent in Charge over a multi-state area, a Super-Special Agent in Charge over an eight state area, and a Professor of Criminology, Homeland Security and Public Safety) testified that pursuant to his training, an interview should not last longer than a couple of hours. He further testified that an interview lasting several hours, spread out over the course of a fourteen hour day, when the person being interviewed had not slept the night before, would not only be ill-advised, but he likely would not have condoned such conduct. Langlois, pp. 89-90, June 17, 2011.

[56]On December 18, 1996 (approximately three months after execution of the search warrant at Canal), the EPA, through Agent Vikin, requested "prosecutorial assistance" in the Canal case as to Canal, but not for Hubert Vidrine.

asked why not, he candidly answered, "...I did not have evidence to prove that."[57] This Court agrees.

### iii.    Conclusion of Vikin's Investigation

In August of 1998, after handling the ongoing investigation for almost two years, Agent Vikin was promoted and transferred to North Carolina.  Agent Vikin testified that during the majority of his supervision of the investigation, his focus was on AFI, and following "the AFI thread" to determine what entities had potentially accepted hazardous waste from AFI - his focus was not on Hubert Vidrine or Trinity Marine.[58]   All the facts relied upon by Agent Vikin to obtain the search warrant for Canal related to AFI and Tiger Shipyard.  The referral letter prepared by Agent Vikin, requesting prosecutorial assistance, contains no mention of Hubert Vidrine. **Agent Vikin testified that at the time he left his Louisiana duty station, he did not believe there was sufficient evidence to open a case file on Hubert Vidrine individually, or to refer Hubert Vidrine to the AUSA for prosecution**.[59]   Thus, the government's reliance of Agent Vikin's testimony to establish the existence of probable cause as to Hubert Vidrine for the crime for which he was indicted, this Court finds, is misplaced.

### b.    Langlois' investigation

In August of 1998, after Agent Vikin was transferred to North Carolina, the ongoing investigation was temporarily assigned to EPA Resident Agent in Charge Ricky Langlois.  The Court

---

[57]Trial Tr. Vikin vol. II, 253:20, June 23, 2011.

[58]*See e.g.* Trial Tr. Vikin vol. II, p.182, June 23, 2011.

[59]Trial Tr. Vikin vol. I, 109:18-19, June 22, 2011 (Specifically, Agent Vikin testified at the time he left his Louisiana duty station, "I just didn't have a lot of evidence to present to Howard so that he could pursue Mr. Vidrine.")

found Agent Langlois to be exceedingly credible, competent, and frank; he exhibited a refreshingly dignified candor.[60]  Unfortunately, Agent Langlois only handled the investigation for a few months, as he, too, was in the process of being transferred.

Agent Langlois testified that while he was investigating the case, his focus, like Agent Vikin's, had been on following the trail of material that had left AFI.[61]  However, of great significance in this matter, is that while Agent Langlois was handling the investigation, he, along with FBI Agent Ekko Barnhill, interviewed a person by the name of Mike Franklin.  (Mike Franklin would ultimately become - to Agents Phillips and Barnhill - the "lynch pin" of their case against Hubert Vidrine.[62])  Agent Langlois testified that in his opinion, Mike Franklin did not tell him anything that he, Langlois, did not already know.  Agent Langlois further testified Franklin "did not resonate with him," for a couple of reasons.  First,  Franklin told the agents he had test results showing one sample from a tank at Trinity Marine tested "over a thousand parts per million total halogens,"[63] *and because Mr. Franklin was discussing "total halogen" content, he was likely discussing used oil rather than hazardous waste.*  Furthermore, Agent Langlois questioned whether

---

[60]His subsequent departure is a great loss to the Agency.

[61]Of interest, Agent Langlois testified that he learned about the connection between Trinity and Canal from the bills of lading found during the search at AFI; whereas Agents Vikin and Phillips testified they did not learn of this connection until the AFI truck carrying Trinity product appeared during the search at Canal. However, Agent Langlois did not know whether or not the Trinity material would stop at AFI en route to Canal, so that hazardous waste could be mixed in with the material from Trinity. *Compare* Langlois, pp. 76-78, June 17, 2011 *with* Vikin, pp. 68-69, 77, 129  June 22, 2001.

[62]In fact, Mr. Franklin was so pivotal, that when he ultimately was prohibited by Judge Melançon from testifying in the criminal trial, the government - referring to Judge Mealonçon's Ruling as a "mortal wound" - ultimately dismissed the indictment against Hubert Vidrine and his co-defendants.

[63]Testimony of Langlois, p.161-162, June17, 2011.  Of note is Agent Langlois' use of the term "total halogens," rather than "chlorinated solvents" (a term Agent Phillips utilized almost to the exclusion of all others).

Franklin was telling the truth, because Franklin did not provide the lab reports to back up his statement, when clearly the reports were essential to validate the technical nature of the allegations. Agent Langlois testified Franklin's information was not a "big deal" to him at the time, nor does it "resonate" with him to this day.[64]  When viewed in its entirety, as evaluated by Agent Langlois, during his brief handling of the investigation, Agent Langlois did not uncover any new evidence which would support a finding different from Vikin's, i.e. that there was not sufficient evidence to open a case file on Hubert Vidrine or to refer Hubert Vidrine for prosecution.

### c.       Phillips' Investigation

In June of 1999, EPA Technical and Regulatory Expert Keith Phillips left his EPA post for approximately six months to attend training to become an investigative agent.  He completed his training in December of 1998, and on January 4, 1999, he received his first assignment - Case Agent in charge of the investigation to which he had previously been the EPA Technical and Regulatory Expert – the "Canal Refining Investigation."[65]  It was at this point the focus of the investigation

---

[64]Agent Langlois testified on this subject as follows:

> He wasn't offering me anything other than he had spoke – this is what came out at me.  He had spoke with Fred McKenzie and took him and his son to lunch and that he knew and had tested one of those tanks and it was over a thousand parts per million total halogens. Now it didn't jump out at me as being key, and I wasn't taking his word, obviously, for anything other than face value, because if you tested something and you were able to espouse a number like a thousand parts per million, you were either doing total halogens. I was under the assumption that, A, where are the results.  If you're telling me you did that, why didn't you bring that with you, where is it, and even does it exist.  But in my mind, Judge, that day, and even to this day today, it just doesn't resonate with me, and that's what I told the counselor.  That's me.

Testimony of Langlois, pp. 161-162, June 17, 2011.

[65]Agent Langlois testified in his experience as a supervisor, it was "not the norm" to assign a new, rookie agent as a case agent in charge.  While he was a supervisor with the EPA, he would  "usually attach them to someone who had a little more time on the bricks so that they could learn the system. . . .and learn with the documents and how to handle them and make sure they didn't make any mistakes. . . ."

radically shifted, almost immediately, from "following the thread" from AFI perhaps to Canal, onto Hubert Vidrine, individually, and Trinity Marine, rather than AFI.  Therefore, the question becomes what new evidence, if any, did Agent Phillips obtain, or what prior evidence did Agent Phillips reevaluate, that almost immediately, upon his taking over the case, justified this shift in focus and arguably provided newly promoted Agent Phillips with a belief probable cause existed to indict, prosecute, and continue to prosecute Hubert Vidrine for ***knowingly*** *storing hazardous waste from* ***Trinity***, when clearly, the two agents who had handed off the ongoing investigation to Phillips, agents with far more criminal investigatory experience than he, had felt there was insufficient evidence to support such a belief, even as to material from AFI?

All parties agree there was probable cause *to investigate* Canal and Vidrine as to *the AFI information*, and all agree probable cause existed to support *the search warrant* executed at Canal, *based on the AFI information*.  What is hotly contested, however, is whether or not probable cause ever existed *to indict* Hubert Vidrine, individually, for material received *from Trinity, and not AFI*, and thereafter, continue to prosecute him, individually, for the next four years.  Although little, if anything, of true substance or relevance was added to the investigation once Phillips assumed command, an indictment, nonetheless, followed, resting primarily on selective information fed to the prosecutor by Keith Phillips and upon Keith Phillips' false testimony given before the grand jury, and Agent Phillips' selective and filtered interpretation of the information provided by Mike Franklin.[66]

---

Langlois, p.92, June 17, 2011.  Advice which this Court suggests, might have been well taken by Agent Phillips supervisor at the time.

[66]In fact, numerous pertinent witnesses, many of whom had been interviewed prior to Agent Phillips' assignment as case agent, were not called to testify at the grand jury.  Rather, Agent Phillips provided generalized, inflammatory, and less than fully accurate, hearsay testimony as to the information

### i. Mike Franklin

As a threshold matter, in evaluating the information from Mike Franklin, this Court agrees with plaintiffs' counsel that even if one were to accept Mike Franklin's story on its face, in all its particulars - which this Court, for the reasons which follow, does not - the story does not provide probable cause to indict or continue to prosecute Hubert Vidrine.

Mike Franklin first became associated with Canal in the summer of 1995, when he made a sales call to Chuck McConnell, President of Canal.[67]  At that time Franklin worked for Products Trading Corporation, brokering sales of hydrocarbons.[68] McConnell instructed Franklin to contact Hubert Vidrine, Canal's plant manager, for discussion of any possible business transactions. Thereafter, Franklin contacted Vidrine and soon began doing business with Canal, which included the brokering sales of hydrocarbons to Canal and selling Canal's refined products.[69]

Of particular interest is the fact that on the day the search warrant was executed at Canal, September 6, 1996, Mike Franklin was present at the Canal refinery and remained there without clear purpose.[70]  Mr. Vidrine testified Franklin came, went to lunch with Vidrine, asked to use the phone, and remained at Canal in an office located across the hall from Vidrine's office, during much of the time Vidrine was being interviewed in his office.  Vidrine further testified that Franklin could have easily heard what was being discussed during the interviews from that location.  Although Franklin's

---

those witnesses provided other agents, despite the fact Agent Phillips did not participate in many of the interviews about which he testified.

[67]Exhibit P014 at 000483.

[68]Agent Phillips learned, during the course of his investigation, that Franklin was terminated by Products Trading Corporation due to his alleged cocaine use.

[69]Id. at 000485, 000494.

[70]Vidrine testimony, pp. 157-160, June 16, 2011; *see also* Government Ex. 86 at USA003301.

name and number appear in Agent Vikin's notes taken during the search warrant, Vikin testified if Franklin was at Canal on the day of the search warrant, he was unaware of that fact. Agent Vikin testified the only time he heard mention of Mike Franklin on the day of the search warrant was when Vidrine mentioned his name while being interviewed.[71]  However, Agent Barnhill testified to the grand jury that Mike Franklin was at the Canal Refinery on the day of the search warrant.[72]

In November of 1998 (more than two years after the search of Canal), while the investigation was under the control of Agent Langlois, Agent Langlois learned of Mike Franklin from Fred Marshall, the plant manager at Canal after it was sold to a new entity.  Langlois testified Marshall told him "about a man [*i.e.* Mike Franklin] who was brokering other additives, MTBE which was a fuel additive and he talked to this man and he made it a point to expound enough to give me the man's name and it interested me."  On December 9, 1998, well after Mike Franklin had been present at Canal during the execution of the search warrant and questioning of Hubert Vidrine, Agent Langlois, along with Agent Barnhill, interviewed Mike Franklin.[73]

---

[71]Vikin Vol. 1, pp. 114-115, 6-22-11.  Vikin testified Vidrine mentioned Franklin during his interview, stating Franklin had advised Vidrine to be careful of the pipeline interface coming into Canal, as it might contain chlorinated solvents.  Id. at p.116, l.2-12.

[72]Agent Barnhill testified at the grand jury:

Q    And in fact, Mike Franklin happens to be at the Canal facility that morning, and essentially has lunch after EPA arrives on the scene, with Hubert Vidrine. What happens at lunch?

A    At lunchtime, they met, I think, at Church's Chicken, or some sort of chicken  - -

Ex. P006 at 000362.

[73]Langlois pp.73-74, June 17, 2011 (Although Agent Langlois is not mentioned in Barnhill's 302, he testified he was present at the interview, and his presence is noted in Agent Barnhill's notes taken during the interview.  Unfortunately, by department policy, FBI interviews are not recorded by tape or video.); P014 at 000483-486

### (1)      Franklin Reports of Interview

The 302[74] Agent Barnhill generated following the initial, December 9, 1998 interview of

Franklin, reads in pertinent part:

> [When FRANKLIN first met Vidrine,] VIDRINE gave [FRANKLIN] a "grand tour" of CANAL refinery.  VIDRINE advised he wanted to buy "cheap product" and get CANAL off the ground and back onto its feet, adding that he had one (1) year to get CANAL running efficiently. VIDRINE was going to be able to do this by buying product low and selling it high. When [FRANKLIN] bought product from CANAL, VIDRINE would receive several cents per drum.

> [FRANKLIN], working for TRANS GULF, began business with CANAL, shipping to CANAL from Houston, TX, a substance called Transmix.  Transmix is mixture of diesel, gasoline, jet fuel, and other constituents. . . .

> Prior to the Transmix being shipped to CANAL, the Transmix was tested for chlorinated solvents. [FRANKLIN] knows that it is illegal to have greater than 1000 parts per million (ppm) of chlorinated solvents. Both [FRANKLIN] and [his partner] AUTENREITH tell VIDRINE that it is illegal to sell a product that has over 1000 ppm of chlorinated solvents. The lab used by TRANS GULF was PRECISION PETROLEUM LAB (PPL), Houston, TX, phone 713/680-9425.

> In early 1996, prior to the search warrant executed on CANAL by Federal Agents, [FRANKLIN] traveled to TRINITY MARINE (TRINITY).  VIDRINE had told [FRANKLIN] that TRINITY had product that [FRANKLIN] may want to purchase.

> [FRANKLIN] thereafter traveled to TRINITY and met with FRED MCKENZIE, Superintendent at TRINITY. [FRANKLIN] subsequently obtained samples of the product TRINITY wanted to sell. These samples were given to PPL for testing. Results of the test showed ***one of the sampled products to be over 1000 ppm of chlorinated solvents.***

> [FRANKLIN] informed MCKENZIE in person that one of the sampled products tested over 1000 ppm of chlorinated solvents, and that he would not

[74]An " FD-302" is a form used by FBI agents to report or summarize interviews that FBI agents conduct. It contains information from the notes taken during the interview, typically by a non-primary, or non-interviewing agent. These forms are often criticized, as the interviews are not recorded, the summaries are not always prepared contemporaneously with the interview, and thus, the 302 is often characterized as more of a summary of the agent's memory and understanding of what a witness said, rather than a memorandum of what the witness *actually said* during the interview.

purchase that product from TRINITY. [FRANKLIN] had also previously told over the phone that the tested product was over 1000 ppm of chlorinated solvents. MCKENZIE said that if [FRANKLIN] wanted to purchase the other products from TRINITY, then [FRANKLIN] would have to take the product in question that was over 1000 ppm.  [FRANKLIN] advised MCKENZIE that he did want the other products, but did not want the product that sampled over 1000 ppm. MCKENZIE replied, "We'll see". [FRANKLIN] described the sampled product over 1000 ppm as ***"black, ambient and flashy"***.

[FRANKLIN] was shown an aerial photograph of TRINITY by the interviewing agents. [FRANKLIN] pointed to where he recalled the product sample over 1000 ppm to be taken from, describing ½ of a large, grey barge close to the office and the bio barge. [FRANKLIN] estimated there to be 50,000 - 100,000 gallons of product from where the sample containing over 1000 ppm was taken. Photocopy of the barge aerial photograph of TRINITY as shown to [FRANKLIN] is attached hereto.

A TRINITY employee, ANDREW (LNU), was present when the sample that tested over 1000 ppm was taken from the grey barge. . . .

Later in 1996, prior to the search of Canal by Federal Agents, [FRANKLIN] observed tanker trucks marked TRINITY arriving at CANAL. [FRANKLIN] asked VIDRINE about the tanker trucks, and VIDRINE advised he had made a deal with someone else to transport product from TRINITY because [FRANKLIN] didn't want to deal with it, with VIDRINE adding, "You didn't want it." Subsequently, [FRANKLIN] told VIDRINE that "You better cover your ass on this" by testing all the loads from TRINITY before accepting any product from TRINITY. [FRANKLIN] told VIDRINE that the test results from samples taken at TRINITY were over 1000 ppm for chlorinated solvents. [FRANKLIN] wanted to help VIDRINE.  VIDRINE told [FRANKLIN] that he would not touch or use the ***"black, flashy stuff"***.  CANAL accepted a lot of loads of product from TRINITY. . . .

Approximately one (1) month prior to the search of CANAL by Federal Agents, [FRANKLIN] sent VIDRINE color tubes so that VIDRINE could test the products CANAL received to ensure that the products did not exceed 1000 ppm total halogens.  Prior to shipping the color tubes, [FRANKLIN] told VIDRINE to be careful about what he accepts because possessing waste that contained over 1000 ppm is illegal.  The color test kit is a field test to determine if a product contains over 1000 ppm of total halogens.  On one occasion, VIDRINE sent back to [FRANKLIN] a tanker of MTBE (Octane booster) because the product in the tanker did not pass the color tube test.

. . .

47

[FRANKLIN] telephonically spoke to VIDRINE the day after the execution of the Federal search warrant on CANAL. VIDRINE said that JOHN BROUSSARD, Management, ANTI-FREEZE INC., a chemical brokerage company, had sent CANAL some "bad stuff". VIDRINE did not confirm that he bought the black, flashy product from TRINITY. VIDRINE told [FRANKLIN] that ANTI-FREEZE INC. had sold CANAL the bad product.[75]

---

[75]Of note, Agent Barnhill does not mention the John Broussard/Anti-Freeze Inc. explanation when testifying before the grand jury on August 11, 1999 (approximately eight months after this interview). Rather, she provides the following anecdote to the grand jury, which is not mentioned in any of the 302s she generated following the Franklin interviews:

Q.     But he [Franklin] asked Hubert Vidrine essentially what's going on, what's the problem here. And Hubert says words to the effect that he thinks the EPA has told him that there may be some hazardous waste hidden in some of the petroleum distillate that's coming into Canal Refinery, is that correct?

A.     That's correct.

Q.     And so Mike Franklin essentially asked him how that happened. And Hubert Vidrine speculated that maybe it was somebody's son whose -- oh, Aaron --

A.     Aaron Hornsby's son.

Q.     -- Aaron Hornsby's son may have planted hazardous waste in some of the tanks in the Canal Refinery, and that's the only way that that could have happened, right?

A.     That's correct.

Q.     He may have poisoned the well--

A.     Right.

Q.     --so to speak?

       Now, later that day, there's another conversation. In fact, the conversation -- he calls Hubert all afternoon, can't get through to him, and in fact, gets through to him the next morning at 1:30 a.m., is that correct?

A.     That's correct.

Q.     And what is the -- the thrust of that conversation is is that he thinks Hornsby has set him up, Aaron Hornsby, correct?

A.     That's correct.

48

. . . .

After the execution of the Federal search warrant and while VIDRINE was still employed with CANAL, [FRANKLIN] offered to buy Tank 402, separate the good product from the bad product, and dispose of the product legally.  This offer was made to CANAL after [FRANKLIN'S] deal to buy CANAL fell through. . . .

[FRANKLIN] recalled that a company named DIAMOND M, which deals in used oil, had put product into Tank 402.  [FRANKLIN] talked to HAROLD LANGDON, who said that VIDRINE bought bad product and that the bad product was put into Tank 402.[76]

VIDRINE left CANAL in 1997 and thereafter bought a new company. Through this company, VIDRINE began to undersell [FRANKLIN], thereby taking [FRANKLIN'S] business. [FRANKLIN] no longer gets along well with VIDRINE.

As background, VIDRINE started out his employment with CANAL as a welder, moving up to quality control.  When AARON HORNSBY was fired, VIDRINE took over as Refinery Manager at CANAL.  VIDRINE had "carte blanche" of CANAL, which [FRANKLIN] estimated to be a 4.5 million dollar operation.[77]

This Court notes Agent Langlois, who was present at the initial Franklin interview, felt Franklin added nothing to the investigation and was skeptical of the information Franklin provided, because Franklin did not provide the test results upon which he relied.  However, Agent Barnhill, on the other hand, created a special agency relationship with Franklin, which allowed and required her, according to FBI policy, to have complete control of all information, or lack thereof, that Franklin provided.  That information, for reasons discussed below, was funneled to and through the

---

Q.     Now, so that essentially is the thrust, the nitty-gritty of what Mike Franklin has said to you, is that correct?

A.     That's correct.

Ex. P006 at 000363-000365.

[76]Again, Barnhill did not mention this explanation when testifying to the grand jury, but rather, she related solely the Aaron Hornsby story, which is not contained in any of her 302s.

[77]Exhibit P014, pp.000483-000486 (Emphasis added).

agent in charge, newly minted EPA Agent Keith Phillips, with whom she became involved in an illicit sexual affair beginning in 1996.[78]

Phillips testified that what Franklin brought to the case that Vikin never had was "knowledge" on the part of Hubert Vidrine, yet Agent Langlois, who was present at the initial Franklin interview, clearly disagreed.[79]   On January 4, 1999 - the day Phillips was assigned as the case agent of the investigation, Phillips learned about Agents Barnhill and Langlois' interview of Franklin,[80]  In contrast with Agent Langlois, Mike Franklin did resonate with Agent Phillips; in contrast with Agent Langlois, Agent Phillips found Mike Franklin to be extremely credible.  Within days of being assigned as the case agent to this investigation, this witness, whom the more experienced agent found to be suspect, became Agent Phillips' "key witness" in his pursuit of an indictment and criminal prosecution of Hubert Vidrine.[81]  **Agent Phillips testified that two days after taking over the investigation as the case agent, Agent Phillips verbally presented Vidrine's case to the United States' Attorney's Office suggesting prosecution of Vidrine.[82]** When asked what he had learned within two days of being assigned to the case that he felt made it appropriate to present the case to the AUSA for prosecution, particularly as Agents Vikin and Langlois had believed there was insufficient evidence of probable cause to warrant a referral to the

---

[78]Agent Barnhill testified she and Agent Phillips only "had sex" when they were working this case.

[79]Phillips Vol. I, June 7, 2011, p. 52.

[80]Phillips Vol. I, June 7, 2011, p.44-45

[81]Phillips Vol. I, June 7, 2011, p. 51.

[82]Id. at 45, 48, The record reflects formal request to his EPA supervisors for prosecutorial assistance on Vidrine was not made until January 23, 2000, **well after indictment had been returned** on Hubert Vidrine.  *See* Ex. P0005.

AUSA, Phillips responded, "would have been Mike Franklin's testimony." [83]

Shortly after Agent Phillips became an investigator and was assigned as the lead case agent to this investigation, he and Agent Barnhill re-interviewed Mike Franklin.  Agent Barnhill's 302, dated January 22, 1999, reflects the following:

> Subsequent to the sampling of product at TRINITY by [FRANKLIN], [FRANKLIN] advised MCKENZIE of the analytical report results as analyzed by PRECISION PETROLEUM LAB (PPL) , Houston, TX.  Specifically, that some of the product at TRINITY tested over 1000 parts per million (ppm) for chlorinated solvents. [FRANKLIN] advised MCKENZIE that he, [FRANKLIN], still wanted to purchase some of TRINITY's product, but not the product that tested over 1000 ppm for chlorinated solvents.  MCKENZIE advised he was looking for someone to purchase all of the product at TRINITY together, not separate.  Additionally, MCKENZIE told [FRANKLIN] that another individual that TRINITY had been doing business with in the past, JOHN BROUSSARD, had expressed interest in purchasing all of the TRINITY product.[84] MCKENZIE advised [FRANKLIN] that he would recontact [FRANKLIN] at a later date regarding the sale of product to [FRANKLIN]. [FRANKLIN] was not recontacted regarding the product at TRINITY.

> Additionally, with the same analytic report from PPl, [FRANKLIN] contacted CHUCK MCCONNELL, CANAL, and advised that the "black, flashy stuff" as sampled from TRINITY was "bad", explaining to MCCONNELL that the lab results showed a sample at TRINITY to contain over 1000 ppm of chlorinated solvents. MCCONNELL told [FRANKLIN], "I'll alert VIDRINE", or words to that effect. Later, [FRANKLIN] phoned MCCONNELL and explained to MCCONNELL how to use the Chloro-Tech tubes, which are used to detect chlorinated halogens. Also, [FRANKLIN] provided a Blue Book to VIDRINE on Feed Stocks, which details information regarding chlorinated solvents.

> After VIDRINE left his job at CANAL, he opened his own business, HIGH TIDE, located in Opelousas, LA . VIDRINE acted as a broker for this company. VIDRINE now operates a gas station in Opelousas.

> When [FRANKLIN] offered to buy CANAL after the Federal search warrant, a document was generated at AMERICAN INTERNATIONAL REFINING

---

[83]Id. at 48-49.

[84]The Court notes the December 12, 1998 302 drafted by Agent Barnhill does not mention that McKenzie told Franklin that "John Broussard[] had expressed interest in purchasing all of the Trinity product."

CORPORATION regarding the price offered by [FRANKLIN] to CANAL. . . . CANAL did not sell to [FRANKLIN] .

Regarding Tank 402 located at CANAL, [FRANKLIN] was told by LANGDON, Vice-President of Marketing, CANAL, that the product in Tank 402 was "ready to go". This was told to [FRANKLIN] after the execution of the Federal search warrant on CANAL. [85]

On July 19, 1999, Franklin was telephonically interviewed by Agent Barnhill.[86] Her Report

reflects the following:

[FRANKLIN], who is in a position to testify, provided the following information.

. . . .

[FRANKLIN] received a telephone call in June/July, 1996, from HUBERT VIDRINE telling [FRANKLIN] to go to TRINITY MARINE (TRINITY) and check on some product that TRINITY has available for sale. VIDRINE stated, "by the way, see if you can get your hands on the product from TRINITY", or words to that effect. Additionally, VIDRINE did not want to have to deal with JOHN BROUSSARD/ANTI-FREEZE INC. (AFI) directly to transport the product from TRINITY to CANAL.[87]

[FRANKLIN] thereafter called TRINITY and spoke with FRED MCKENZIE, the barge cleaning facility manager. MCKENZIE told [FRANKLIN] to come over to TRINITY. [FRANKLIN] arrive [sic] the next day prior to lunch and subsequently took MCKENZIE and another TRINITY employee, ANDREW HANSON, to lunch. Upon return to TRINITY, the samples of the product which [FRANKLIN] was considering purchase of were already prepared. [FRANKLIN] advised that he would be back in touch with MCKENZIE in a few days upon receipt of the lab result of the samples. **[FRANKLIN] thereafter took the samples and provided the samples to a lab in Houston, TX, called PRECISION PETROLEUM LAB (PPL)**.

**When the sample analytical results were returned to [FRANKLIN] from**

---

[85]P014 at 000490-000491.

[86]Barnhill 6/13/11, at pp. 32-33

[87]The fact that Vidrine did not wish to deal directly with Broussard or AFI is not mentioned in the previous 302s.

**PPL**,[88] [FRANKLIN] contacted TRINITY and spoke with HANSON. [FRANKLIN] advised HANSON that some of the samples were over the limit for halogens, and that some of the samples showed good product. MCKENZIE did not return [FRANKLIN]'s call regarding the sample results.

Shortly thereafter, [FRANKLIN] went back out to TRINITY and watched as HANSON collected samples from the barge holds containing product.[89] MCKENZIE did not come out to the barges while the samples were being taken but was aware that [FRANKLIN] was there because [FRANKLIN] had told MCKENZIE earlier in a phone conversation that he was coming out to take more samples. [FRANKLIN] then left and took the samples to PPL where they were analyzed. The analytical results were good on all the samples except one.[90] [FRANKLIN] recalled that the bad product came from a barge hold that contained 50,000 gallons of product. [FRANKLIN] recalled the barge to be the "1st barge", and the holding tank opening to be 6" from the deck of the barge. [FRANKLIN] could identify the location if provided a diagram of the TRINITY barges.[91] The 50,000 figure was verbally provided by HANSON to [FRANKLIN].

[FRANKLIN], in trying to purchase all the product from TRINITY except the bad product, contacted MCKENZIE at MCKENZIE's residence. MCKENZIE told [FRANKLIN] to call back to TRINITY the following Monday. Sometime later,[FRANKLIN] talked to MCKENZIE. [FRANKLIN] told MCKENZIE that [FRANKLIN] wanted all of the TRINITY product except the bad, contaminated product. MCKENZIE replied that he already had someone who was going to

---

[88]**It should be noted, no such lab tests or results were ever produced, located, or found to exist**.

[89]Of note, neither of Franklin's prior 302s make any reference to a second sample being collected by Franklin. Additionally of interest, Franklin identified where the original sample came from, using an aerial photograph. However, in this 302, it reflects the original sample was provided to him when he returned from lunch with McKenzie. Thus, it seems unlikely Franklin would have had personal knowledge of the location from which the sample was pulled. *See also* Testimony of Langlois, pp. 160-161, June 23, 2011.

[90]On September 14, 1999, Agent Phillips testified to the grand jury:

Mr. Franklin indicated to me that, in all probability, he didn't test it again. He just told -- Mr. Franklin's statement was, "Why should I test it again? I have faith in my analytical. The stuff was contaminated. I told Mr. Vidrine again that it was hot. And I probably didn't actually test it the second time because I had faith in my first analytical."

Ex. P033 at 39-40.

[91]Recall that Franklin previously identified where a sample came from by using an aerial photograph at his first interview. *See* P014 at pp. 000483-000486.

purchase the whole lot, the good product and the bad product, adding, "why do I have to deal with you", or words to that effect. [FRANKLIN] told MCKENZIE that the product was "hot", that it was over the limit for halogens. MCKENZIE replied that he had someone to take care of the bad stuff.[92]

[FRANKLIN] thereafter contacted CANAL and spoke to VIDRINE. [FRANKLIN] advised VIDRINE that [FRANKLIN] wanted to buy the product from TRINITY for CANAL, but that not all of the product was good.  [FRANKLIN] advised VIDRINE that some of the sampled product was determined through laboratory analysis to be over the limits for halogens.  VIDRINE asked [FRANKLIN] if [FRANKLIN] was sure that [FRANKLIN] did not want to take all of the product at TRINITY, both the good and the bad product.  VIDRINE stated that maybe he, VIDRINE, could dilute it with other product at CANAL or mix it with something else.[93] [FRANKLIN] advised that diluting or mixing the bad product was not a solution.  VIDRINE responded, "Well, if you can't do it ...ok", or words to that effect.

. . . .

[FRANKLIN], who was doing business as a broker with POWER TRADING CORPORATION (POWER TRADING), was working in partnership with JOHN AUTENREITH.  When the second set of analytical results were returned to [FRANKLIN]/POWER TRADING,  AUTENREITH sent to CANAL/VIDRINE some testing tubes that would assist in identifying bad product containing halogens.  It was explained to VIDRINE that for his own protection, every truck needed to be tested for halogens prior to being accepted by CANAL.

[FRANKLIN] made contact with VIDRINE on a daily basis, sometimes as often as 3 or 4 times per day. [FRANKLIN] sold most of CANAL's refined products.  VIDRINE had, at some point, advised [FRANKLIN] that he, VIDRINE, was going to try to save CANAL money by buying cheap feedstock and selling high. The refinery was going to be closed down if it did not show a profit.

About one (1) or two (2) weeks prior to the execution of the Federal search warrant on CANAL, [FRANKLIN] contacted VIDRINE because [FRANKLIN] had learned that VIDRINE had accepted a tanker of product from TRINITY.  VIDRINE

---

[92]Of note, Franklin's prior 302s do not indicate McKenzie told Franklin he "had someone to take care of the bad stuff."

[93]Again, this information is not contained in any of Franklin's prior 302s.  Additionally, when asked about this entry, Vidrine testified the only conversation he ever had with Franklin regarding "dilution" was in reference to "diluting gravity," utilizing, for example, "Louisiana sweet crude," for a heavier AFS that was inconsistent with what the refinery could run. Vidrine testimony, pp. 182-185, 188, June 20, 2011.

told [FRANKLIN] that he, VIDRINE, had to buy the product from TRINITY, adding, "we're just going to try it out", or words to that effect. *VIDRINE advised [FRANKLIN] that, "we have tested it out and it was not over 1000 parts per million (ppm)", or words to that effect.*[94]

[FRANKLIN] stated that he had previously faxed to VIDRINE the PPL analytical results of both the first and second sets of samples from TRINITY.[95] Additionally, [FRANKLIN] had faxed the same analytical results to MCKENZIE. However, [FRANKLIN] does not know if MCKENZIE read the fax. [FRANKLIN] reiterated that he/she had verbally advised MCKENZIE that the analytical results of the samples as received from TRINITY were over the limits for halogens and therefor unacceptable.[96]

[FRANKLIN] advised that his/her relationship with VIDRINE had a "bitter end". VIDRINE had lost his job at CANAL. [FRANKLIN] advised VIDRINE to open up his own business and . . . [FRANKLIN] would help VIDRINE get started in brokering products. Approximately one (1) week later, around 11/97, [FRANKLIN] found out that VIDRINE had taken over [FRANKLIN]'s own accounts. At that point, the relationship ended between [FRANKLIN] and VIDRINE. [FRANKLIN] stated that he/she paid VIDRINE all monies that was owed and they ended the relationship on even money terms.[97]

### (2)    The Unraveling of the Franklin Story

The following exchange between plaintiffs' counsel and Keith Phillips is illustrative of the

limited value of the information Mike Franklin provided to Agents Phillips and Barnhill:

Q: [T]he first subject matter ... The first is going to be whether or not even if Franklin's testimony had been admissible, even if you had been able to use Franklin's testimony at trial, would you have with that have, had probable cause to go forward,

---

[94] Again, this information is not contained in any of Franklin's previous 302s.

[95] The facsimile, purportedly showing the results of the two sets of test results Franklin claimed to have done (but told Agent Phillips he actually, likely only tested one sample) was not found during the execution of the search warrant on Canal, nor at any other time, even to this day.  Phillips Trial Tr. vol II, 350-351.

[96] This Court notes no such facsimiles were ever found as a result of the search warrants executed at Canal or Trinity, and indeed, no evidence was presented by the government to establish this statement was ever verified by McKenzie.

[97] Ex. P014 at 000492-000494 (emphasis added).  This portion of Franklin's information is in contradiction to Vidrine's testimony.  Vidrine testified Franklin owed him money.

all right?  That's the first subject.

. . . .

A:  It's the subject matter of Mike Franklin's analytical [*i.e.,* alleged test results from alleged samples taken from Trinity].

Q:  Okay.  And your testimony that you told the Grand Jury you had them, and it turned out you didn't really have them, right?

A:  Correct.

. . . .

Q: (By Mr. Cornwell) Even if you could have gotten the Franklin story into a trial, even if it had not been excluded because of its hearsay nature, even if you would have found the Franklin lab reports which you never did, would you even under those circumstances have had probable cause to indict or continue this prosecution?  That's the question.

A: Yes, we would.

Q: Okay.  Then I want to go through that answer and ask you some pointed questions about it.   We've already established that the Franklin allegation was that one compartment of the Kentucky barge contained over a thousand parts per million of chlorinated solvents, right?

A:  Correct.

Q:  And that he took several, allegedly took several samples, right?

A:  Yes.

. . . .

Q: (By Mr. Cornwell) If you look at [Exhibit P014 - the 302s of Mike Franklin, at] Bates stamp 484 with the FBI number 13 on the right-hand lower corner.

. . . .

Q: (By Mr. Cornwell) Okay.  You see it says, "Results of the tests showed one of the sampled products to be over a thousand. . ."  And the next paragraph, "Franklin informed McKenzie in person that one of the sampled products tested over a thousand. . . ."

56

A:  Okay.

. . . .

Q:  All right.  So what we're dealing with is a story told to you by Franklin and for probable cause purposes we're just going to go along as if it were the truth, okay.  So what he said was that he had in effect, evidence that there was something somewhere on the premises of Trinity Marine with over a thousand parts of chlorinated solvents in it, right?

A: Yes.

Q:  And you believed that, right?

A:  I had no reason not to.

. . . .

Q:  [I]t was a potential, but only a possibility because Franklin did not even profess to know whether the contents of that compartment had ever been shipped to Trinity [sic], did he?

A:  No, I do not believe he did.

Q:  Okay.  He knew nothing about the specific shipments from Trinity to Canal, did he - -  Franklin, Franklin didn't, did he?

A:  No.

Q: [W]hen did Franklin say that he took a sample of one compartment and found it was over a thousand?

A:  I believe that he said it was summer of '96.

Q: [T]here are reports reflecting that you-all thought, from what he was saying, it might have been June or July, somewhere in there, right?

A:  That's correct.

. . . .

Q:  You remember you helped Parker [the AUSA] prepare the Bill of Particulars, right?

A:  Yes.

Q:  We've already established that.  And then we already looked at them, and the August 13th was the earliest date.  Does that now come back to mind?

A:  That sounds right?

. . . .

Q:  So even if you had ever obtained a test result from the compartment, whatever it was that Franklin got his alleged thousand parts per million from, that same compartment may or may not have contained the same product a month or maybe two months later when the first alleged shipment from Trinity to Canal occurred, right?

A:  Yes, . . . .

. . . .

Q: [N]ow, in fact, we also know that, again, just going on what Franklin said, while one compartment contained over a thousand, there certainly were other compartments in the same barge that did not -- excuse me  - - that did not contain a thousand parts per million, right?

A:  Yes.

. . . .

Q: [E]ven the defendants' lawyers readily admitted that Trinity had hazardous waste on its property, right?

A:  I believe they did . . . .

. . . .

Q: [A]nd in fact they admitted that Trinity had a permit to process and dispose of or get rid of, in other words, to handle and deal with appropriately under the regulations hazardous waste.  They had a hazardous waste permit didn't they?

. . . .

Q:  Okay.  And they also sold used oil from Kentucky barge's 1S and 1P tanks to Canal for feedstock.  Do you see that?

. . . .

A:  That's what it states.

. . . .

Q:  The materials sent for re-refining, meaning sent to Canal, came from 1S and 1P, right?

A:  That's what it states.

Q: Okay.  And they point out that not only did they believe this was nonhazardous waste, but they point out that the government never tested 1S and 1P to refute their allegations.  Is that accurate?

A: As far as I know.  Ivan Vikin was the case agent at that point in time, but I do not believe we ever tested the tanks.

Q:  I'm talking about the prosecution you were in charge for from January 4 of 1999, through September of 2003.  Surely you know the answer to that question in light of the fact that was your case?

A:  It was in 1999, but the reference here is 1996.

Q:  I understand, sir, but your case was based on what Franklin said happened in 1996, and your indictment of Vidrine was based on shipments from Trinity from August 13 to September 4, 1996.  So are you saying because it occurred in 1996 you don't know the answer to my question?

. . . .

A:  Yes.  I thought I said, as far as I know, we didn't sample that.

. . . .

Q: [M]y understanding from all the documents I've seen, at least, is that you-all thought the over a thousand part lab test that Franklin said he had came from 4P, and furthermore in response to the judge's question that this eating problem where one of the compartments had become corroded and it began over time to have little perforations in it and some exchange of product went through those little holes, that was also down at that time same end of the barge where 4P is, wasn't it?

A:  I believe that's correct.

Q: Okay. So what we have here is both a Franklin story and this corrosion problem you're talking about occurring at one end of this huge barge and the Trinity people saying, we shipped Canal the petroleum distillates out of the total other end of the barge, 1S and 1P; isn't that true? That's what they said. That's what the Trinity lawyers said?

A: If that's in the document. Then, I agree.
        . . . .

THE COURT: I understood you to just have testified that Mr. Franklin at no time told you that he, Mr. Franklin, knew whether or not any materials were shipped to Trinity [sic] that, in fact, had come from the compartment where he allegedly took these samples; is that right?

A: Yes.

THE COURT: So Franklin did not tell you that the materials which he allegedly sampled in fact went to [Canal]. He didn't know.

. . . .

WITNESS: That's correct.[98]

Consequently, this Court finds, the evidence presented clearly indicates the Franklin samples, even if presumed to exist, were not pulled from the same hold that contained the product ultimately sent to Canal - or even from a hold where cross-contamination likely would or could have occurred.[99] Furthermore, assuming *arguendo* that Franklin actually had tested samples of Trinity product on two occasions, and assuming the samples Franklin tested came from the same hold as the product sent to Canal, and assuming that *one* of those samples contained more than the allowable amount of total halogens, the evidence establishes it is unlikely the product from which those samples were taken was the same product which was *some one to three months later*, sold to Canal and ultimately became the subject of the indictment. Furthermore, Mr. Vidrine's undisputed testimony at trial was

---

[98]Phillips Trial Tr. vol. III, 465-466, 468-474, 478-479, 480-482, 486, June 9, 2011.

[99]Exhibit D17 at 127.

that Tank 402 – where product such as that obtained from Trinity would have been placed - had been completely drained as of August 13, 1999 (*i.e.* at least one month **after** Franklin had allegedly collected samples from Trinity for testing).[100] Consequently, this Court finds whatever was in Tank 402 *for which Hubert Vidrine was indicted*, would not have been the same product Mike Franklin allegedly sampled, as Mike Franklin's alleged samples from Trinity predated August 13, 1996 by a minimum of one month, and Tank 402 was drained one month after any such product was sampled.

Furthermore, according to the Bill of Particulars, Canal stored "hazardous waste" received from Trinity from August 13, 1996 (the date the tank was drained) until September 4, 1996. According to Franklin's 302s, the first sample he claimed he received of Trinity product which he claimed was over the limit for total halogens was in "early 1996"[101]; when Franklin was re-interviewed some seven months later, Agent Barnhill wrote in her report that the testing was in June or July of 1996[102]; according to Franklin's 302s, the barge hold from which the bad product came contained 50,000 gallons of product.[103] According to Andrew Hanson of Trinity Marine, the holds for used oil ranged from a 40,000 gallon capacity up to 80,000 gallons.[104] Hanson told Agents Barnhill and Phillips that Canal would receive approximately 2 truckloads a day of Trinity's product, 5 to 6 days per week, with each truck containing 7,000 gallons of product.  At that rate, it seems

---

[100]June 20, 2011, pp. 152-154. Mr. Vidrine testified Canal had "done a run. . . in the beginning of August and emptied the tank," and on August 13th, Canal was preparing "the next batch that was being filled up to run."

[101]P014 at 000483; furthermore, again, all sampling actually presented showed the product at Canal to have been beneath the 1000 ppm threshold limit.

[102] Id. at 000492.

[103]Id. at 000493.

[104]D64 at USA01016.

unlikely that the product Franklin allegedly tested in either "early 1996" or " June/July 1996" was the same product that Canal purchased and stored *after* August 13, 1996 – the date Tank 402 was drained – to September 4, 1996.

Additionally, according to Barnhill, Mr. Vidrine told Franklin that Canal had the Trinity product tested **before** it was accepted by Canal, and it was under 1000 ppm total halogens[105]; the samples which were taken by Trinity as soon as they learned of the search warrant at Canal were all under 1000 ppm total halogens[106]; the samples taken by the government from the tanker containing Trinity material at Canal on the day of the search warrant were under 1000 ppm total halogens; and the samples taken by the government from Tank 402 on the day of the search warrant were under 1000 ppm total halogens.[107]  No tests or test results verifying or corroborating the alleged Franklin samples and results were ever found to exist; to the contrary, all samples presented contradicted the unsupported Franklin allegations.

Finally, even if one were to assume Mike Franklin took samples of the same product from the same hold at Trinity that contained the product ultimately sent to Canal and that that product

---

[105]P014 at 000494.

[106]Although the test results of the samples taken at Trinity on September 30, 1996, showed the product to contain less than 1000 ppm chlorinated solvents, Agent Phillips focused his testimony on the presence of benzene in the product, which might only have been a violation had the product fallen under the hazardous waste regulations, rather than the used oil regulations.  Moreover, when testifying about the lab reports of the samples taken at Trinity, Agent Phillips was asked: "Of the test reports that you discussed with Ms. Gutierrez in D6, which of these came from the compartment or compartments that were shipped to Canal?"  Phillips responded, "I can't answer that."  He was then asked, "And it's because the EPA in the course of this investigation never was able to answer that; isn't that true?  In other words you can't answer it because the EPA never answered it, right?",  Mr. Phillips answered, "That's true."  June 13, 2011 at 115-116; June 10, 2011 at pp. 83, 111-112.

[107]Agent Phillips, along with EPA technical and regulatory expert Tidmore, at best, obfuscated, and at worst, falsified a verification made under oath and filed in this Court concerning these samples - a matter that remained before this Court on plaintiffs' request for sanctions.

made its way into Tank 402 after it had been drained on August 13, 1996, and even if one were to

assume Tank 402 was not drained as of August 13, 1996, and even if one were to assume Franklin's

sampled product remained in Tank 402 for a minimum of two to three months (*i.e.* the time between

the latest date Franklin stated he took samples and the alleged storage events), and even if one were

to assume Franklin's lab results showed that the product had tested above 1000 ppm for total

halogens, one cannot escape the fact that notwithstanding Agent Phillips assertion, **Mike Franklin**

**had no personal knowledge of any knowing violation on the part of Hubert Vidrine**.

When asked about this at trial, Agent Phillips testified:

THE COURT:  What, if anything, did Mr. Franklin tell you that would indicate that if he, in fact, did not know whether or not any of the shipments that went to Canal were in fact adulterated or contained over the 1,000 parts per million, that in fact Mr. Vidrine knew that.

A:  It was Mr. Franklin's position that Fred McKenzie [manager of Trinity] had told him.

THE COURT:  Told whom.

A:  Told Mr. Franklin that, if you want the material here on the Trinity, you have to take the good with the bad.

. . . .

THE COURT: [W]hat, if anything, did Franklin say that would have led you to believe that Vidrine knew that he had gotten product that was over the 1,000 parts per million because that was the problem that Franklin had told you about, not any TCL, or toxicity characteristics, but thousand parts per million.

A:  Correct.

. . . .

A:  He [Franklin] told Vidrine that Fred McKenzie told me to take - - I could - - if I wanted the good, I had to take the bad, and so I walked away from it.

THE COURT:  **So I walked away from it.**

A:  He didn't try to broker the material.

THE COURT:  Okay.  So at this point, we still don't have anything going to Canal.

A:  No.

THE COURT:  When did that change?

A:  When that material [from Trinity] started coming into Canal which was brokered by John Broussard?[108]

. . . .

A:  Franklin learned of that and questioned Mr. Vidrine, "Why are you taking this? I told you that if you took the good you had to take the bad." **Vidrine's response to Franklin was, "We're only taking the good."**

THE COURT:  Okay, so my question to you then is, what, if anything, did Franklin tell you that showed that Vidrine knew he was getting the bad?

THE WITNESS:  That's - - that's what we had.

THE COURT:  Really.  So you had - - Franklin did not tell you that he had told Vidrine --

THE WITNESS:  Oh he did.

THE COURT:  Please listen - - that he had told Vidrine that, in fact, the materials from Trinity, all the materials or the materials that you're getting would be adulterated, correct?  He didn't tell him that.

THE WITNESS:  No.

THE COURT:  Franklin did not say that McKenzie told Vidrine, correct, that it was adulterated, or it was going to be over a thousand parts per million, correct?

THE WITNESS:  That's correct.

THE COURT:  McKenzie didn't say he had told Vidrine that, that you had to take the good with bad, correct?

---

[108]Testimony established the Trinity product in question, which went to Canal, was not brokered by John Broussard.

THE WITNESS:  No.

THE COURT:  So far we have nobody telling Vidrine that, and when - - what Franklin did tell you is that, when Franklin was - - when Franklin allegedly asked Vidrine, when another broker had been able to cut a deal, whatever that deal was, "Why are you taking it; I told you we had to get the good with the bad," Vidrine's response was, "No, our deal is, we only got the good." Is that what you're telling me?

THE WITNESS:  That's what I'm telling you.

THE COURT:  And in a nutshell that's what you had to show knowledge on the part of Vidrine that he was getting - - that he knowingly was receiving and storing hazardous waste?

THE WITNESS:  That was not the only.  The other issue is the reputation of barge cleaning facilities, as I discussed yesterday, that the industry knew, as a rule –

THE COURT:  I'm not interested in the industry at this point.  I'm interested in Mr. Vidrine.

THE WITNESS:  Mr. Vidrine should have known that barge cleaning operations produce adulterated material.

THE COURT:  Why?

THE WITNESS:   It was common knowledge in his industry and alternate feedstocks.[109]

Thus, even Phillips admitted at trial that Franklin had not provided evidence of Vidrine's actual knowledge, as would be required under the criminal statute for which Mr. Vidrine was indicted.  Furthermore, as of at least March 3, 2000, Phillips, the government's lead investigator, was aware the samples taken by the government from Tank 402 at Canal on the date of the search warrant did not corroborate Franklin's assertions, as those samples were far beneath the 1000 ppm threshold level.

### (3) Additional Credibility Issues re: Franklin

---

[109]Phillips Trial Tr. vol. III, 486-491, June 9, 2011. (emphasis added).

Of particular relevance to this Court is the fact that in none of Agent Barnhill's reports to her supervisors, nor in any of the 302s she drafted reflecting her interviews of Mike Franklin, does Agent Barnhill mention that Mike Franklin, whom the government agents considered to be their key witness, had failed to provide the lab reports upon which the case turned, nor that a plethora of subpoenas had failed to produce any such lab reports.[110]   Agent Barnhill testified that although it was her custom to include all negative information in her 302s, she inexplicably did not do so with Franklin, on any matter.

Phillips' notes and reports, like Barnhill's, were also devoid of any mention of Mike Franklin and the problems associated with this "key witness." In point of fact, Phillips' documents were devoid of any mention whatsoever of Mike Franklin.   Although Agent Phillips testified his omission was the result of the unique agency relationship created by Agent Barnhill between the FBI and Mike Franklin, a fact Agent Barnhill corroborated and Agent Langlois affirmed, both Agent Phillips and Agent Langlois testified verbal reports should have been provided.   The government presented no witness or evidence, beyond Phillips unsubstantiated assertion, of any such verbal reports, nor any evidence that notice of Franklin or his credibility problems was provided to Phillips' supervisor. Thus, there is no evidence that Agents Barnhill or Phillips ever indicated to their superiors the

---

[110]When asked about these omissions at trial, Agent Barnhill testified as follows:

THE COURT:  [I]t strikes me as odd that someone who approaches things that way with that mind-set that you have illustrated here, would not have made a note in the 302, "does not have actual reports," "looking for them."

THE WITNESS:  I agree, it is not in my 302, but as I said, it was certainly not an omission on my part to be deceptive or to be anything else.   It just was not documented. I don't – I didn't not document it.  It just was not documented. **As I look back, it should have been, and there's no reason why it should not have been documented.  I easily concur that as a  - -  it should have been documented**.

Barnhill Trial Tr. vol. II, p. 98, June 14, 2011 (emphasis added).

inherent escalating proof of the weakness of the Franklin story.[111]

Agent Barnhill testified Mike Franklin told her during an interview that he had notes of a conversation he had with Vidrine - a conversation Barnhill, Phillips and the government argue is pivotal to a finding of knowledge on the part of Vidrine.  Barnhill testified Franklin told her he would fax his notes of that conversation to her.  However, some seven days later, when Agent Barnhill ultimately drafted the 302 memorializing  that interview, **Franklin had still not sent the promised notes to Barnhill**.  *More troubling is the fact that information regarding Franklin's statement that he had notes of a conversation with Vidrine showing knowledge on the part of Vidrine, as well as Franklin's failure to send a copy of those notes to Agent Barnhill, is mysteriously missing from Agent Barnhill's 302.*   Again, this is yet another failure by Mike Franklin to deliver corroboration of his allegations, another example of the indifference of the government to that fact during the investigation and prosecution of Hubert Vidrine, and another example of the only reporting agent's failure to report Franklin's inability to corroborate his alleged information to the very supervisors who were to oversee the investigation.[112]

Additionally, Mike Franklin had an eighteen year cocaine habit[113], a history of psychiatric

---

[111]Furthermore, no evidence was presented to establish the inherent weaknesses of the Franklin story were every conveyed to the AUSA prosecuting the case, rather, the evidence is to the contrary.  The 302s of Franklin, prepared by Barnhill, admittedly **with Phillips' help and input**, appear to have been physically kept from the AUSA, as the AUSA requested Agent Barnhill and Phillips bring the Franklin 302s to a meeting as late as February 26, 2002. Ex. P028 at 000756.

[112]Agent Barnhill eventually testified before this Court, that there was some question in her mind as to whether the Franklin conversation was actually memorialized by a phone log, which was ultimately provided to agents.  The phone log only shows calls to Canal; no substantive information is contained therein. Regardless, Barnhill failed to document yet again, yet another failure by Franklin to support his assertions.

[113]P019 at 000642; *see also id.* at 000601-000609, 000618-000626, 000643; Phillips' Trial Tr. vol. III, p. 542, June 9, 2011.

treatment, several arrests involving narcotics, and had had several liens filed against him. This information was available to Phillips throughout much of the investigation.[114] **Agent Barnhill's 302s and reports to her superiors fail to document any of this information, and as noted, Agent Phillips' reports were devoid of any mention of his self proclaimed key witness**.

It should be noted Agent Phillips and Agent Barnhill also knew Mike Franklin held a grudge against Hubert Vidrine, as Mr. Vidrine had become a direct competitor of Franklin's and had taken business from Franklin.  Barnhill's 302s reflect that in 1997, after Vidrine left Canal, Vidrine began to undersell Franklin, thereby taking some of Franklin's business. Additionally, in contrast to that which Franklin told agents, Vidrine testified Franklin did owe him money from some business deals they had done together when Vidrine first started his own brokerage business.

Also, after the execution of the federal search warrant at Canal and its negative impact upon Canal, yet while Vidrine was still employed by Canal, Franklin attempted to purchase Canal.  When he was unable to obtain the financing, he then offered to buy Tank 402, separate "the good product" from "the bad product," and dispose of the product legally.  In other words, Franklin offered to "make a deal" similar to that which he had allegedly walked away from previously, he attempted to purchase a weakened Canal, and he saw Vidrine as a competitor.

On January 23, 2001, following a hearing presenting the problems and absences in the Franklin story, the presiding judge in the criminal case barred Franklin's testimony – a development the AUSA characterized as a "mortal wound." Yet again, this information is not reported by Agent Barnhill at all, and not reported by Agent Phillips until seven months later.  Nevertheless,  the

---

[114]Exh. P013, P019. Additionally, it was indicated at trial that Mike Franklin may have been receiving assistance from the FBI on certain legal proceedings against him, as well as other matters of interest to the FBI in light of his special relationship with the FBI.  However, no direct evidence was presented on this point.

prosecution of Hubert Vidrine continued in vain in its continuing failed attempt to locate Franklin's fictitious lab reports, which had not surfaced in the three years since agents had first contacted Franklin. In a last ditch effort to locate the phantom reports, on August 21, 2003, the government hypnotized Mike Franklin. The information Franklin provided under hypnosis, like most other information he provided, bore no fruit. The reports were never located; evidence of their existence was never found; information given could not be verified.

(4)     **Phillips Testimony regarding Franklin before the Grand Jury**

First, one cannot lose sight of the fact that Mike Franklin never testified before the grand jury. Rather, at the first grand jury hearing held on July 14, 1999, Keith Phillips conveyed what he chose as the primary points of the Mike Franklin narrative to the grand jury, notwithstanding Phillips had not been present at the initial Franklin interview. However, at the September grand jury session, Agent Phillips went even further in describing that which he selected from the Franklin story. On this occasion, Agent Phillips, while under oath, testified falsely to the grand jury on the central damning point: he testified to the grand jury that he had reviewed Franklin's reports (which were never found), and Franklin's reports showed the Trinity product "contained chlorinated solvents" (neglecting to mention Franklin actually said *over 1000 ppm* chlorinated solvents."[115]

---

[115]Specifically, on September 14, 1999 (the second time Agent Phillips testified to the grand jury in this matter), he testified as follows:

Q     All right. So he had the material tested. And the Grand Jury has subpoenaed the records from the lab that he sent it to be tested to?

A     Yes, sir.

Q     **And you've reviewed those records for the Grand Jury's benefit. And those lab results are, essentially, what?**

A     **They indicate that the material, at least, in part, was contaminated with**

69

As of August 11, 1999, Agent Phillips had numerous lab reports in his possession, obtained by way of grand jury subpoena, from Precision Petroleum Labs, the lab to which Franklin said he had sent the Trinity samples to be tested, as well as from other potential labs.[116] Prior to the September 1999 grand jury session, Agents Phillips and Barnhill met with Franklin to review the subpoenaed test results, and, according to Agent Barnhill, **Franklin advised the agents the subpoenaed test results were not the lab reports of the samples at issue**.[117] Nevertheless, on December 14, 1999, Agent Phillips testified falsely **for a second time** to the grand jury, again claiming to have seen the Franklin test results, and again, stating the reports showed Trinity's product was "contaminated with chlorinated solvents."[118]

At trial of this matter, Agent Phillips attempted to explain his behavior by stating he had

_____

chlorinated solvents?

Ex. P033 at 148. (emphasis added). One must also note not only had Agent Phillips not seen Franklin's lab results, but, also, that in every 302 of Franklin, the sampled product is described as containing over 1000 ppm chlorinated solvents (in other words, Franklin is discussing the used oil regulations), but Agent Phillips testifies the product showed the presence of chlorinated solvents (in other words, Agent Phillips changed Franklin's testimony to use language falling under the hazardous waste regulations).

[116]P018 at 000549, 000554.

[117]Agent Phillips testified he did not think he asked Franklin about the subpoenaed reports before he testified **falsely** to the grand jury in July, but he was not certain; however, he admitted that it would have been the prudent thing to do. June 8, 2011, pp. 124-125; June 13, 2011 at p.111.  Agent Barnhill testified she and Agent Phillips did meet with Franklin and asked Franklin about the subpoenaed lab results prior to Agent Phillips' **false** testimony, and Franklin advised **both agents** the lab reports they had obtained were not the pertinent reports.  June 14, 2011 at p. 49.

[118]At his December appearance before the grand jury, Agent Phillips testified as follows:

Q    And you've obtained the samples -- the test results of what Mike Franklin took in the summer of 1996. They came back positive for chlorinated solvents, correct?

A    **That is correct**.

Ex. P033 at 196.  (emphasis added).

70

thought the reports obtained by subpoena from PPL were the Franklin reports.   Agent Phillips

testified:

A:  I do not remember when we first asked him for those lab reports.

Q:  Do you remember that he, at least, was asked for it one or more times before you sent out Grand Jury subpoenas?

A:  I know in my, I guess it was, July 1999 Grand Jury testimony that we believed we had them.  We had an analytical from Petroleum Precision Laboratory which . . . I . . . believed to be the analytical data.

. . . .

THE COURT:  Uh-huh.  And when did you realize it wasn't [the Franklin lab report]?

A:  At some point Michael Franklin himself pointed out that was not the right analytical data.  It would have been sometime after the Grand Jury testimony.

THE COURT:  You didn't show it to your witness, Mr. Franklin, before he went in to testify before the Grand Jury about this lab report?  You didn't show him the purported lab report and talk with him about it before you sent him into the Grand Jury?

A:  We did not send him into the Grand Jury.

THE COURT:  He did not testify?

A:  No, ma'am.

THE COURT:  Well, you testified there?

A:  Yes, ma'am.

THE COURT:  About something you had not asked him about as to whether these were the lab reports?

A:  I do not remember if we asked him or not, Your Honor.

THE COURT:  No I'm asking whether you asked him.

A:  I don't know.

71

THE COURT:  You were the one who was going before the Grand Jury and under oath.

A:  Correct.

THE COURT:  Were testifying to what you had personal knowledge thereof?

A:  Absolutely.

THE COURT:  And you, I'm assuming, testified as to the existence of those reports to the Grand Jury, correct.

A:  That's correct.

THE COURT: Uh-huh.  And you could not have, in fact, seen the actual lab reports because they were never found, right.

A:  We had -- no.

THE COURT:  Right?

A:  Yes.

THE COURT:  And what you thought you had you went and testified about without talking to Mr. Franklin about it?

A:  I do not remember if we talked to him or not.

THE COURT:  Well, that raises the next point.  If you talked to him about it and showed it to him, it would seem he would have told you these are not the right ones because you are telling me he said that at some point in time.

A:  Yes, ma'am, that's correct.

THE COURT: Uh-huh.  And if you showed it to him and he said they were the right ones, that would be a whole 'nother issue.

A:  That's correct.

THE COURT:  So you're telling this Court that these documents that never -- it turned out they never existed, but that there were some "analyticals" that you are telling this Court you believed to be the Franklin documents.

A:  That's correct.

THE COURT:  You went and testified under oath before the Grand Jury without ever having spoken to Franklin and asked him about those documents and what they meant, where they were, are these the right ones.  You don't remember.

A:  I do not remember the chronology of events leading up to that.

THE COURT:  But do you agree with me that you have now said that Mr. Franklin at some point told you, no, those aren't the right ones.  Correct?

A:  That is correct.

THE COURT:  It would seem to be a reasonable presumption, then, or a reasonable inference you didn't ask him about those before you went to the Grand Jury or he would have told you then, unless there's something I'm missing.  Please enlighten the Court if possible.

A:  I would have to say you're correct.

. . . .

THE COURT:  Yeah.  And you went in and testified about something asserting you had personal knowledge of it when in fact you did not, yes?

A:  It would appear so.[119]

This Court notes upon review of the lab reports Agent Phillips referenced, that even a cursory review by the most unseasoned rookie would have shown the proclaimed error.  Agent Phillips testified after he had received the subpoenaed reports, there were two which he thought were the pertinent Franklin reports.  However, even the briefest of reviews would have shown one of the two reports Phillips referenced did **not** show the sampled product to contain over 1000 ppm total halogens as Franklin had alleged, and the other was of a sample taken **after** the time frame for which Mr. Vidrine was indicted.  Hence, **on their face, neither could have been mistaken for the absent Franklin reports**.[120]  Furthermore, even if the Court accepts Phillips prior testimony that at the September

---

[119]Phillips Trial Tr. vol. II, pp. 343-347, June 8, 2011.

[120]Phillips Trial Tr. vol. II, pp. 386-388, June 8, 2011.

grand jury session he had not had sufficient time to review the subpoenaed documents, setting aside the recklessness of such a statement in a court of law, he nevertheless had more than three months to review those documents prior to the December grand jury session – yet still made the same "mistake."

This Court, for the reasons noted above and those which follow, finds Agent Phillips wholly without credibility, in toto, on any matter before this Court, but in particular on this point – the documents, on their face belie Agent Phillips' testimony.  This Court finds, based upon the evidence presented in this case, including Agent Phillips' testimony, that Agent Phillips' grand jury testimony likely raised the specter of perjury not once, but on two separate occasions: (1) his testimony before the Grand Jury in September 1999, when he testified he had seen the Franklin test results, and testified as to the contents and results of the non-existent reports, when in fact he had not; and (2) his testimony before the grand jury on December 14, 1999, when he, again, testified he had in hand and had reviewed the Franklin test results when, in fact, he had not.  And again, Agent Barnhill testified Franklin had previously advised the agents the argued reports were not the reports to which he had alluded.[121]

Agent Phillips testified he was mistaken when testifying before the grand jury, a fact he realized only after testifying to the grand jury.  However, this Court found that particular testimony to be wholly without credibility, and not supported by the record.  Furthermore, this Court finds Agent Phillips' failure to verify his assumptions with Mike Franklin when Franklin was readily available, is at best, illustrative of reckless disregard, or at worst, intentional disregard for the oath he took as an EPA agent and the oath he took before the grand jury.

---

[121]It should be noted the statute of limitations has run as to any perjured testimony Phillips might have given the grand jury.

ii.     Conclusion of that which the Franklin information added
to the prosecution

Mike Franklin was a broker within this peculiar niche (the buying and selling of alternative feedstock) of the oil industry.  He was a salesman, in competition with other salesmen, in the pursuit of a finite product in a shrinking market.  By the time Mike Franklin came on the radar of law enforcement agents investigating this matter, he had already become a competitor of, and lost the competition to Hubert Vidrine.

Had the AUSA had been given all the facts by Phillips and Barnhill (both good and bad, and excluding half-truths), or had the 302s been more complete and timely provided to the AUSA, and had a reasonable interpretation of the applicable regulations been provided to the AUSA and the grand jury by Phillips, and had Agent Phillips testified truthfully to the grand jury, this Court finds a very different result likely would have ensued: Hubert Vidrine would not have been indicted.  For reasons that will never be known by anyone other than Agent Phillips, Agent Phillips was not content to merely "gather the facts and let the facts themselves either support or not support the indictment" as he testified one should do.[122]  Rather, Agent Phillips, either deliberately, or with reckless disregard for the truth, provided false testimony to the grand jury in order to secure an indictment against Hubert Vidrine, on at least two occasions, and permeated the entire investigation with omissions, half-truths, overstatements, inflammatory language, misstatements, patent falsehoods, and tortured readings of regulations.

The <u>facts,</u> themselves, did not change; the <u>law</u>, itself, did not change. What changed was Phillips' ability to continue to hide his "over speaking," his "misleading," his false testimony to the

---

[122]Phillips Trial Tr. vol. I, p. 51, June 7, 2011.  (Agent Phillips testified on more than one occasion that this was the manner in which he handled the Vidrine investigation and prosecution.)

Grand Jury, and the glaring omissions of pertinent information. "The mere presence of chlorinated solvents" is <u>not</u> illegal as Phillips testified; Mike Franklin and Agent Phillips did <u>not</u> have test results showing Trinity had hazardous waste on its premises it was attempting to sell as used oil; Mike Franklin <u>never</u> told investigators he had a test showing "the presence of chlorinated solvents with the characteristic of toxicity" on Trinity Marine's premises; Mike Franklin had <u>no</u> personal knowledge of knowledge on the part of Hubert Vidrine.  With only the smallest bit of objective detective work, Agent Phillips could and should have known (and indeed, likely did know) that Mike Franklin's story was neither credible nor trustworthy.[123]   The investigation revealed conflicts of interest, unpleasant business competition, financial problems( perhaps stemming from an almost two decade long cocaine habit), and possible contamination of Franklin's alleged information due to Franklin's presence during the search at Canal.[124]   What ultimately secured an indictment against Hubert Vidrine was not Mike Franklin, as Keith Phillips testified - it was Keith Phillips' and Phillips' "tweaking" of the Mike Franklin story to create facts, as Agent Phillips wanted to see them. Given the inherent problems, omissions and glaringly obvious weakness of Mike Franklin and his information, Agent Phillips and Barnhill's omission of those problems, and Phillips' dogged pursuit of Hubert Vidrine, this Court is left with the question, "Why?"  (That question will be discussed in full detail below when this Court explores the issue of malice.)  For now, it is sufficient to note the

_____

[123]Agent Langlois suspected Franklin lacked credibility even without conducting further investigation.

[124]Franklin's presence at Canal on the day of the search provided him the opportunity to hear much of that which transpired during Hubert Vidrine's interviews, and thus provided him with the information and a roadmap to take out a competitor - Hubert Vidrine - in a shrinking market, and create a possible business opportunity - *i.e.* his attempt to purchase the same product once Vidrine and Canal were removed, and the opportunity to purchase the decimated refinery, itself.  However, it is also a possibility that Franklin simply provided whatever information he thought the agents wanted to curry favor in connection with his own legal problems.

conduct.

Again, the Court returns to the fact that Canal Refining and Hubert Vidrine (as an employee of Canal Refinery) were in the legal and legitimate business of buying alternative feed stock, including used oil, which by its nature, and as contemplated by the regulations, **is expected to contain certain amounts of halogens (which include chlorinated solvents)**, thus, a finding of chlorinated solvents, in and of itself, is not violative of the law.  One source of used oil for Canal was the barge cleaning industry (namely, Trinity Marine), which was also in the legal and legitimate business of emptying and cleaning barges used to transport various material, including oil, and thereafter recycling that used oil by selling it to re-refiners such as Canal – a practice explicitly encouraged by the EPA.  Although Agent Vikin, whom this Court found to be credible, testified that as an industry, the barge cleaning industry had a poor enforcement record, nonetheless, the industry itself was a legal and legitimate industry.

Again,  "Probable cause for arrest exists when facts and circumstances within the knowledge of the arresting officer *and of which he has reasonable and trustworthy information* are sufficient to justify a man of average caution in the belief that the person to be arrested has committed or is committing an offense."  Miller, 511 at 452 (emphasis added). Unfounded suspicion and conjecture will not suffice. Id. **Verification is required to establish probable cause if the source of the information seems unworthy**. Id.  (emphasis added).[125]  In light of the foregoing, this Court finds Mike Franklin in no way provided probable cause to indict, or continue to prosecute, Hubert Vidrine.

---

[125]Of course, that is the "less stringent" standard, for under Louisiana law, in order to indict, the evidence must constitute probable cause sufficient "to justify a conviction absent an explanation or contradiction."  Huff at 1046.

### d.   "Deliberate Ignorance" of Vidrine

With the exception of Agent Phillips' testimony that Mike Franklin provided the crucial element of knowledge on the part of Hubert Vidrine, which, for the reasons provided this Court finds to be wholly without merit or credibility, the government presented no persuasive evidence of direct knowledge on behalf of Mr. Vidrine. To overcome this essential void in its case, the government has argued that had the criminal matter gone to trial, the government could and would have proven knowledge on the part of Hubert Vidrine, through the use of the "deliberate ignorance" jury instruction.[126] The Fifth Circuit Criminal Pattern Jury Instructions define "deliberate ignorance" as follows:

> You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him.  While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact.[127]

As stated by the Fifth Circuit in U.S. v. Lara-Velasquez[128]:

> The term deliberate ignorance "denotes a conscious effort to avoid positive knowledge of a fact which is an element of an offense charged, the defendant choosing to remain ignorant so he can plead lack of positive knowledge in the event he should be caught." *The key aspect of deliberate ignorance is the conscious action of the defendant-the defendant consciously attempted to escape confirmation of conditions or events he strongly suspected to exist.*  As one opinion has colloquially noted, deliberate ignorance is reflected in a criminal defendant's actions which suggest, in effect, "Don't tell em, I don't want to know."  The purpose of the deliberate ignorance instruction is to inform the jury that is may consider evidence

---

[126]Of course, this requires one to assume the presiding judge, Judge Melançon, would have granted such a request, in light of his ruling as to Mike Franklin.

[127]Fifth Circuit Pattern Jury Instruction 1.37 - Criminal, 2001 ed.

[128]Lara-Velasquez, 919 F.2d 946, 951 (5th Cir. 1990)(internal citations omitted, emphasis added).

of the defendant's charade of ignorance as a circumstantial proof of guilty knowledge. "[T]he instruction is nothing more than a refined circumstantial evidence instruction properly tailored to the facts of a case . . . ."

A deliberate ignorance instruction should be used sparingly.  *See* United States v. Chen, 913 F.2d 183 (5th Cir. 1980).

The government argues that because Vidrine was responsible for the purchase of all feedstock for Canal since 1995, he had to have known what he was doing - in other words, the government argues Mr. Vidrine was "deliberately indifferent" to the fact that he was accepting hazardous waste. More specifically, the government argues that in March, April, and May of 1996, Canal had been losing money for a couple of years; that Vidrine was responsible for Tank 402, which was used to store AFS prior to the manufacture of high sulfur diesel; and that high sulfur diesel was the big "money maker" for Canal - thus arguing Vidrine had a motive to accept used oil that was "cheap," due to its adulteration with hazardous waste, to get Canal "back on its feet."[129]  For the reasons that follow, the Court finds a "deliberate ignorance" jury charge does not overcome the government's inability to show knowledge on the part of Hubert Vidrine.  This Court will now address the evidence the government argues supports the application of the deliberate ignorance charge.

### i.    Fred McKenzie

As briefly noted earlier, Agent Phillips testified that Fred McKenzie actually *told Mike Franklin* (and not Hubert Vidrine) that if he, Franklin, wanted Trinity Marine's used oil, he had to "take the good with the bad."  The only 302 that mentions anything about taking both good and bad product, is the final Barnhill 302 from July of 1999:

> [FRANKLIN] told MCKENZIE that [FRANKLIN] wanted all of the TRINITY product except the bad, contaminated product.  MCKENZIE replied that

_____

[129]Exhibits D68, 30:10-11; D7 at 93.

he already had someone who was going to purchase the whole lot, the good product and the bad product, adding, "why do I have to deal with you", or words to that effect.[130]

While the government vehemently argues this statement meant McKenzie, and thus, Trinity, was attempting to illegally dispose of purported hazardous waste, equally plausible readings are that McKenzie was looking for a buyer with a hazardous waste permit, so that he could buy all the product - both hazardous and non-hazardous – or that he was referencing other problems with the used oil, not relating to hazardous waste.

The government had multiple witnesses who advised agents that in their opinion, any statement by McKenzie that a buyer must "take the good with the bad" was not a reference to hazardous waste, but rather, was a reference to used oil that did not meet the specifications of a customer.  In other words, Trinity Marine – who had a hazardous waste permit, and thus, presumably had been deemed by the applicable government agencies as sufficiently knowledgeable and prudent in the handling of hazardous waste - was not attempting to illegally dispose of its hazardous waste, but rather, was not going to separate its used oil into separate batches to meet the various specifications of different refineries and those refineries' equipment.

For example, the government relies upon a facsimile from David Deshotels of U.S. Filter to Fred McKenzie, dated August 12, 1997, addressing potential hazardous waste contained on the Kentucky barge, as well as an interview of David Deshotels, to bolster its claim that Trinity was attempting to dispose of its hazardous waste and Hubert Vidrine should have known this fact.[131]

---

[130]The December 1998 302 reads on this topic as follows: "MCKENZIE said that if [FRANKLIN] wanted to purchase the other products from TRINITY, then [FRANKLIN] would have to take the product in question that was over 1000 ppm."  The January 1999 302 reads: "MCKENZIE advised he was looking for someone to purchase all of the product at TRINITY together, not separate."

[131]Exhibits D54, D62.

Essentially what these two documents show is that in 1997, while Trinity was selling off its used oil (because it was in the process of closing its barge cleaning facility), U.S. Filters, a buyer of used oil, collected samples of Trinity's product to determine whether it wished to purchase that material.  One of the samples tested by U.S. Filter showed a "high concentration of total halogens."[132] Another sample showed a high concentration of water, which is not a violation of the hazardous waste or used oil regulations, but rather is a factor that can make used oil "bad" for the specifications of a given refinery.  In fact, Agent Phillips' own memorandum of the Deshotels interview states:

> DESHOTELS stated McKenzie told him he would 'have to take it all or nothing' ***but did not understand McKenzie to mean the oils containing high concentrations of total halogens.***

> DESHOTELS stated he agreed to take all the oil except the oil containing high concentration of total halogens.[133]

When U.S. Filter subsequently returned to Trinity to pick up the used oil, one of the three tankers was rejected, **due to the oil containing more water** than the samples had represented.[134]  McKenzie had U.S. Filter pump the rejected oil back into Trinity's barge.[135]

First, the foregoing **post-date the alleged criminal acts for which Mr. Vidrine was indicted by almost one year,** and second, Trinity's Kentucky barge remained in use after the search warrant was executed at Canal, and during that time it was still being filled and emptied.[136] Consequently, any hazardous material that might or might not have been found on the Kentucky

---

[132]Exh. D62 at 2010FBI00338.

[133]Id. at 2010FBI00339.

[134]Id. at 2010FBI00337, 2010FBI00339.

[135]Id. at 2010FBI00337.

[136]Trial Tr. vol. IV, p. 704, June 10, 2011.

Barge **almost one year after** the storage events in question, at a facility that was licensed to handle hazardous waste, is no way indicative of whether or not Hubert Vidrine was knowingly storing hazardous waste, without a permit, at the Canal refinery, from August 13, 1996 through September 4, 1996.

Additionally, Andrew Hanson, Environmental and Safety Coordinator at Trinity Marine, who worked directly under the supervision of Fred McKenzie, testified on this topic before the grand jury. Hanson's testimony reads as follows:

Q      Now, there came a point in time, this vendor [Franklin] is trying to do business with Trinity, and I have reason to believe that the vendor said words to the effect, to not you necessarily unless you tell me he did, but to Fred McKenzie words to the effect that "I'll take the good stuff, I'm not going to take the petroleum distillate that has chlorinated solvents in it, because, you know, that's - -"

A      Waste.

Q      - - "waste. I'm not going to take that."

And the grand jury has heard, or will hear, testimony to the effect that management with Trinity said words to the effect, "You take it all or you take none at all."

And of course, that suggested to the vendor that you take the good stuff with the bad.

However, you have a perspective on that, and you need to share that with the grand jury. I think your perspective is is that Fred McKenzie may have meant you take the good stuff, the medium stuff, and the stuff that's not so good, but not hazardous waste. So you have to take the good with the not so good, you have to take the better with the poorer. But to your way of thinking, when he said that - - were you there when he said "all or nothing"?

A      I was not there when he said it to any vendor. He had said it to me that that was the course he was pursuing in obtaining a vendor to handle the material.

Q      But you took that to mean, from your perspective, that some of the stuff you had was real good stuff, some was fair stuff, and some was - - is marginal

82

> stuff, but it's all stuff that you can sell.
>
> The next category of stuff is that hazardous waste, which you must dispose of by manifesting it and taking it to disposal areas, correct?

A    Talking about good - - by levels, I'm talking, referring to price, not quality.

Q    and so when Fred has said to you, Fred McKenzie, "all or nothing," **you don't take him to include the hazardous waste in that "all or nothing." Because essentially, if that's what he meant to do, what would your position have been**?

A    **I would have quit**.[137]

In light of the foregoing, the Court finds *if* McKenzie told *Franklin* he would have to take all of Trinity's used oil, both "the good and the bad," it is more likely than not he was referring to product that would not meet a buyer's specifications - not that an unpermitted buyer would have to illegally accept Trinity's hazardous waste as well as its used oil.  Most importantly, however, again, the statement McKenzie allegedly made to Franklin still does not impart knowledge or deliberate indifference on behalf of Hubert Vidrine, as the government argues.

　　　　　　　　　　　　　**ii.    Andrew Hanson**

The government argues Andrew Hanson's grand jury testimony supports its showing of probable cause and Hubert Vidrine's deliberate ignorance, particularly as it provides corroboration of Franklin's statement that one sample taken at Trinity Marine tested positive for over 1000 ppm chlorinated solvents. First, from this Court's review of Hanson's grand testimony, it actually

---

[137]Exh. D63, pp. 970-972.  The Court notes, at the trial of this matter, Agent Phillips testified (when it bolstered Phillips' testimony) that Andrew Hanson was fired by Fred McKenzie prior to his grand jury testimony, and thus, it would seem Hanson would not be framing his testimony to protect McKenzie.  However, like much of Agent Phillips' testimony, the Court doubts the veracity of that statement.  From the materials the Court has reviewed, it appears Hanson worked for Trinity Marine until shortly before it dismantled its barge cleaning operations in 1997. Furthermore, nothing in Agent Phillips' memoranda of the two interviews he conducted with Hanson, nor in Hanson's grand jury testimony, suggests Hanson was fired by McKenzie.

indicates Hanson had no specific recollection of Mike Franklin coming out to Trinity to buy product or take samples.[138] Rather, those were facts assumed by the prosecutor in his questioning of Hanson, likely due to information funneled to him by Barnhill and Phillips.

Next, Hanson testified to the grand jury that at some point in time, Hanson did realize that chlorinated solvents in the number 4 starboard hold of the Kentucky barge had eaten through the walls of that hold and leaked into at least two of the surrounding holds containing petroleum distillates.[139] However, as previously discussed, the evidence indicates that, in fact, had Franklin pulled samples, they would not have been pulled from the same hold that contained the product ultimately sent to Canal - or even from a hold where cross-contamination likely would or could have occurred. Additionally, Hanson testified when he learned of the search warrant executed at Canal, he was "fairly sure" he resampled all tanks from which material was pulled to send to Canal, and to his recollection, the test results came back showing no signs of chlorinated material.[140]  Hanson further testified it would have been difficult for someone at Trinity to have clandestinely smuggled out chlorinated solvents mixed with petroleum distillates without his having known about it, and he

---

[138]Exh. D63 at 965-967.

[139]Id. at USA00967-968, 984.

[140]Id. at 988; *see also* Agent Barnhill's July 1999 memorandum of interview of Hanson, reading in pertinent part:

> TRINITY became aware of the CANAL warrant through a representative from AFI.  This call was in September, 1996, the day of the CANAL warrant.  TRINITY thereafter pulled samples from the source tanks there at CANAL and sent the samples to a lab.  TRINITY also pulled samples from non-source tanks, which HANSON described as tank product that had not been shipped out yet.  **All samples as pulled from TRINITY came back negative for chlorinated materials.**

Ex. D17 at127.  (emphasis added).

had no such knowledge.[141]  Finally, as already discussed, Hanson testified if and when McKenzie told Franklin he had to take all product - both good and bad - he would not have been referring to hazardous waste, but rather, all used oil, whether or not it met the particular specifications of a particular refinery.

### iii.    Harold Langdon

The government, also, argues Harold Langdon, Vice President of Marketing and Administration at Canal, not only supports deliberate ignorance, but also provides corroboration of the Franklin story. Agent Barnhill's December 302 of Franklin reads: "[FRANKLIN] talked to HAROLD LANGDON, who said that VIDRINE bought bad product and that the bad product was put into Tank 402."  Again, the evidence revealed that in the refinery business, references to "bad product" typically refer to product that does not conform to a given refinery's specifications, for a variety of reasons, and can lead to a shut down of the refinery's equipment. For example, in the refinery business, "bad product" can refer to product with a high salt content, a high viscosity, excess gravity, excess water, etc. Consequently, the statement contained in Barnhill's 302, which itself constitutes, at best, her memory of hearsay within hearsay, does not necessarily correlate with Franklin's allegation of the presence of more than 1000 ppm chlorinated solvents in one of the multiple samples he allegedly took and had tested at least one month prior to the alleged conduct for which Hubert Vidrine was indicted. Additionally of note, Harold Langdon was interviewed by Agent Phillips, and Agent Phillips' Investigation Summary Report reveals no reference to Langdon having stated Vidrine bought bad product and put it in Tank 402.  Of further interest, Phillips' report states: "Langdon had little interaction with Vidrine other than discussions concerning supply and

---

[141]Id. at 991-995.

85

marketing."[142]

### iv.    Frank Bourque

The government, also, relies upon the interview of Frank Bourque, an AFI employee, to show "deliberate ignorance." Specifically, the government relies upon the following statements in Agent Barnhill's memorandum memorializing that interview: "BOURQUE stated that VIDRINE knew what sort of material CANAL was receiving from TRINITY. 'It was all about money', or words to that effect. BOURQUE added, 'Where they (CANAL) could save that buck, they would save it', or words to that effect."[143] The Court finds the foregoing does not support the government's assumption that because Vidrine acted to save his company money, he set out to purchase illegal AFS to further that endeavor.  Moreover, the foregoing does not provide knowledge, direct or otherwise, that Vidrine *knew* the used oil he was receiving had, perhaps, been adulterated with hazardous waste by Trinity. The Court finds the government overreaches in its argument.  Furthermore, the Court finds when read in its entirety, the Bourque interview actually undercuts the government's argument regarding knowledge - deliberate or otherwise.

Agent Barnhill's 302 of Bourque reads in pertinent part:

> In developing the deal to transport material from Trinity to Canal, John Broussard dealt with Fred McKenzie at Trinity regarding what materials were available, and Campbell dealt with Hubert Vidrine at Canal regarding what materials Canal would accept.

> . . . .

> Whiting was the full time driver of the AFI tanker used to transport between Trinity and Canal.  When Whiting was to transport a load between trinity and Canal, he would receive from the AFI office Bills of Lading that would already be filled out.

---

[142]P036 at 1211.

[143]Exhibit D65 at 1022.

. . . It would already be known by John Broussard what material was to be picked up that day from Trinity. . . .

At Trinity, only Trinity employees were allowed to pump the Trinity material into the AFI tanker. A sample was then taken from the top and the bottom of the tanker by a Trinity employee.  If no sample was provided, Whiting would pull the sample himself.  Upon arrival at Canal, a Canal employee would sometimes pull a sample from the tanker, depending on the Bill of Lading.  If the material being brought in from Trinity was listed as ethanol, then a sample was always pulled at Canal.  If the material from Trinity was listed as petroleum distillates, then a sample was often not pulled at Canal and the tanker went immediately to off load at a special storage tank.

Bourque recalled that on many occasions, the material from Trinity was not what McKenzie had said it to be. At times, the material AFI was told to be petroleum distillates **was found to contain water and sludge**.  Some of Trinity's materials were not accepted by Canal.  When that occurred, the material in the AFI tanker was brought to AFI to be stored.  Bourque sated that he was told by John Broussard, "We have to take the bad with the good", or words to that effect. Bourque added that if the bad was not taken by AFI, then AFI would not get the good material.

Bourque advised that Vidrine accepted almost anything.  If a load was rejected at Canal, **it was done due to sludge or a high water percentage in the ethanol**.  Canal would accept anything else.  Quantity, not quality, was important. Bourque states, "It would have to be horribly bad off for them not to accept it.  Canal would hide it in something else", or words to that effect.

Bourque recalls that approximately every other return trip from unloading material at Canal from Trinity, Whiting would bring a sample from that load to AFI. This sample, which John Broussard was told by Trinity to be petroleum distillates, was tested at AFI and found to contain constituents to include benzine, toluene, and xylene.  Chlorinated solvents were identified by John Broussard as being present in the sample **according to the smell**. Through these test results at AFI of Trinity material, Bourque thought that the material should have been disposed of, not sold, by Trinity. Bourque stated, "Trinity was doing anything it took to get the barges striped [sic]", or words to that effect.

Bourque recalls the day of the federal search warrant on Canal because Whiting returned to AFI with a tanker load of material from Trinity that was turned away from Canal and not permitted to unload. . . .

. . . .

. . . However, Bourque recalls that on possibly two (2) occasions, the tanker

87

did not go directly to Canal from Trinity, but instead returned to AFI from Trinity to get "topped off" with either ethanol or a red oil substance. John Broussard used ***petroleum distillates*** to top off the tanker.  ***Bourque does not believe that John Broussard used chlorinated solvents to top off the tanker***.  Bourque added, "I see everything put into the tankers", or words to that effect. ***Bourque did not observe John Broussard use known chlorinates to top off the tanker.***

Bourque is not aware of any time when AFI loaded the tanker with any material from AFI prior to the tanker leaving for Trinity to receive a load for Canal. On the day of the federal search warrant, wherein the load from Trinity to Canal was returned to AFI, the entire load was pulled straight from Trinity and was not brought by AFI to be topped off.

. . . .

Campbell always dealt with Vidrine.[144]

Thus, the Bourque information shows Mr. Vidrine dealt with Mel Campbell, not John Broussard, again undercutting Agent Phillips' testimony to this Court and his testimony at length to the grand jury about John Broussard and AFI, and his argument that he gave that testimony to the grand jury because he wanted the grand jury to "know who Mr. Vidrine was doing business with"[145]; it provides further support for Vidrine's statement to Agent Vikin that trucks from trusted vendors were not always sampled for compatibility with Canal's refinery equipment immediately, but rather, were allowed to unload prior to Canal testing the compatibility of the product; it provides further support for the proposition that in the refinery industry, "bad product" typically refers to product that is incompatible with a refinery's equipment and does not refer to product adulterated with chlorinated solvents; ***it  specifically states Broussard was not laundering his hazardous waste in the Trinity material destined for Canal; and it contains no indication that Vidrine knew he was storing purported hazardous waste, rather than used oil, at Canal Refinery.***

---

[144]Exhibit D65 at 1020-22.

[145]Phillips Trial Tr. vol. III, p. 604, June 9, 2011.

v.       **Randall Whiting**

The government cites the following information from Randall Whiting, the full time driver of the AFI tanker used to transport product between Trinity and Canal, in support of its showing of Vidrine's deliberate ignorance and of probable cause.[146]   Specifically, the government argues Whiting told agents about a contract between Broussard and Trinity; that Whiting told agents when product was being transferred from Trinity's hose to the AFI tanker, Whiting observed the product to be blackish-grey in color and smelling of chemicals; that Whiting stated no samples were pulled at Canal from the AFI truck prior to the off-loading of product; and that Whiting told agents he did not make any stops to pick up other product en route from Trinity to Canal.

First, yet again, there is no evidence Whiting shared any of the foregoing information with Vidrine.  Furthermore, there is no evidence Hubert Vidrine smelled the material, or that Mr. Whiting had the expertise to discern the difference between used oil, which might or might not be violative of the regulations, and various other petroleum substances perhaps mixed with hazardous waste, via his sense of smell.[147]   Furthermore, as to Canal pulling samples from Whiting's load, when one reviews the actual source of this information, it reads as follows:

> At CANAL, no samples were pulled from the AFI truck prior to the AFI truck off loading product into the CANAL tank. WHITING stated that at times when he, as an AFI tanker driver, trucked products in to CANAL from other facilities besides TRINITY, a sample would be pulled by CANAL prior to the product being off loaded into CANAL tanks.[148]

---

[146]Exhibit D16, bate stamp 119.

[147]Of note, the actual Whiting memorandum, also, reflects Broussard, unlike Phillips' testimony to the grand jury, correctly advised Whiting that used oil may contain a certain amount of chlorinated solvents and not be in violation of the applicable regulations.

[148]Exh. D16, p. 121.

The foregoing is in conformity with that which Vidrine told investigators at his initial interview: the testing Canal was doing at that time was not to check for chlorinated solvents or other halogens, but rather, was designed to determine whether or not product was consistent with the specifications of Canal's refinery.  Before purchasing product, Canal had the product tested for the foregoing purposes.  If the product was purchased from a trusted vendor, it was not always re-sampled immediately upon delivery.[149]  And again, although the Trinity material was transported from Trinity to Canal on a tuck owned by AFI, it is undisputed the material did not come from, or stop at AFI.[150]  Thus, the Whiting information does not support the government's argument.

### vi.      Financial motives

In addition to Bourque, the government, also, relies on Mike Franklin and Michael Fruge to show the existence of deliberate ignorance as to Hubert Vidrine, arguing that for Vidrine, it was "all about the money."  In Franklin's July interview, Barnhill records that Franklin advised her that at some unidentified point in time, Vidrine told Franklin he was going to try to save Canal money by buying cheap feedstock and selling high, because the refinery was going to be closed down if it did not show profit.[151]  This in no way shows intent to break the law, rather it shows an aggressive business strategy which, on its face, in no way indicates illegal intent.  Similarly, the government

---

[149]And, again, lest we lose sight of the "big picture," even had Canal pulled a sample from the AFI truck delivering product on the day of the warrant, it would have tested "clean" - *i.e.* it would have tested below the 1000 ppm total halogen threshold which applies to used oil, based upon the government's own laboratory results.

[150]Of further interest to this Court, although not abundantly clear, it appears that Agent Barnhill's memorandum of interview of Whiting reflects that on the day of the search at Canal, Whiting contacted Broussard upon arrival at Canal and complied with Broussard's instruction that he immediately return to AFI.  There is no mention of Whiting being stopped by law enforcement agents, or agents collecting samples from the material he was carrying, yet another seemingly inaccurate statement. Ex. D16, p. 121.

[151]Exhibit P014 at 494.

relies upon the interview of Michael G. Fruge, a Process Manager at Canal who was supervised by Vidrine, to show "high sulfur diesel is the big 'money maker' for Canal."[152] Again, the Court finds the fact that Vidrine was a business man who tried to save his company money does not mean he set out to purchase illegal AFS to further that endeavor, and more importantly, these statements do not provide knowledge, direct or otherwise, that Vidrine *knew* the used oil he was receiving had been adulterated with hazardous waste as the government argues. Moreover, a review of the entire Fruge memorandum reveals, like so many others in this case, that Fruge actually undercuts the government's allegations against Hubert Vidrine.[153] The Court, again, finds the government overreaches in its argument.

The government argues Agent Barnhill's interview of Aaron Hornsby supports their argument of deliberate ignorance. Agent Barnhill's memorandum reflects the following:

> [W]hen feed stock is bought at 20 cents a gallon there is something wrong with it. Common sense tells a person there is a reason why it is cheap. Santa Clause died a long time ago. Another refinery is not going to give you good feedstock at cheap price. Why would they? The AFS [Alternate Fuel Stock] had a pungent egg smell to it. The AFS did not smell like crude oil, "or words to that effect."[154]

Much like Mike Franklin, the evidence in the record showed Aaron Hornsby also had great reason to bear animosity toward Hubert Vidrine. The testimony at trial indicated Mr. Hornsby had an alcohol problem, that at some point prior to being fired by Canal, Hornsby was no longer allowed to deal with Canal's AFS, as that job was given to Vidrine. After Hornsby was fired, he was replaced

---

[152] Exhibit D7 at 93.

[153] Just hitting the highlights: "When asked if there have been any problems associated with tank # 402, Fruge answered in the negative. When asked if the trans-mix stored in tank # 402 is contaminated with chlorinated solvents, Fruge answered in the negative." Id.

[154] Exhibit D13 at 111.

91

by Hubert Vidrine, whom Hornsby had previously supervised. Hornsby's animosity toward Vidrine is further bolstered by Barnhill's testimony at the grand jury that Franklin told her that Vidrine told him that Vidrine thought Hornsby's son may have "planted" hazardous waste in Tank 402. Additionally, it appears other employees at Canal were aware of Hornsby's animosity toward Vidrine, as reflected by the following information contained in Agent Phillips' March 2000 Investigative Summary Report regarding his interview of Ben Harmon, a former laboratory assistant at Canal:

> Harmon advised SA Phillips that Aaron Hornsby's wife had ties to the Kennedy family in Washington D.C. and that 'the issue of Vidrine handling hazardous waste was a conspiracy between the Hornsby's with the help of the Kennedy's to get even with Hubert Vidrine for taking Hornsby's job as refinery manager', or words to that effect.[155]

Nonetheless, Hornsby's information, even if found to be reliable, which is in great question, would not support the government's argument that the deliberate ignorance instruction should apply.

### vii.    Chuck McConnell

The government additionally points to Agent Phillips' Investigative Activity Report regarding Chuck McConnell, Hubert Vidrine's boss, in support of its argument that because Vidrine was buying "cheap product," he was choosing to be deliberately ignorant of the fact that what he bought from Trinity was (according to the government) hazardous waste and not used oil:

> McConnell stated he had questioned Vidrine about the cost of the AFS due to the low price. However, McConnell advised that the cost fluctuated depending on what the market would bear. McConnell stated that 20 to 30 cents a gallon for AFS was cheap. If the price seemed to [sic] low, he would question Vidrine about what was being brought into the refinery as feed stock.[156] McConnell stated that he had

---

[155]P036 at 1225.

[156]On June 2, 1999, Virginia Bowen was interviewed by Agents Phillips and Barnhill. Bowen was of the opinion that McConnell was a micro manager, and that Vidrine could not have purchased any

questioned Vidrine if, he Vidrine, was receiving certified analyses on the AFS. McConnell advised Vidrine had indicated the refinery was receiving certified analyses on AFS.

. . . McConnell advised that if Hornsby felt something was too cheap and therefore unsuitable for AFS, Canal would have stopped purchasing material.[157]

First, it should be noted that according to Bourque, Canal was actually paying 30¢ per gallon for the used oil from Trinity.[158] Second, no evidence was presented as to what the government felt was the average cost of used oil in 1996. The Court finds the government's reliance on Hornsby and McConnell is misplaced, as the price of the Trinity material was not 20¢, but 30¢, and there is no evidence (other than hearsay) that 30¢ per gallon, or even 20¢ per gallon, was so far beneath the average market price of used oil in 1996 that Vidrine should have known the product from Trinity had, allegedly been adulterated with hazardous waste by Trinity Marine.

The government, additionally, argues three months prior to the search warrant at Canal, McConnell requested Vidrine implement a procedure to identify the presence of chlorinated solvents in AFS received at the refinery, due to "a discussion with a chemical broker concerning the presence of chlorinated solvents in AFS."[159]  When testing still had not begun in August, McConnell wrote a memo to Vidrine, dated August 16, 1996, stressing the need for the testing.[160] The memo, entitled, "Alternate Feedstock Quality Control," states in pertinent part: "[W]e added a check for chlorinated hydrocarbons on each truckload delivered to Canal. ***Presence of chlorinated hydrocarbons is***

---

AFS without McConnell's approval.  Ex. P036 at 2964.

[157]Exhibit D59 at 1244.

[158]Exh. D70.

[159]Exhibit D59 at 1244.

[160]Exhibit D46

***automatic failure and rejection of the load.*** . . .   If this procedure does not match Canal's procedure in place now, please let me know immediately."[161]

Mr. Vidrine readily admits his boss issued a memo reflecting an instruction to him that he begin testing all loads for "chlorinated hydrocarbons."  In fact, Mr. Vidrine testified that it was he who advised his boss that the presence of chlorinated solvents could be problematic.  Mr. Vidrine testified that at some point prior to ordering the CHLOR-D-TECT kits, he had learned from Mike Franklin that a company called Enjet "had gotten into legal trouble" due to chlorinated solvents, and he had advised Mr. McConnell that Canal should start testing for chlorinated solvents.  Thereafter, the testing equipment was ordered.  However, due to Canal's credit problems and the test kits having been sent to the wrong building, the testing for chlorinated solvents did not begin before the search warrant was executed.[162]  The Court finds this internal instruction, contained in the memorandum

---

[161]Id. at 765 (emphasis in original)

[162]When questioned about the memo, Agent Phillips testified:

Q. [Y]ou've already told this Court that you did not infer any guilty knowledge on behalf of Vidrine or Canal or McConnell or any of these guys because they were voluntarily preparing to start testing the stuff [for chlorinated compounds], right?

A.  They were in the process but they never tested.

Q.  Right.  So they actually were taking steps to voluntarily be even more cautious, right?  That's what you said yesterday?

A.  Yes.
         . . . .

Q.  [T]hey ordered the test kits, CHLOR-D-TECT 1,000s, remember that?

A.  Right.

Q.  [H]ubert Vidrine was on vacation for a couple weeks in August, and then the kits arrived, and then they started -- slow down? - - then they started seeing how they worked, remember that?

from Mr. McConnell, was just that - an internal company procedure - it does not evidence knowledge

on Mr. Vidrine's part that the used oil he was storing was actually hazardous waste.

### viii.    "Reputation" of barge cleaning operations

The last significant argument in support of knowledge and deliberate ignorance made by the

government was, essentially, that it is "common knowledge" that "barge cleaning operations produce

adulterated material." According to Agent Phillips, Trinity (like most barge cleaning companies)[163]

utilized sloppy housekeeping procedures, such as using non-dedicated hoses to clean barges, which

could have allowed chlorinated solvents to migrate into Trinity's used oil.  Agent Phillips' testimony

about this issue was as follows:

> THE COURT:  And in a nutshell that's what you had to show knowledge on the part
> of Vidrine that he was getting - - that he knowingly was receiving and storing
> hazardous waste?
>
> WITNESS:  That was not the only.  The other issue is the reputation of barge

---

A.  Correct.

Q.  But they hadn't actually started testing the loads.  They were just about to when the search occurred, right?

A.  Test kits were in Vidrine's office.

Q.  Right, Now let's assume the timing had been off a little differently.  **Let's suppose they took these voluntary steps two weeks earlier, or a month earlier, and they had tested all these truckloads from Trinity.  What would the tests have reflected? Under a thousand, as far as you know.  You have not the slightest evidence that, if they had been testing this, any of these trucks would have been over a thousand, do you?**

A.  **No, I do not**

Phillips Trial Tr. vol. III, pp. 495-497, June 9, 2011.  (emphasis added).

[163]P033 at p. 950 ("It's known within the industry, the barge cleaning industry and people who deal with buying barge bottoms, that barge cleaning operations are anything but sanitary. Cross-contamination does occur. This is widely known."); p. 952 (cross-contamination in the barge cleaning industry is "primarily due to laziness").

cleaning facilities . . . .

WITNESS:  Mr. Vidrine should have known that barge cleaning operations produce adulterated material.

THE COURT:  Why?

WITNESS:  It was common knowledge in his industry and alternate feedstocks.

. . . .

WITNESS:  I'm not an expert but I do, - - I did learn the barge cleaning facility operations in the course of the investigation.

THE COURT: **But even with that, . . . there was nothing to show that Mr. Vidrine knew he was getting adulterated product. . . . [S]o what you're telling me is that, because after the fact you decided that these people didn't - - the Trinity barge cleaning people were not honorable, that Mr. Vidrine should have known he was getting bad product?  That's your knowledge on his part?**

THE WITNESS: **Yes**.[164]

This Court disagrees with the government: All the foregoing testimony indicates is that Keith Phillips, who by his own admission is not an expert on barge cleaning operations, is of the opinion that everyone in the refinery business knows, or should have known, that all barge cleaning facilities only produce materials adulterated with hazardous waste.  The Court finds this testimony, as it relates to probable cause as to Hubert Vidrine's knowledge, to be so absurd as to warrant no further explanation.

### 3.    Conclusion - Probable Cause

This Court ends its evaluation of probable cause with the conclusion that even if it had found Mike Franklin to be a credible source of information, which it does not, and even had Agent Phillips provided truthful testimony to the grand jury, which he did not, probable cause would not have

---

[164]Phillips Trial Tr. vol. III, pp. 490-491, June 9, 2011.

existed to have indicted Hubert Vidrine for ***knowingly*** storing hazardous waste, originating from Trinity Marine, without a permit, beginning on August 13, 1996. Again, however, as the indictment was dismissed prior to trial, under applicable Louisiana law, the presumption exists that there was no probable cause, and the government has failed to overcome that presumption.  However, for the reasons provided, this Court finds the presumption would not have proved necessary for plaintiffs to prove their case, as this Court finds the evidence presented to establish probable cause to indict Hubert Vidrine did not and does not exist.  Furthermore, this Court finds a "deliberate ignorance" instruction would not have cured the defects in the government's case, as there was no basis to present that instruction to the jury, based upon the evidence presented to this Court.

This Court finds, at best, at the end of the day, Agent Phillips set out to obtain an indictment and prosecution of Hubert Vidrine, based on what he perceived to be, at best, evidence of "Other Crimes, Wrongs, or Acts." *See* Fed. R. Evid. 404(b). However, again, at best, what the government proved at this trial, was that at some point after October 10, 1996 (at the earliest and being generous to the government), Canal probably should have more closely scrutinized any product it may or may not have received from John Broussard and AFI.[165]  But again, one cannot lose sight of the fact Hubert Vidrine was not indicted for any material or product Canal might have received from AFI and John Broussard.  Not only do the crimes for which Broussard and AFI were ultimately convicted have nothing whatsoever to do with the indictment issued against Hubert Vidrine, the indictment against Broussard and AFI did not issue until after the storage events for which Vidrine was indicted, and thus, the omission of Canal in the indictment of AFI and John Broussard, and the omission of product received from John Broussard and AFI in the Vidrine indictment, are rather telling.

---

[165]Again, John Broussard and AFI were indicted on October 10, 1996; they were presumed innocent until their convictions on January 15, 1997.

Accordingly, the Court finds probable cause did not exist to indict, nor did it exist at anytime thereafter to continue to prosecute Hubert Vidrine. Accordingly, the Court finds the government has failed to carry its burden to overcome the presumption of an absence of probable cause.

**B.     Malice**

The Court now turns its attention to malice, the legal issue inherent within the question of "why?" As previously noted, pursuant to Louisiana law, when an indictment is dismissed, a presumption of a lack of probable cause arises, which allows malice to be inferred, and thus the burden shifts to the defendant to show an absence of malice. <u>Zerbe</u>, at 1231.[166]

With regard to malice, the Louisiana Supreme Court has stated:

> [M]alice does not submit readily to definition. . . .  Any feeling of hatred, animosity, or ill will toward the plaintiff, of course, amounts to malice. But it is not essential to prove such ill will. **Malice is found when the defendant uses the prosecution for the purpose of obtaining any *private advantage*,** for instance, as a means to extort money, to collect a debt, to recover property, to compel performance of a contract, to "tie up the mouths" of witnesses in another action, or as an experiment to discover who might have committed the crime. **Malice may be inferred from the lack of probable cause or inferred from a finding that the defendant acted *in reckless disregard* of the other person's rights.**

<u>Miller</u> at 453 (citations omitted, emphasis added).  All parties agree the presumption is at play, and the government has the burden to overcome the inference of malice.

After hearing all argument of counsel, and receiving all evidence and testimony, the Court finds the government has failed to overcome the inference of malice, as it finds probable cause was lacking *and* specifically finds Agent Phillips acted with malice, as defined, for the reasons that follow.

------

[166]*See also* <u>Hope</u> at 1143; <u>Robinson</u> at 251; <u>Keppard</u> at 959.

### 1.    Keith Phillip's false statements and inaccurate testimony permeated the criminal case, as well as this civil case

The most egregious conduct of Mr. Phillips is his repeated disregard of the oath he took, on multiple occasions, to tell the truth.  His testimony before the grand jury on Sept. 14, 1999 and Dec. 14, 1999, particularly as it relates to the Franklin "analytical" or test results, is particularly troubling. Even if this Court were to find Phillips' testimony that he was mistaken to be credible - which, when judged against the test reports themselves and Agent Barnhill's testimony, it does not - at a minimum, that "mistake" would not have occurred but for Phillips' "reckless disregard for other persons' rights." Miller at 453.  Phillips testified he had seen the Franklin analyticals, and they were positive for "chlorinated solvents." As explained above, the two potential reports Phillips had in his possession in August of 1999 clearly and obviously, on their face, could not have been those Franklin test results.  Of the two reports, one showed the sample to be **under 1000 ppm** (Franklin consistently and exclusively said his were **over 1000 ppm**), and the other is clearly dated as **the day after the search at Canal**, in which Phillips participated (Franklin's statement was his results **predated the search at Canal.**) Furthermore, a simple conversation with Mike Franklin could have settled the issue, a conversation both Barnhill and Phillips admit, at some point, occurred.

Thus, the documents Phillips now relies upon to ameliorate his false testimony are of no benefit to him.  Although the alleged Franklin test results were never found, Phillips testified not once, but twice, under oath, that he had seen those tests and their contents.  Had Phillips actually looked at the PPL test reports, it is clear they could not be the Franklin reports.  Furthermore, had he merely inquired of Franklin, prior to testifying about those reports, Franklin himself would have told Phillips the PPL reports were not his missing reports. As previously noted, Agent Barnhill, whom this Court found to be far more credible than Agent Phillips, testified Mike Franklin had

99

indeed told her **and Agent Phillips, prior to the July or certainly December grand jury session, that the subpoenaed reports were not the applicable reports**; Phillips himself admitted Franklin told him as much at some point in time.

Phillips admitted to this Court that Franklin always referred to the test results as being "over 1000 ppm."[167]  Nevertheless, at the September 14, 1999 grand jury session, Agent Phillips testified:

Q.  All right. So he had the material tested.  And the Grand Jury has subpoenaed the records form the lab that he sent it to be tested to?

A.  Yes, sir.

Q.  **And you've reviewed those records for the Grand Jury's benefit**.  And those lab results are, essentially, what?

A.  **They indicate that** the material, at least, in part, **was contaminated with chlorinated solvents**.[168]

Q.  **You have Franklin's test that came back in June positive?**

A.  **That's correct.**[169]

And again at the December 14, 1999 grand jury session:

Q.  **And you've obtained the samples - - the test results of what Mike Franklin took in the summer of 1996.  The came back positive for chlorinated solvents, correct?**

---

[167]When one returns to the testimony of Keith Phillips as to Mike Franklin:

THE COURT: . . .The 302s dealing with Mr. Franklin, do they discuss the characteristics of toxicity or do they discuss that there was something that was over a thousand parts per million?

A:  Franklin stuck with the thousand parts per million.

Phillips Trial Tr. vol. III, p. 477, June 9, 2011.

[168]Exhibit P033, 973:6-14.

[169]Exhibit P033, 988:19-21.

A.  **That is correct.**[170]

In other words, Agent Phillips, clearly, was not content to merely "gather the facts and let the facts themselves either support or not support the indictment"[171], but rather, shaded and colored those facts, and in no way checked or reviewed any possible assumptions he might have chosen to make. Rather, he provided unsubstantiated and false testimony, that could have easily been recognized as false had he simply reviewed the contents of the reports or spoken to his star witness, Franklin.  But instead, Phillips chose to manipulate the "facts," as provided by Franklin, by changing the languaging in significant fashion by, for example, shifting the language from "test results showing over 1000 ppm chlorinated solvents" as Franklin indicated (which suggest the regulations relating to used oil) to "positive for chlorinated solvents" (which suggests the hazardous waste regulations) - i.e. one suggesting possible violations, the other not.  This is extremely relevant to this matter, as Agent Phillips knew there were no test results showing material "over 1000 ppm," because the government's own lab results showed the samples taken at Canal on the day of the search were well under 1000 ppm.  The Court finds Agent Phillips' testimony before the grand jury, in and of itself, supports a finding of malice.

At best, Agent Phillips' failure to verify with Franklin he had the proper test results (or testifying in total disregard to Franklin's having told him the contrary), his testifying **he had reviewed the test results** (even if that was a "mistake" as Phillips argued at this trial), and his coloring of his testimony as to that which he was told by Franklin constituted a reckless disregard for Hubert Vidrine's rights merely by the extent of its sloppiness.  Keith Phillips testified before this

----

[170]Exhibit P033, 1021:16-20.

[171]Phillips Trial Tr. vol. I, p. 51, June 7, 2011.

Court:

THE COURT:  I'm not asking about his conversation, and I'm not asking a thing about Howard Parker.  I'm asking about you, Special Agent Phillips, who went into a Grand Jury and testified, after having taken an oath, whether or not, before you testified to the Grand Jury, that you, in fact, had a lab report in hand if you looked at the lab reports -- did you look at them?

WITNESS:  As far as I know I did, Your Honor.

THE COURT: Okay.  And you're telling me that the first one couldn't apply, right?

WITNESS:  It was a clean -- our logic was it was the clean material.

THE COURT:  Yeah.  So the only other one is this one  that has the date of after the search warrant was issued.

WITNESS:  Correct.

THE COURT:  Did you look at that one before you went and testified?

WITNESS:  I'm sure I did, Your Honor.

THE COURT:  **Okay.  Can you in any way tell me how you didn't catch it then?**

WITNESS:  **How I what?**

THE COURT:  **Did not catch this date and something being amiss?**

WITNESS:  **No, ma'am, I cannot**.[172]

The PPL subpoenas clearly did not produce the Franklin tests, nor did the additional subpoenas issued to all potential labs within the region where Franklin could have taken the alleged samples produce the Franklin tests.  And yet, Phillips testified before the grand jury he had reviewed those test results and what their contents were.  Thus, when Phillips testified, Phillips knew, or clearly should have known, that he did not have the Franklin results about which he was giving testimony.  Accordingly, only one conclusion can be drawn:  Phillips either acted with intentional malice and

---

[172]Phillips Trial Tr. vol. V, p. 877-878, June 13, 2011.

ill will, or with an alarming reckless disregard for the rights of Hubert Vidrine and the oaths that he took.

Agent Barnhill, Phillips co-agent with whom he was engaged in a clandestine sexual affair, testified she never believed the PPL reports were the missing Franklin reports, because Franklin had told her **and Agent Phillips**, certainly by the December 14, 1999 grand jury session, that the reports the government had obtained were not the "smoking gun" reports Franklin had discussed with agents on numerous occasions. Furthermore, as to the subpoenaed PPL report dated September 6, 1996, Agent Barnhill testified she did not even need Franklin to tell her that was not the proper report:

> THE WITNESS:  I don't know that I considered the document on 9-6 of '96 to ever be in the equation . . .  I mean, his analytical that he took was back in June or July. So myself, I never considered that to be what I was looking for.  And the document that was in question was the one on 6-17 of '96. . . .[173]

And yet, her co-agent and then lover, testified before the grand jury not once, but twice, that he had reviewed non-existent documents and testified as to their content in the most damning fashion.

Again, Phillips, himself, admits Franklin told him at some point the test reports obtained by grand jury subpoena from PPL were not the reports Franklin had allegedly provided to Hubert Vidrine and Fred McKenzie.  Phillips testified in this matter:

> THE COURT:  So you basically believed you had the wrong lab reports.
>
> WITNESS:  Is what we came to the conclusion of, yes, ma'am.
>
> THE COURT:  And that conclusion you came to happened when you sat down and looked at that time lab reports at some point in time?
>
> WITNESS:  I believe my testimony, and if my memory serves me, I believe Mike Franklin pointed out that these were the incorrect lab reports.
>
> THE COURT:  So you had never asked Mr. Franklin whether or not these were the

---

[173]Barnhill Trial Tr. vol. II, p. 130, June 14, 2011.

correct lab reports before you went to the Grand Jury and testified that, in fact, they were?

WITNESS:  I don't believe I did, Your Honor.

THE COURT:  Seems to me a rather glaring omission, does it not?

WITNESS:  We did not -- I don't believe we showed them to Mr. Franklin prior to the Grand Jury.

THE COURT:  **Why not**?

WITNESS:  **I can't answer that, Your Honor**.

Q.   (By Mr. Cornwell) In fact, in terms of the questions the judge just asked you, there is no record, is there, or maybe I missed it, of -- in any Franklin interview of your asking him to look at this lab report before or after the Grand Jury, is there?

A.   I don't -- **I don't believe any of the 302s reference that, no.**[174]

Contrarily, Agent Barnhill testified in this Court:

THE COURT: . . . , the **Grand Jury from which an indictment came, and I show that to be December 14, 1999.  Prior to that time you -- it's your memory that you, Agent Phillips and AUSA Parker**[175] **would have met with Mr. Franklin and that Mr. Franklin told you that the Precision Petroleum Labs documents that we're looking at in front of you, invoice number 5673 in particular, was not the lab report that he had told you about, correct?**

WITNESS:  **That's the best of my recollection.**

THE COURT:  **And so you dismissed it because Franklin had told you this wasn't the right one?**

WITNESS:  **That's correct**.

THE COURT:  **And this was before the Grand Jury met on December -- well, in and around December 14, 1999, from which an indictment flowed?**

---

[174]Phillips Trial Tr. vol. V, pp. 880-881, June 13, 2011.

[175]Agent Barnhill later noted she is not sure whether or not AUSA Parker was present at this discussion, but testified Phillips was present.

WITNESS:  **That's correct, because if I felt we had the document, I would have stopped sending -- I would not have continued looking for the document through subpoenas to labs.**[176]

Thus, again, this Court finds, when judged against the documentary evidence and other more credible testimony, Agent Phillips' attempt to explain his conduct to be alarmingly without merit or credibility.

Setting aside the fact Phillips' testimony before the grand jury was false, it was also clearly designed to inflame the passions and play on the fears of the grand jury.  For example, Phillips testified, again inaccurately, to the grand jury:

If that diesel fuel contains a chlorinated solvent such as carbon tetrachloride or chloroform, or one-two dichlorobenzene, then you've not only gotten diesel fuel on your clothes, but you've also exposed yourself to a known carcinogen, a compound, a chemical, that has been known to cause cancer.[177]

This testimony was categorically refuted by plaintiffs' expert, Peter Romanowsky, whom this Court found knowledgeable and credible, and is contrary to the EPA's own comments contained in the Federal Register.[178]

Phillips testified before this Court, when questioned by plaintiffs' counsel:

Q.  . . . During the course of your focusing on this exhibit [regarding samples taken at Trinity on September 30, 1996], you made reference to benzene readings and you volunteered in one of Ms. Gutierrez's questions that they were extremely high.  Do you remember that?

[176]Barnhill Trial Tr. vol. II, p. 129, June 14, 2011. The Court agrees, there would have been no need to continue to send subpoenas if the results were in hand.  This Court finds it wholly without credibility that Agent Phillips was unaware the PPL return could not have been the Franklin test results when his co-agent handling the case and with whom he was engaged in a sexual relationship, was completely aware.

[177]Exhibit P033, 840:12-18.

[178]Again, despite being on their will-call witness list, at trial, the government made a strategic, and likely wise, decision and declined to call their expert witness, EPA Regulatory and Technical Specialist Guy Tidmore, to testify.

A.  Yes.

Q.  Now that bothers me, Agent Phillips, because does that in some way suggest that you or some of your EPA cohorts are now thinking about indicting Mr. Vidrine or somebody on some benzene violation?

A.  No, we are not.

Q.  Well, if you look at the actual charges at issue ..., There's not a single reference to benzene, is there?

A.  No there is not.

Q.  There is not a single reference to benzene in the indictment, is there?

A.  Going back to the Bill of Particulars, I believe, didn't they reference the BTEX components?[179]

Phillips testified at length to the grand jury, as well as this Court, about John Broussard, even though Broussard was not indicted with Mr. Vidrine, nor was any of his product involved in the criminal activity alleged against Mr. Vidrine.  Phillips referred to John Broussard as "an environmental terrorist" while testifying before the grand jury - a statement Agent Vikin testified was inappropriate, and Agent Langlois testified was not only inappropriate, but factually incorrect.[180] Phillips testified before this Court on this issue as follows:

Q.  I'd like to just ask you, Agent Phillips, why did you go on and on in this Grand Jury about this guy that you described, I think, as an environmental terrorist, this guy Broussard.  Why did you go on and on about him?

. . . .

Q.  So in other words, you put all this in front of the grand jury in order to basically prejudice Mr. Vidrine in the Grand Jury's eyes, didn't you?

---

[179]Phillips Trial Tr. vol. V, p. 882, June 13, 2011. Btex is an acronym that stands for benzene, toluene, ethylbenzene, and xylenes. Phillips testified benzene is not a chlorinated solvent. Id. at 883.

[180]Vikin Trial Tr. vol. II, p. 243, June 23, 2011.

A.   I put it in so the Grand Jury would know who Mr. Vidrine was doing business with.[181]

Phillips' grand jury testimony contained a myriad of additional false and misleading testimony, flowing from his deliberate manipulation of the facts, and his alleged technical expertise, such as:

[T]he burning of chlorinated solvents produce[s] what is known as dioxins.  And dioxins are known carcinogens.  And the ingestion of dioxins would certainly lend a person to a higher probability of contracting cancer.  **So they should not be in anything that is going to be used as a fuel**.

And that's the situation we have here, where materials that would be suitable to be used as alternate feedstock, such as a barge bottom, being diesel, being mixed then with materials which are not suitable for fuel, such as carbon tetrachloride or chloroform or 1-2 dichlorethane.   All of these being chlorinated solvents.[182]

Agent Phillips provided no support for this statement to the grand jury, or to this Court, and it was directly contradicted by plaintiffs' expert, Peter Romanowsky.  Furthermore, this statement is undercut by the EPA regulations themselves, as the used oil regulations clearly contemplate some presence of halogens, such as chlorinated solvents, as illustrated by the 1000 ppm rebuttable presumption.

As has already been discussed by this Court, Phillips' testimony before the grand jury was that the presence of any amount of chlorinated solvents triggers the application of 42 U.S.C. §6928 (the crime of knowingly storing hazardous waste without a permit) - a statement that was directly contradicted by plaintiffs' expert – and even Phillips admitted at trial was incorrect.

Not only did Agent Phillips testify falsely before the grand jury, Agent Phillips misled AUSA Parker when preparing for his grand jury testimony.  Agent Phillips testified:

---

[181]Phillips Trial Tr. vol. III, pp. 601-604, June 9, 2011.

[182]Exhibit P033, 950:11-25, 951:7.

107

Q.  (By Mr. Cornwell) The context, Agent Phillips, is that this is July 13, 1999, and you were going to appear before the Grand Jury on your first appearance, introducing this case to the Grand Jury the very following day on July 14th, correct?

A.  Yes.

Q.   And would it be fair to state that this was, as it says, your case summary to AUSA Parker?

A.  It appears to be, yes.

Q. So you're telling him what this case is all about so that he can be prepared to ask you questions in the Grand Jury the follow day, right?

A.  Yes, I believe he asked for this.

Q.  Okay.  And if you look down through here, the drift of what I'm going to be asking you is whether or not this was accurate or whether or not this was misleading in your description to AUSA Parker, okay?  You refer to Tank 402 and a tanker trailer containing a chemical soup?

A.  That's correct.

. . . .

Q. . . .That's not a word that your chief witness, Mike Franklin, used is it?

A.  No.

Q. What he said was, thousand parts per million, right?

A.  Yes, sir.

Q. Okay. You tell Parker it exhibited the hazardous waste character particular of toxicity and yet your chief witness, Michael Franklin, who was imparting knowledge to Vidrine, in your opinion, did not ever use the words hazardous waste characteristic of toxicity, did he?

. . . .

A.  No.

Q. Okay.  And you tell Parker, in describing this chemical soup, that it was benzene, toluene, xylene, fluorine and other hydrocarbons.  Well, number one, none of that's

illegal, is it?

A.   No.

Q.   Those are the things you find in crude oil, aren't they?

A.   They are called BTEX components.

Q.   Yeah, and you find them in crude oil, don't you?

A.   Yes.

Q.   Okay.  So that might have sounded like a chemical soup, but it certainly might have also misled someone like AUSA Parker who was not an EPA expert like you, right?

. . . .

THE COURT:   I'm interested in, however, the sentence that begins the next paragraph where you say, "Interviews conducted during the investigation have established that chemical brokers had previously warned Canal Refining that alternate feedstock received from barge cleaning operations contained chlorinated solvents and was therefore unsuitable for use as feedstock in refinery operations.  In spite of this warning, Canal Refinery chose to continue to receive alternate feedstock from barge cleaning operations such as Trinity Marine."

WITNESS:  Yes, ma'am.

THE COURT:  What is the basis of that statement?

WITNESS:  That's the Frank -- Michael Franklin's statements to Vidrine about the material at Trinity.

. . . .

Q.   But it's not the Franklin story.  The Franklin story was a thousand parts per million of chlorinated solvents, not what you put in here.  Franklin didn't tell Vidrine to worry about barge cleaning operations, did he?

A.   I believe he warned him about Trinity.

Q.   He told him there was one sample from one compartment that had over a thousand parts per million.  Why, I wonder, didn't you just describe it that way to Parker?

A.  Because our analytical data we obtained during the search warrant did not reflect that.[183]

Q.  **And even more.  All of the analytical data, not just that you got from the search warrant, but that Canal got from Tank 402 and that the shipper got from the tanker truck, it all was under a thousand parts per million, right?**

. . . .

THE WITNESS:  **Yes.**

. . . .

Q.  (By Mr. Cornwell) **At the bottom of that paragraph, "For alternative feedstock to be suitable, it must not contain any contaminants, such as chlorinated solvents."  That's just not true, is it?**

A.  It's a generalized statement.

THE COURT:  That's not his question.  Is that accurate?

WITNESS:  Yes, it is.

THE COURT:  It is accurate pursuant to the regulations?

WITNESS:  I believe it is.

THE COURT:  **You believe that is accurate pursuant to the regulations that alternate feedstock, which would be that which would be used oil, cannot contain any -- let me rephrase this.  That alternate feedstock is defined as any suitable alternate crude oil, and for alternate feedstock to be suitable it must not contain any contaminants such as chlorinated solvents, zero amount.  That's your belief, you believe that is true**.

WITNESS:  **No I should not have used "any."**

. . . .

Q.  (By Mr. Cornwell) And furthermore, sending Parker this memo worked, didn't it, because the very next day he asked questions, and you put this same false

---

[183]At this juncture, not only did Phillips have no test results from Franklin or PPL – the lab to which Franklin said he had taken the alleged Trinity samples – but Phillips knew the samples taken at Canal on the day the search warrant was executed showed far below the 1000 ppm threshold.

testimony in front of the Grand Jury, didn't you?

A.   I do not believe this was false testimony.

Q.   Well you just said it wasn't accurate.  What's the difference?[184]

Equally egregious is Phillips' willingness to mislead his supervisors, as evidenced in a letter dated January 23, 2000 to Phillips' supervisor in the Dallas office and to the acting director of the Criminal Investigative Division. In that letter, Agent Phillips requests reference to the U.S. Attorney for prosecution of Trinity Marine, Hubert Vidrine, Fred McKenzie, and Canal Refinery. This letter, both in its draft and final form, is a collection of inaccurate assertions and blatant false statements - not the least of which is that at the time Phillips is ostensibly asking for prosecutorial support to prosecute Trinity, Vidrine, McKenzie and Canal, Trinity, Vidrine and McKenzie **had already been indicted**; Canal never was indicted.[185]  The Court finds the letter written by Phillips to his supervisor was likely an attempt to create a "paper trail" and mitigate the mess he had created.  The letter of referral is completely devoid of any factual basis that Vidrine (or McKenzie) had committed any crime.  Rather, all information in the letter addresses Trinity Marine, Canal and AFI, and yet, nevertheless, Phillips includes Hubert Vidrine in the request for prosecution.  Equally bizarre is the fact Vidrine had already been indicted, as had Trinity and McKenzie.[186] The testimony regarding these letters at trial indicated to this Court that this was, yet, another attempt by Phillips to, after the fact, create a paper trail justifying his continuing prosecution of Hubert Vidrine, when in point of fact

---

[184]Phillips Trial Tr. vol. III, 551-555, 557-559, June 9, 2011.

[185]Although Phillips testified his supervisor had requested he create this document, this Court did not find that in any way credible and notes no evidence was presented to substantiate this assertion.

[186]Exhibit P005.

there existed no such justification, nor had there ever existed any such justification.

Additionally, the unique manner in which Agent FBI Barnhill handled Franklin, which allowed her to have exclusive control over the Franklin information, both positive and negative, further fostered Phillips' ability to control and manipulate the information provided to the AUSA and his supervisors. Barnhill admitted she did not include negative information about Franklin in her reports, and candidly admitted she should have.[187] Phillips' reports do not mention Franklin at all in any relevant manner. Although Phillips argues he was prohibited from creating any written references regarding Franklin, he testified he provided this information to his superiors verbally. However, no such testimony from any supervisor was presented, and this Court notes even his present supervisor, Agent Vikin, as well as Agent Langlois, who had been Phillips' supervisor for a brief time, testified they thought the Vidrine matter grew out of and was the result of, at least in part, the storage *of AFI product*. Thus Phillips, aided by the unique relationship created by Barnhill between the FBI and Franklin, and the sexual relationship shared by Phillips with Barnhill, likely was able to control or strongly influence what information was disseminated to his and Barnhill's superiors and the AUSA as well as the manner in which the information was framed and colored.

## 2.    Agent Phillips' false statements and false testimony in this matter

Even in this case, Phillips attempted to mislead the AUSA who was previously assigned to this matter, and to manipulate the facts and information provided to plaintiffs during discovery. Specifically, plaintiffs issued the following request for admission to the government:

> Please admit or deny the following Request for Admissions, and if denied, provide the information and/or documents requested:

---

[187]At this time Phillips and Barnhill were engaged in their clandestine affair - a fact which plaintiffs suggest allowed Phillips to unduly influence the manner in which Barnhill reported to her supervisors about Franklin.

1. **Admit that the government never possessed any sample of the contents of Canal Refinery Tank 402 that, according to a lab report from a certified lab, contained more than 1,000 ppm of chlorinated solvents.** If you deny the Request for Admission in whole or in part please produce a copy of each lab report reflecting the contents of each such sample.

On May 15, 2009, the AUSA formerly assigned to this matter responded to plaintiff's discovery as

follows:

ANSWER: Admitted in part and denied in part as written. **The United States admits that it has never possessed a lab report from a certified lab confirming that any sample of the contents of Canal Refinery Tank 402 contained more than 1,000 ppm of chlorinated solvents since a specific test for 1,000 ppm of chlorinated solvents was never run on samples collected by the United States from Canal Refinery Tank 402.**[188]

However, the government had in its possession, since March 3, 2000, (i.e. over nine years

prior to the false response) a letter from the EPA Regulatory and Technical Expert Guy Tidmore

_____

[188]Exh. P011(emphasis added). The remainder of the response reads, in accordance with Agent Phillips' erroneous interpretation of the applicable regulations (see correspondence from Sue Brauer, EPA "used oil" expert - P031, pp. 815-817, Phillips test., p. 133, June 7, 2011), as follows:

The request is denied in so far as it seeks the implicit or inferential admission that the United States did no have a sample that confirmed the presence of hazardous waste material in Canal Refinery Tank 402. The rebuttable presumption for used oil, as set forth under 40 C.F.R. § 261.3(a)(5), is a regulation that establishes, that unless otherwise supported, a used oil that has a total concentration of more than 1,000 ppm of halogens is regarded to be a hazardous waste. This regulation establishes a mechanism for persons to rebut this presumption, but it does not prevent any other requirements from applying. Therefore, testing for total halogen concentration is not a standard test that a regulatory agency, such as the EPA, would conduct.

If a representative sample of a material prepared according to Method 1311 and analyzed for one of the listed constituents exceeds a concentration listed at 40 C.F.R. § 261.24, it is a hazardous waste. All three samples the EPA collected from Tank 402 exhibited the hazardous characteristic of toxicity for chloroform, 1,2-dichloroethane, and tetrachloroethene. *See* Rec. Doc. 40-5 (exhibit 2.A, B, D & F). Likewise, test results from SPL labs on samples taken from Tank 402 using the TCLP analytical method also revealed the characteristic of toxicity as defined in § 261.245. *See* Rec. Doc. 40-6 (exhibit 2.g).

(who assumed that position once Keith Phillips became an investigative agent), stating in pertinent

part as follows:

> **I requested the Houston lab to analyze the remaining portion of the samples collected at Canal for total concentrations of halogens and have received that information.** The chemists at the lab did this by reevaluating the Gas Chromatograph/Mass Spectrometer printouts from the original analyses. **Concentrations of chlorinated solvents in the samples ranged from non-detect to 692 mg/kg (ppm).**[189]

The Court, obviously disturbed that such a blatantly false answer, on such a pivotal issue, was

provided by not only an officer of the court, but by a representative of the rights and interests of the

United States citizens, ordered the AUSA previously assigned to this matter, who had provided the

false response, to appear at a hearing in court.  When asked how this occurred, the AUSA responded:

> THE COURT: . . . So it's Tidmore who said, since a specific test for 1,000 ppm of chlorinated solvents was never run on samples collected by the United States from Canal Refinery Tank 402 when he had this letter that he sent to Howard Parker saying, in fact, a test had been run, in fact, he had a second analysis run on it, and in fact, there was a result analysis showing that it was under, it was from nondetect to 692 parts per million.  Is that what you are telling me?
>
> MR. MANSFIELD:  That is what I'm telling you.  **I relied on Mr. Tidmore to provide the substantive response**.  His verification is found at Bates 441 **and Mr. Phillips verification is found at Bates 449**.
>
> . . . .
>
> THE COURT:  **So this was a Tidmore/Phillips response provided to you and you went ahead and signed off on it, basically, yes?**
>
> MR. MANSFIELD:  **That is correct**.[190]

---

[189]Exh. P031 at 775 (emphasis added).

[190]Testimony of Mansfield, uncertified transcript, 13:1-21, June 9, 1011.

**The certification Phillips signed on May 11, 2009 in connection with that discovery reads as follows**:

## CERTIFICATION

I, EPA-CID Special Agent Keith Phillips, hereby state that I am authorized to verify the foregoing Answers to Discovery, that I have reviewed the Discovery and have assisted in the preparation of the attached Answers to Plaintiff's Discovery; that to the best of my information and belief, the answers are correct. **I declare under, penalty of petjury that the foregoing certification is true and correct under 28 U.S.C. § 1746 and Fed. R. Civ. P. 33.**[191]

Agent Phillips' certification, again made under penalty of perjury, clearly was false, and appears to this Court to be yet another attempt to, at the very least, conceal highly pertinent information from persons legally entitled to same.

One of the more distressing allegations made at trial, involved allegations of Agent Phillips' sexual, extra-marital affair (and its subsequent "cover up") with Agent Barnhill.  The evidence strongly indicated Agent Phillips deliberately used his investigation and prosecution of Hubert Vidrine to foster, further, facilitate and cloak his extra-marital affair with Agent Barnhill, and perhaps, to exert improper influence over the manner in which she investigated and reported upon this case.[192]  Agent Barnhill candidly testified that she and Agent Phillips began a physical, sexual relationship while assigned to this matter, which lasted from approximately 1996 until January or February 2001.  Agent Barnhill testified she and Agent Phillips were only physically intimate when working together on the Vidrine case - in other words, they did not meet to pursue their sexual

---

[191]Exh. P011 at 449.  Although in the cover letter the AUSA indicates Mr. Tidmore's certification would be forthcoming, the Court has not found it in the voluminous record.

[192]As merely one example, see Agent Barnhil's handwritten notes from 2000, stating, "Why can't we call it used oil?" Exh. P007 at 337.  Additionally, Agent Barnhill testified Agent Phillips "interpreted" the information given by those interviewed before she included that information in her 302s.

relations on occasions when they were not working the case together.  Thus, the case granted the opportunity for those rendez-vous, as well as providing justification for Agent Phillips wife.

During the investigation and prosecution, Agent Barnhill, who was single, lived in South Louisiana; Agent Phillips, who was married, lived in Dallas, Texas with his wife. Prior to and at trial, plaintiffs' counsel consistently argued Agent Phillips used the Vidrine investigation as a cover, excuse and opportunity to facilitate his illicit affair with Agent Barnhill and to hide the affair from his wife.[193]  Plaintiffs consistently argued Keith Phillips manufactured a case, both in law and fact, against Hubert Vidrine, and carefully fed the AUSA and his supervisors only the information which would further that end and perpetuate the case, all to promote access to Agent Barnhill and perpetuate and conceal their illicit affair.  Regrettably, the Court agrees with plaintiffs: this inappropriate and unprofessional behavior likely was, at least in part (if not in whole) a motivation for Agent Phillips' continued pursuit of Hubert Vidrine, without probable cause, and certainly with a complete and total reckless disregard of Hubert Vidrine's rights.  Agent Phillips sought to obtain private advantage and he acted accordingly.

At trial, each time Agent Phillips was asked about the illicit affair, upon advice of counsel, he invoked the protections of the Fifth Amendment.[194] While the Court respects Mr. Phillips' right

---

[193]When asked about an affair with Agent Barnhill at his deposition, Agent Phillips denied the affair and responded, "I've been married 31 years and you don't stay married 31 years by having extramarital affairs."  At the trial of this matter, upon advice of counsel, Agent Phillips asserted his Fifth Amendment privilege when asked about his relationship with Agent Barnhill.

[194]When asked about the affair, Keith Phillips invoked his Fifth Amendment rights:

Q.   (By Mr. Cornwell) "Now, what was the relationship between you and Ekko Barnhill during the course of this investigation?"  And did you answer: "Coagents.  She represented the FBI.  I represented the EPA."

MR. SPAGNOLETTI [separate counsel for Keith Phillips]:  Your Honor, I would counsel Mr. Phillips not to answer that question so as to preserve his Fifth Amendment

privilege.

THE COURT:  I'm going to allow him to stand on his privilege.

Q.  (By Mr. Cornwell) Was the answer that you gave the truth, the whole truth and nothing but the truth?

MR. SPAGNOLETTI:  And Your Honor, once again I will counsel Mr. Phillips not to answer that question so as to preserve his Fifth Amendment privilege.

THE COURT:  I will allow him to stand on the privilege.

Q.  (By Mr. Cornwell) Agent Phillips, were you thereafter asked the following questions and did you give the following answers?  "Question:  Would that fully and completely describe the nature of the relationship you had with Agent Barnhill?  Answer:  We're close friends. Question:  Does that fully and - - it says close closely, I think it was completely - - describe the nature of the relationship many?  Answer: Yes, it does. Question:  How close?  Answer:  Working together, we became friends as well as case agents, period."

THE COURT:  Do you have a question somewhere in there?

Q.  (By Mr. Cornwell) Yes.  The question is: Did you - - were you asked those questions, did you give those answers?

MR. SPAGNOLETTI:  Your Honor, I would counsel Mr. Phillips not to answer that question so as to reserve his Fifth Amendment privilege.

THE COURT:  I will allow him to stand on the privilege.

Q.  (By Mr. Cornwell) Were those answers the truth, the whole truth, and nothing but the truth Agent Phillips?

MR. SPAGNOLETTI:  Your Honor, I would counsel Mr. Phillips not to answer that question so as to preserve his Fifth Amendment privilege.

THE COURT:  I'll allow him to stand on the privilege.


Q. (By Mr. Cornwell)  Go back to page, Agent Phillips 166.  Was the question asked: "Were you also -- and I'm -- I don't enjoy asking this, but it's troubling to me.  Are you having an affair with her?"  And there's some colloquy at which point there is the question: "You can answer.  Answer:  What's the question?  Question:  Did you have an affair with her?  Answer:  No."  Did you give those answers to those questions?

MR. SPAGNOLETTI:  Your Honor, at this time I would counsel Mr. Phillips not to answer that question so as to preserve his Fifth Amendment privilege.

to invoke the Fifth Amendment, the Court found Agent Barnhill's testimony on this issue to be candid and credible, and therefore, based upon the testimony of Agent Barnhill, the Court finds that the two agents were engaged in a clandestine sexual affair during much of the criminal investigation.

While the Court need not go so far as to explicitly find Agent Phillips' dogged and relentless pursuit of Mr. Vidrine was wholly motivated by his illicit affair, this Court finds it played a role in that pursuit. The evidence of malice, over and above it's legal inference, is overwhelming, no matter the specific motivation in operation.

Equally disturbing (but for the fact that this is a civil matter, and Mr. Vidrine's liberty is not at stake) are the lengths Agent Phillips went to, while this case was pending, to cover up the affair.

---

THE COURT:  I'll allow him to stand on the privilege.

Q.  (By Mr. Cornwell) And were those answers the truth, the whole truth and nothing but the truth?

MR. SPAGNOLETTI:  Your Honor, at this time I'd counsel Mr. Phillips not to answer that question so as to preserve his Fifth Amendment privilege.

THE COURT:  I'm assuming you wish to do that, correct Agent Phillips?

WITNESS:  Yes, ma'am.

THE COURT:  Okay.  Then I'll allow you to stand on the privilege.

Q.  (By Mr. Cornwell)  And did you further complete the answer we just read which was, "no," by stating: "No.  I take offense to you even putting that in the record.  I've been" -- and then continuing - - "I've been married 31 years, and you don't stay married 31 years by having extramarital affairs."  Did you give that answer to that question?

MR. SPAGNOLETTI:  Your Honor, I would counsel Mr. Phillips not to answer that question so as to reserve his Fifth Amendment privilege.

THE COURT:  That is the position you wish to take.

WITNESS:  Yes, ma'am.

Phillips Trial Tr. vol. III, pp. 635-638, June 9, 2011.

Agent Barnhill testified Agent Phillips called her prior to her deposition in this matter to advise her he had been asked about the nature of their relationship at his deposition.  Phillips told Agent Barnhill he had testified "they had had a professional relationship," and that he had denied the fact that they had engaged in an extra-marital affair.  Additionally, Agent Phillips called Agent Barnhill a second time, shortly after her deposition, and asked her if she had been asked anything about the nature of their relationship during her deposition. Agent Barnhill advised him she had not been asked any such questions. Still seemingly intent on covering up his inappropriate affair - which was highly relevant and material to these proceedings - Agent Phillips called Agent Barnhill *a third time*, just prior to her meeting with the AUSA currently assigned to this matter, to again remind her he had testified that their relationship during the Vidrine investigation was purely professional.[195]

### 3.    Conclusion - Malice

At the trial of this matter, in addition to the inference of malice, evidence was presented showing Agent Phillip's malice permeated the criminal and civil proceedings against Hubert Vidrine. In contrast to the other agents who testified, Agent Phillips' testimony (like the documents he created during the criminal investigation), was fraught with "mispeaking", "over speaking", internal contradiction and unexplained inaccuracies. As the Court has, also, painstakingly discussed, at times it was outright false.[196]  In short, this Court found Keith Phillips' testimony to be wholly without credibility, and is of the opinion he likely engaged in conduct indicative of perjury on more than one occasion.  However, this Court need not make such a finding as it is sufficient for these narrow purposes to find the conduct of Agent Phillips constituted malice, as defined under the law.

---

[195]Barnhill Trial Tr. vol. I, pp. 65-66, June 13, 2011.

[196]Merely one example - the discovery verification Phillips executed.

Whether Agent Phillips' true motives were, as plaintiff's hypothesize, to have a cover and vehicle for his illicit sexual affair, whether he had a personal vendetta against Hubert Vidrine,[197] whether as a brand new criminal investigator - giddy with the newly minted power and authority he had previously lacked when serving in a supporting role – or whether a combination of all three, it is patently clear Agent Phillips lacked the innate judgment and experience necessary to counter an overzealousness, which unfortunately can arise when one is granted such awesome power over the lives and liberties of others.  Agent Phillips never stopped to consider the very significant legal ramifications which automatically occurred when he shifted the focus from AFI, convicted of, essentially, laundering hazardous waste, to Trinity, a company who at worst engaged in poor housekeeping. Thereafter, and after the fact, he set about trying to make the facts fit the law as he defined it, or to  make the law fit the facts he thought he could sculpt, perhaps in order to conceal his rookie mistakes, or perhaps to perpetuate an investigation which had become the vehicle for his sexual assignations. Which of these particular motivations was truly at play, or whether it was a combination of all of the above, is a question this Court need not, specifically, determine as that mystery is Agent Phillips' alone to reveal.  It is sufficient for this Court to find Keith Phillips set out with a flagrant and reckless disregard of the rights of Hubert Vidrine, as he deliberately controlled and skewed the investigation, falsified and sculpted reports and requests made to his superiors, mislead the prosecutor, gave patently false testimony under oath to the grand jury, made false verifications to this Court, all the while taking advantage of the opportunity he created to pursue his clandestine sexual affair with Agent Barnhill.

---

[197]Vidrine testified that he, Vidrine, got hostile and loud with Phillips during the day long execution of the search warrant and interviews at Canal, that Phillips was the "bad cop" to Vikin's "good cop" during the search at Canal, as well as other instances of animosity between the two.

Based upon all of the foregoing, this Court finds the government has not overcome the inference of malice. Rather, the Court finds in his dogged and relentless pursuit of Hubert Vidrine not only did  Keith Phillips act with malice and a very disturbing, complete and total disregard of Mr. Vidrine's Constitutional rights, but he also debased his role as an agent for and of his government, sorely abused the power that role granted him, and all the while exhibited a disdain bordering on contempt for the legal system within which he, as an agent of the government, was selected to operate. Phillips showed no compunction for his "misspeaking" or "over speaking," and he engaged in obfuscation at every turn.  His clear disregard for the oaths taken before the grand jury, in connection with his verification, and at his deposition is alarming, if not criminal, and each of those instances of false testimony bore directly upon matters material to this civil case.  Such conduct, in and of itself, illustrates an appalling disregard for the truth and evidences a hidden agenda so clearly at play, as to leave this Court with no doubt, whatsoever, of Keith Phillips' malicious intent.

### C.    Agent Phillips controlled the investigation and prosecution

After review of all evidence, having heard all testimony, and having heard the arguments of counsel, this Court finds Phillips intentionally controlled the criminal prosecution of Vidrine by shading, filtering, manipulating, and concealing the information necessary for the Assistant United States attorney to conduct a proper and honorable prosecution.[198] Hubert Vidrine's criminal defense attorney, Jim McManus (now an AUSA in the Western District of Louisiana, Lafayette Division, and like Parker, highly respected), testified AUSA Parker was the "go to guy" in the Lafayette office for environmental crimes.  Canal attorney Shaun Clarke, with the firm of Liskow and Lewis, made the

---

[198]Exhibit D 91 at 2282.

following assessment concerning AUSA Howard Parker: "Mr. Parker is a respected career prosecutor, and I felt that he dealt candidly with me in the meeting."[199] Unfortunately, however, Parker as the AUSA, relied upon Keith Phillips as his investigating agent and a former technical and regulatory consultant, to supply the facts flowing from the investigation and to give regulatory interpretation and assistance in applying the facts to these very technical environmental regulations. As Jim McManus testified, the AUSA properly relies heavily on his case agent, particularly in highly technical areas. Sadly, the documents presented establish that at every turn, Phillips manipulated the flow and nature of the information fed to the AUSA. When Phillips was no longer able to suppress and manipulate the facts, or the flow of information - particularly when he could no longer keep up the caricature of Franklin that he had created, and Franklin's story, credibility, and trustworthiness were called into true question - Parker, correctly and astutely, pointed out the dwindling options to his agents. And yet, Phillips moved forward with conviction, going so far as to testify to this Court that it was not until after the investigation of the information obtained from Franklin during hypnosis failed to locate the missing Franklin reports, that he, Phillips, agreed the indictment should have been dismissed.[200]

---

[199]As previously discussed, RCRA is an exceedingly complicated, technical, and very poorly drafted body of regulatory law, over which Agent Phillips purportedly had expertise.

[200]Actually, Phillips did not make this admission until after a very lengthy and detailed cross-examination by plaintiffs' counsel on this topic. Initially, when asked at trial about Parker's statement (made at a hearing in the criminal case) that the prosecution could not go forward if the court prohibited Franklin from testifying, Agent Phillips testified he disagreed with Parker's assessment, because "[he] believed that Andrew Hanson, an employee with Trinity Marine, could provide 75% of Mr. Franklin's testimony." [Phillips Trial Tr. vol I, p. 148] Phillips later conceded the case could not go forward without Franklin's testimony, because that was the only evidence of knowledge on the part of Vidrine. When asked on the second day of trial if he still wished the case had gone forward on the basis of Franklin's hearsay (despite the trial judge having found that Franklin's testimony, without the reports to back it up, was not only hearsay, but would have been an error of Constitutional concern, namely the Confrontation Clause), Phillips responded, "Yes." Of further note and interest is the fact that when a request was made to appeal the criminal court's ruling barring Franklin from testifying, the request was summarily denied

Phillips directly, and through his influence over Barnhill, controlled the reporting, sculpted the facts, and with the help of Tidmore, provided a tortured interpretation of the law and facts for his own personal reasons and with alarming reckless disregard for the rights of Hubert Vidrine, the judicial process at play, and the oath he took as an agent of the Environmental Protection Agency. The correspondence to and from AUSA Parker and Phillips, as well as Parker's request that Tidmore draft a response to Canal's attorneys, are but two pieces of the evidence presented at this very lengthy and document intensive trial which illustrate that the investigatory agents acted to mislead the AUSA. Further evidence is found in the correspondence Parker sent Phillips and Barnhill on **February 26, 2001**, requesting that she and Phillips "bring the 302s" to a meeting in Lafayette. Although Agent Barnhill testified the Franklin 302s resided in the AUSA's office, the February 26, 2001 document belies that testimony.

Agent Barnhill testified that in her preparation of her 302s, Barnhill allowed Phillips "to interpret" for her the information provided by the witness, again, granting Phillips the opportunity to shade and sculpt the reporting, a point driven home by numerous example on cross examination by counsel for plaintiffs, not the least of which is the telling shift in languaging from "over 1000 ppm" to "presence of chlorinated solvents" and "hot." As Agent Barnhill testified in this Court:

> Q: In fact, you even told me in your deposition that Agent Phillips would often times suggest wording for your FD-302s when it was a technical issue like this sort of thing that was regulatory, right?
>
> A: That's true.
>
>            . . .
>
> WITNESS: He would suggest wording trying to explain – and again, he was just trying to explain to me the technical aspect of, as I was writing it. I was gong to write

---

by the Solicitor General.

the same thing I would always write.  I just want to understand when I'm writing this down of whatever the WITNESS was telling me.  Yeah, I was certainly going to document what the WITNESS told me.  I just wanted a better understanding from him, from Mr. Phillips, what exactly does this mean?  That doesn't mean I was writing what Mr. Phillips was saying.  It means I was writing what the WITNESS was saying, but I would ask Mr. Phillips, what does this mean?[201]

Agent Barnhill's entry in her handwritten notes – "why can't we call it used oil"[202] – only provides further support for this Court's conclusion of Phillips' manipulation of the facts.  Phillips' reports to his supervisors were few, riddled with glaring omissions, relevant inaccuracies, patently obvious internal contradictions.  While the evidence strongly suggest his superiors were not providing the level of oversight necessarily required over a rookie agent, Phillips' manipulation of the facts only made such a task even more difficult and complex.  One should recall, Franklin, Phillips proclaimed key witness is wholly absent in all particulars from any reports of Phillips to his superiors and no evidence was presented, beyond Phillips' unsupported assertion, of any verbal communication on the subject having been given to a supervisor.  Consequently, Phillips made no mention of Franklin, exerted influence and control over what Barnhill reported by telling Barnhill "what the witness meant" and Phillips and Barnhill, for whatever reason, kept the 302s in their possession.

Furthermore, and again, illustrative of the pattern of control at play, Agent Barnhill created a special agency relationship with Franklin.  A relationship which allowed her and Phillips, with whom she was having an illicit sexual affair, and upon whom she relied "to interpret" the technical aspects of what those she interviewed told her, to create a circle of control, interpretation and dissemination of the evidence.  Phillips provided Parker with only that information he desired, and sculpted that information by way of selection and omission, in order to allow only the conclusions

---

[201]Barnhill Trial Tr. vol. II, pp. 202, 206, June 14, 2011.

[202]Exhibit P007, bate stamp 377.

124

he desired to be drawn from those facts. As is illustrated by the discussion of this Court of the applicable and relevant regulations involved, this particular regulatory area is less than clear, extremely complex and quite technical. The AUSA was wholly justified in relying upon his case agent and technical and regulatory expert to guide him and to provide technical interpretation of the interplay between and among the complex and less than clear regulatory scheme and the known facts. Phillips skewed both, the facts and the law, and this Court finds he did so for his own purposes and with reckless disregard of Hubert Vidrine's rights.

VII.   **Damages**

Plaintiffs seek damages for the following: costs and attorneys fees incurred in defending the original criminal prosecution, loss of earning capacity, lost income, damages to reputation, emotional distress, mental anguish, loss of enjoyment of life, humiliation, and loss of consortium. Plaintiffs admit their damages cannot exceed $5,180,929.18, as that is the amount of damages asserted in their administrative claim. [*See e.g.* Doc. 244, p. 5] Additionally, at the trial of this matter, plaintiffs affirmed in open court that their claims for damages are limited to only those damages incurred between the years 2000 and 2010. Furthermore, at trial, the parties stipulated that the cost and expenses incurred by the Vidrine's in defending the criminal prosecution is $127,000.00.

A.   **Loss of earning capacity**

1.   **Applicable Law**

Under Louisiana law **there is a distinction between loss of future earnings (wages) and loss of future earning capacity:**

> Loss of earning capacity is not the same as lost wages. Rather, earning capacity refers to **a person's potential**. Earning capacity is not necessarily determined by actual loss. While the plaintiff's earnings at the time of the accident may be relevant, such figures are not necessarily indicative of his past or future lost earning capacity. The

plaintiff need not be working or even in a certain profession to recover this type of award. **What is being compensated is the plaintiff's lost ability to earn a certain amount, and he may recover such damages even though he may never have seen fit to take advantage of that capacity.**

Batiste v. New Hampshire Ins. Co., 657 So.2d 168, 170 (La. App. 3rd Cir. 1995) (citing Hobgood v.

Aucoin, 574 So.2d 344 (La.1990)).

An award for loss of future earning capacity is not predicated only on the difference between a person's earnings before and after the disabling injury. **It encompasses the loss of the person's potential or earning capacity, the loss or reduction of a person's capability to do that for which he is equipped by nature, training, and experience, and for which he may be recompensed.**

Bell v. Ayio, 731 So.2d 893, 903 (La. App. 1st Cir.1998) (citing Morris v. State, Department of

Transportation, 664 So.2d 1192, 1198 (La. App. 1st Cir. 1995).

Pursuant to Louisiana law, **lost future earnings does not have to be proven to a mathematical certainty, however, a plaintiff must present evidence which proves that a loss of earning capacity has, in fact, been sustained.** Jordan v. Travelers Ins. Co., 245 So.2d 151, 155 (La. S. Ct. 1971); Bell at 903 (citing Housley v. Cerise, 597 So.2d 71, 74 (La. App. 4th Cir. 1992); *see also* Bize v. Boyer, 408 So.2d 1309, 1311-12 (La.1982). "[P]roof by direct or circumstantial evidence is sufficient to constitute a preponderance, when, taking the evidence as a whole, such proof shows that the fact or causation sought to be proved is more probable than not." Jordan, *supra*. Such evidence **"may even consist of plaintiff's own reasonable testimony, if accepted as truthful,"** without "corroborative evidence such as income tax returns or employment records." Jordan at 154, 155.

*The Courts further clarify that the very nature of lost earning capacity makes it impossible to measure the loss with any kind of mathematical certainty.* Batiste, 657 So.2d at 170 (citing Finnie, 620 So.2d 897, 901 (La. App. 4th Cir. 1993)). *See also* Theriot v. Allstate Ins. Co., 625 So.2d

1337, 1344 (La. 1993) (La. Supreme Court "recognize[s] the difficulty inherent in fixing damages for limitation and/or loss of vocational opportunity.") Louisiana Courts instruct the general considerations which should be observed: the trial court should consider whether and how much plaintiff's current condition disadvantages him in the work force, what plaintiff might have bene able to have earned but for his injuries, and what he may now earn given his resulting condition. <u>Batiste</u>, 657 So.2d at 170 (citing <u>Finnie</u>, 620 at 897). Additionally, specific factors a court should consider (relevant to this matter) are: the plaintiff's condition prior to the accident, his work record prior to and after the accident, his previous earnings, the likelihood of his ability to earn a certain amount but for the accident, and the plaintiff's employment opportunities before and after the accident. <u>Batiste</u>, 657 So.2d at 170 (citing <u>Finnie</u>, *supra*).

This Court notes the Louisiana Supreme Court has permitted awards for loss of future earning capacity without requiring the testimony of vocational and economic experts. *See* e.g. <u>Jordan</u> at 154, 155.

### 2.   Analysis

Mr. Vidrine started High Tide Traders and Consultants in mid-1996. High Tides was a sole proprietorship that brokered various petroleum related products, such as blended stock, additives, MTBE, ethanol, transmix, used oil, and related products. High Tides additionally offered the consulting services of Mr. Vidrine, and Vidrine, through High Tides, worked as a consultant for Ashland Chemical, in connection with a refinery patent jointly developed by Mr. Vidrine and Ashland.  From 1996 to 1997, Mr. Vidrine ran High Tides out of his home office. In 1998, Mr. Vidrine purchased a second business - Weston's Meat Market and Grocery - and began running High Tides from his office at the grocery store. Mr. Vidrine testified he enjoyed being a broker, because

it was "a fun business," he could meet and help a lot of people, and Mr. Vidrine is "the kind of guy that likes to meet a lot of people."[203] Mr. Vidrine testified he had always intended for High Tides Trader and Consultants to be his primary source of income upon his retirement from Canal.[204] High Tides, however, essentially shut down in April of 1999, when Vidrine received a target letter from the EPA; the final nail in High Tide's coffin was hammered when an indictment was returned against Mr. Vidrine for knowingly storing hazardous waste at Canal Refinery, hidden in used oil, without a permit.

Mr. Vidrine's testimony, which this Court found credible, was that his intention was to expand High Tides, by growing Weston's Meat Market and Grocery, such that he could get a line of credit (secured by Weston's) to purchase High Tide's product up front. Without a minimum of a $100,000 revolving line of credit, Mr. Vidrine was limited to small deals that he could either pay for himself, or through "good faith brokering," which only provided him with sufficient credit to move small amounts of product in a business where profit is largely driven by volume.[205] Buying the product up front would have enabled Mr. Vidrine to reduce his up front costs and increase the volume of product he purchased, which would have allowed him to "really start[] marketing large volumes of everything from used oil to finished product."[206] Without a line of credit (or a large amount of cash), Mr. Vidrine was unable to buy large loads of product, such as barge loads, big

---

[203]Vidrine, June 17, 2011.

[204]In fact, Mr. Vidrine testified in the spring of 1996, he informed Canal he intended to leave and start his own brokerage business. However, Canal intended to close down the refinery, asked Vidrine to stay on until the final closure of the refinery, and gave him its blessing to start his brokerage business on the side. Mr. Vidrine agreed to stay with Canal under those conditions.

[205]Vidrine, p. 39, June 17, 2011.

[206]Vidrine, pp. 38-39, June 17, 2011.

tanker loads, or railroad car loads, and thus, as the profit largely was determined by the volume involved, his earning capacity was limited.  High Tides was operable and preparing to expand when Mr. Vidrine received the target letter in this case. At that time, he was convinced he would "beat the indictment," but he slowed down his trading through High Tides, because he felt he was "under a microscope with the EPA." Once he was indicted, however, the companies with whom High Tides did business would no longer return his phone calls, and he became a pariah in his own industry. Accordingly, Mr. Vidrine turned his attention to Weston's in order to survive financially.

The Vidrine's agreed to purchase Weston's Meat Market and Grocery on New Year's 1997, and took over an existing business at that time, although the sale was not completed until February of 1998. At the time of purchase, Weston's was a small mom-and-pop gas station in a small, rural area of South Louisiana. Mr. Vidrine did indeed eventually obtain the desired $100,000 line of credit, secured by Weston's, however, this did not occur until early 2000 - after High Tides had crumbled. Accordingly, rather than using the line of credit for High Tides as the Vidrines had initially planned, it was used to expand Weston's and start new related businesses.[207] The Vidrines soon turned Weston's and their other ventures into thriving businesses, including a grocery store, meat market, deli, restaurant, and bar with video poker machines. The Vidrine's doubled Weston's revenue within one year of owning it. As the years passed and Weston's became more successful, the bank increased their line of credit to several hundred thousand dollars.

The Court found the testimony of Mr. Vidrine credible that he could have operated High Tides, as well as his other businesses concurrently, particularly as he had help running his other businesses - Mrs. Vidrine, a bookkeeper by trade, did the accounting, the Vidrines' son and daughter-

---

[207]Mr. Vidrine additionally started selling real estate during this time period.

in-law helped out in the Weston and Weston-related businesses, the Vidrines employed a store manager and a restaurant manager. Furthermore, at the time of High Tide's demise, Mr. Vidrine was running High Tides out of his office at Weston's, and consequently, he would have been physically located at Weston's while conducting the majority of his oil brokerage business. Vidrine further testified that a High Tide's brokerage transaction typically took only 20 to 30 minutes of telephone calls to complete and they were not a "daily deal." Because of the contacts Mr. Vidrine had made through his many years in the  industry, as well as through his more recent consulting and patent work with Ashland, Vidrine's travel time involved in his oil business was minimized.

Although the government pointed out at trial that many of the companies High Tides had done business with were no longer in business, the Court, after hearing several days of testimony from the Vidrines, observing the evidence of the entrepreneurial spirit exhibited by Mr. Vidrine when he was forced to turn his attention away from the oil industry and to the Weston businesses, finds it is more likely than not that Mr. Vidrine would have made new connections while running High Tides, had the indictment not destroyed High Tides and effectively shut Mr. Vidrine out of the petroleum industry.  Moreover, Mr. Vidrine had only a one and a half year period to initiate, build and operate High Tides full time before the target letter and indictment caused its demise. Accordingly, the Court is not persuaded that High Tides would be out of business today, merely because many of the contacts Mr. Vidrine had from 1996 until December of 1999 are no longer in the petroleum industry.   To the contrary, the evidence of Mr. Vidrine's work ethic and entrepreneurial skills (exhibited by the success created in the Weston businesses and his patent related endeavors) convince this Court High Tides would have evolved and grown as did Vidrine's other businesses.  This Court specifically finds the evidence establishes  Mr. Vidrine is not the kind

of man who would have "given up" when a brokerage customer left the industry, rather, he would have evolved with that change, as he did with the Weston businesses. The evidence has shown Mr. Vidrine is not a man who sits around feeling sorry for himself – he works, and he finds ways to make things work.[208]

Mr. Vidrine testified that after he was indicted, people would not return his phone calls and would not see him when he called for an appointment.  Furthermore, at the time he was indicted, he was conducting the business on "good faith" brokerage deals - *i.e.* "good faith between the people I bought from and sold to, to collect the money and pay on time."[209]  This Court accepts Vidrine's testimony that people were no longer going to, and in fact they did not, extend their "good faith" to a person who was accused of violating the environmental laws which governed that particular industry; nor were they going to trust an indicted man's word on whether or not product was clean; nor were they going to do business with a person who they feared might bring the EPA and DEQs attention upon them.  Thus, this Court finds, as of the target letter and indictment, Mr. Vidrine's ability to earn a living within that industry was effectively destroyed.

The court further finds, because Mr. Vidrine did obtain his line of credit, but for the Indictment, he could and would have used that line of credit to expand High Tides as he testified, by making the larger more profitable high volume "deals"- *i.e.* deals for larger amounts of product

---

[208]Furthermore, many of the business entities referenced during the liability phase of this case, at some point in time over the lengthy investigation and prosecution, changed names, were bought out by new companies, or ceased to exist, which further emphasizes the fluid nature of this particular niche of the petroleum industry. As the evidence also showed, Mr. Vidrine adapted with the changing nature of the industry. (Merely one example of this is the testimony of Hubert Vidrine that he recognized, beginning in late 1995, that due to changes in EPA regulations unrelated to the regulations at issue in this case, that Canal Refinery would not remain a profitable entity much longer; accordingly, he started High Tides.)

[209]Vidrine, p. 47, June 20, 2011.

purchased by Vidrine, rather than only the smaller deals made on "good faith." Additionally, Mr. Vidrine's ability to parlay the consulting work High Tides he had begun with Ashland into further business endeavors with Ashland or other such companies, was also taken from him.[210] When one factors in the Court's finding that the evidence shows  Mr. Vidrine is a true entrepreneur, an extremely hard worker very talented in his field, had developed two petroleum related patents, and had an established reputation in the petroleum industry prior to the indictment (as evidenced, merely in part, by the fact that he ran High Tides on "good faith brokering," and his work history with Canal and Ashland) - the Court finds Mr. Vidrine would have expanded High Tides into a thriving company, just as he did with his numerous other businesses, but for the indictment.  However, the opportunity to participate in any meaningful fashion in the oil industry was taken from him with the indictment. While this Court cannot know with absolute certainty, what he might have eventually created through High Tides, that is not the question before this Court at this juncture. Rather, what is pertinent, is that Mr. Vidrine *lost the capacity* to run and expand High Tides and to create and increase his earnings in that industry.  This Court finds once the indictment issued, he essentially became a pariah in the oil industry and all earning capacity within that industry was lost.

Plaintiffs argue that once High Tides was collateralized, the revenue generated from High Tides would have substantially increased, and the Court finds, based upon the evidence presented, that argument is persuasive.  This Court finds it is reasonable and supported by the evidence, to accept the potential for Vidrine's oil business, by way of High Tides, to have moved to a different plane and level of profit, with proper collateralization.  Consequently, this Court finds it reasonable

---

[210]Although plaintiffs did not carry their burden to allow award of the amount of "lost income" from Ashland that they sought, they did present sufficient evidence to show High Tide suffered a loss of *earning capacity* regarding Ashland, or other such companies, due to the government's malicious prosecution of Hubert Vidrine.

to infer (and a conservative inference at that) Mr. Vidrine's profit would have moved to that reflective of the higher volume trade, and at a minimum the profit would have doubled once he obtained collateralization through his line of credit. This particular industry is based on volume, and Vidrine's capacity to do substantially larger volume "deals" would have further increased proportionately with the subsequent increase in the line of credit. The Court finds a beginning baseline to evaluate Mr. Vidrine's lost *earning capacity* for his brokerage and consulting activities in High Tides' in the 1998 tax records, as prior to that, he was still working for Canal full-time, and only brokering part-time, and in 1999 he worked only half a year due to the target letter followed by the indictment. In 1998, the fledgling company, High Tides had a net profit of $42,176.00 without a line of credit. Once the $100,000 line of credit was in place, High Tides' available cash would have increased proportionately. As the line increased, the profits would have increased as well.

Plaintiffs have limited their damages to those incurred between the years 2000 and 2010, thus, the Court will consider High Tides net profits from 1998, increased by collateralization, and apply that figure over the ten (10) year period, as a guide in assessing his loss of earnings capacity. The line of credit which Mr. Vidrine obtained was eventually increased from $100,000 to "several hundred thousand dollars," thus, the possible level of purchase might have, again, increased, although it is not clear whether this increase was or was not within the relevant ten year period. Nonetheless, as the profit within the brokerage business was volume driven and thus, limited and expanded by the amount of money or credit one had available to buy product for re-sale, as that ability to buy increased, i.e. one's credit limit increased, so would the possible volume and hence, the possible profit. Consequently, once the credit line was again increased, so did the capacity to earn increase; yet that opportunity was stolen. Thus, for the ten year period at issue, this Court finds

the resultant loss and damage to Mr. Vidrine's *earning capacity* was increased. Consequently, the Court finds Mr. Vidrine suffered a lost earning capacity in the amount of $843,520.00 for the period before the second increase in his line of credit and that an additional increase in possible earning would have occurred with the additional increase in his line of credit. Consequently, this Court finds there is sufficient evidence to support a finding of a total loss of earnings capacity over the ten year period of $900,000.00.

### 2.    Lost income

At trial, the Court granted in part the government's motion, pursuant to Fed. R. Civ. P. 52(c), in the following particulars: the motion was granted to the extent it sought a dismissal of plaintiff's claims for loss of income and loss of earning capacity with respect to the consulting work plaintiff performed for Ashland Chemical.[211]   The motion was denied in all other aspects.

As to the remainder of plaintiff's claim for *lost income* (*i.e.* that portion of High Tides revenue not generated by consulting work with Ashland), once expenses were subtracted, the Court found plaintiffs carried their burden only to show, by a preponderance of evidence, that of the three to four years High Tides was in existence, it earned, collectively, a net amount of $20,000.00, given the realities under which it operated.[212]   Accordingly, the Court finds Mr. Vidrine suffered a loss of actual income, for the years 2000 through 2010, of $50,000.00.

### 3.    General Damages: damages to reputation, emotional distress, mental anguish, loss of enjoyment of life, and humiliation.

Mr. Vidrine learned he had been indicted by hearing it on the radio; Mrs. Vidrine learned of

---

[211]*See* Court's findings of fact and conclusions of law, Trans. pp. 215-241, June 21, 2011; pp. 16-21, 33-35, June 22, 2011.

[212]Unfortunately, though the Court recognizes this number might be far too low to reflect the reality of the situation, it was all that was affirmatively proven.

her husband's indictment by hearing it on the television news.[213] Mrs. Vidrine testified when Mr. Vidrine called her, "he sounded awful;" Mr. Vidrine testified he was "torn apart" and "just shocked." Because news of the indictment was reported in the newspaper and on the television news (both their local and Lafayette channels), and because the nature of their businesses at that point had shifted to the service industry - *i.e.* a grocery store, meat market, deli, gas station, restaurant, etc. -the Vidrines were constantly in the local public eye, dealing with the public.  Neighbors and members of their small community were asking them, again and again, about the indictment and the details of the criminal case.  The Vidrines testified many people in their small community just assumed Mr. Vidrine was a criminal, merely because he had been indicted.  Both felt genuine humiliation, discomfort and embarrassment.  The Vidrines changed their heretofore open and active life within their community and began staying home; they stopped going out together as frequently, because they feared people in their small community would recognize Mr. Vidrine or want to discuss his legal problems, or they would have to endure the judgment of their friends and neighbors. On the few occasions they did have an evening out together, the criminal case was the only topic of conversation.  Once news of the indictment spread, the Vidrines felt as if they "had a fall from grace."  The Vidrines went from being well respected and well liked community leaders to objects of diversion and curiosity.

Mrs. Vidrine testified her husband would wake up thinking about his legal troubles, and would go to bed "still thinking about them." Mr. Vidrine testified the criminal case was always on

---

[213]The Court recognizes Mrs. Vidrine has brought only a claim for loss of consortium (and indeed, pursuant to Louisiana law, she is restricted to only that claim). Nevertheless, it is difficult to discuss the general damages Mr. Vidrine suffered in a vacuum, because the testimony at trial, like their lives together, was so intertwined. However, the Court wishes to be clear, that any damages awarded in this section are limited *solely* to those incurred by Mr. Vidrine. Mrs. Vidrine's damages will be addressed in the following section, entitled "loss of consortium."

his mind, and it was all the two talked about – it defined and governed their lives publically and privately. Both Mr. and Mrs. Vidrine testified Mr. Vidrine became depressed, frightened, and constantly worried about his family, his business, and his marriage. Mr. Vidrine testified it was very difficult for him to watch the emotional and mental impact his legal situation had on his wife, because he "could fight," whereas "she was just basically seeing me suffer and it was very hard on her, very hard."[214]

Mr. Vidrine testified he was particularly frightened about what would happen to his wife and family if he went to prison, as he was the breadwinner in the family. The Vidrines did not know if Mrs. Vidrine would be able to pay the large criminal fines they anticipated if Mr. Vidrine were to be convicted, particularly as all of their savings and income were rapidly being diminished due to his attorneys fees. Both testified he became even more of a "workaholic" than he had previously been, not only to keep his mind occupied, but to try to save enough money to support his wife if he were to go to prison. However, each testified most of the money their businesses were earning was going to pay his attorney. Mr. Vidrine testified he and his wife were in constant fear that if he was convicted of a felony, they would lose their gambling license, video poker license, liquor licenses, and food stamp license - which were essential to their businesses - because each of those licenses was in Mr. Vidrine's name.  They both believed the loss of those licenses would have destroyed their only remaining sources of income.

They both testified their sexual relations, also, were greatly diminished during this time period; what had been a loving, consistent physical relationship was effectively lost.

Finally, Mr. Vidrine testified:

------

[214]Trial Day 9, June 17, 2011.

I served three-and-a-half years federal probation.[215]  I get reminded of that every time
I go by that second floor, and I had to go there every month and report.  I have to tell
them they want to know your financial report every month and couldn't leave the
country, forget that.  If you leave the state you had to call and report. When you
leave, when you come back or get written permission and you are basically in jail.
You're basically under house arrest.[216]

Hubert Vidrine's life was radically changed in all aspects at the moment of indictment.

Although Mr. Vidrine did not seek counseling or medication for the depression and emotional

problems which resulted, this Court finds that is not surprising given Mr. Vidrine's character

established by his testimony and conduct during indictment – Hubert Vidrine is an independent,

hard-working, scrappy, almost stereotypical Cajun gentleman.  He is not the sort of fellow who is

likely to visit a "nerve doctor." This Court finds based upon the testimony and evidence received that

Hubert Vidrine suffered damage to his reputation and standing in his small, insular community,

extreme humiliation, significant limitation to his freedom, radical shifts to his day to day life,

genuine deterioration to his marriage and physical relationship with his wife, depression and

emotional distress (played out by throwing himself into building Weston's and the related

businesses), and demonstrable loss of enjoyment of his life as a result of this malicious prosecution.

Mr. Vidrine was stripped of perhaps his most valuable asset, his good name, and the consequence

of that may never be fully ameliorated - it certainly was not during the relevant ten year period.

---

[215]Technically, Mr. Vidrine was on pretrial supervision and not probation, however, to the
Vidrines (and likely to most innocent lay persons) that is a distinction without a difference. While a
defendant who is released on pretrial supervision certainly has far more freedom than one who is ordered
detained, such freedom is nevertheless limited. A defendant's ability to travel is nearly always restricted
or precluded (as was Mr. Vidrine's) pending adjudication of a criminal action. One's right to possess
firearms is almost always completely restricted during the pendency of a criminal action when one is
released on conditions involving pretrial supervision. One's right to be free from searches of person and
property without warrants in violation of the Fourth Amendment can be greatly circumscribed during
pretrial release.  One must report to and check n with one's pretrial services officer - as did Mr. Vidrine,
and one must abide by all conditions of pretrial release or risk incarceration.

[216]Vidrine, pp. 180-181, June 16, 2011.

Based on the foregoing, this Court hereby awards $400,000.00 as compensation for these damages.

    **4.**        **Loss of consortium**

Pursuant to Louisiana law, a cause of action exists for "loss of consortium, service, and society" for the spouse of an injured victim. *See e.g.* Ferrell v. Fireman's Fund Inc. Co., 696 So.2d 569, 573 (La. 1997). "The compensable elements of a claim for loss of consortium . . . include loss of love and affection, loss of companionship, loss of material services, loss of support, impairment of sexual relations, loss of aid and assistance, and loss of felicity." Id. (citing Choyce v. Sisters of Incarnate Word, 642 So.2d 287 (La. 2nd Cir.1994)).  Loss of consortium is designed to compensate the primary tort victim's family members for their diminished relationship with the primary tort victim.  McGee v. A C and S, Inc., 933 So.2d 770, 779 (La. 2006).[217]

Mr. and Mrs. Vidrine were married on November 9, 1974.  Neither had been previously married.  They have two adult children. Mrs. Vidrine testified once the indictment issued, her husband threw himself into his work and pulled away from their marriage. Mr. Vidrine became even "more of a workaholic" than he had been pre-indictment, and was perpetually absent, if not physically, emotionally.  They no longer did things together they had before, such as travel, shop, gardening, riding bikes, and exercise. Prior to the indictment, the two were "best friends;" post-

---

[217]As the McGee court further notes:

> A family member's detrimental alteration in lifestyle, i.e. loss of enjoyment of life, results from the diminished relationship with the primary tort victim and therefore is already compensated with an award for loss of consortium. Hence, a wife's claim that she is unable to engage in activities that she formerly enjoyed prior to her husband's injury, such as taking vacations, attending sporting events, or dancing, is compensated under loss of consortium and need not be compensated again under loss of enjoyment of life. Allowing family members to recover for both their loss of consortium and their loss of enjoyment of life would be duplicative and would not be authorized by La. C.C. art. 2315(B).

Id. at 779.

indictment, Mr. Vidrine "was not in the mood to do anything with her" and spent most of his time with his attorneys, working, or just by himself. Their sexual relations drastically decreased because they were always worried, frightened, depressed and overwhelmed. As a result of the changes in their lives and in the community, Mrs. Vidrine had difficulty concentrating, became irritable and impatient, and would make errors in the bookkeeping work she did at their business in the evenings - thus, compounding the tension in the Vidrine's already strained relationship. Ultimately, the indictment and changes in their lives led Mrs. Vidrine to seek medical help and she was prescribed anti-depressants, which she took from December 1999 until 2003.[218] Mrs. Vidrine testified she shut the people who were important to her out of her life - her parents, siblings, and loved ones.  She did not want to leave the house, she could not sleep, and eventually had to take medication to help her sleep.  She gained weight due to her depression, and the depression caused her to stop exercising, further compounding the difficulties in their further strained relationship. Mrs. Vidrine testified she felt like they were "treated as criminals," due to the restrictions placed upon Mr. Vidrine by pre-trial services, restricting his (and thus her) ability to travel unless approved by pretrial services.  This Court finds based upon the testimony heard and evidence received that Mrs. Vidrine suffered a loss of the love and affection she and her high school sweetheart had shared before the indictment.  Mr. Vidrine withdrew leaving Mrs. Vidrine without her long time companion, and the emotional support he had always, heretofore, provided.  Material services, aid and assistance heretofore provided by Mr. Vidrine were now missing, as was their comfortable sexual life once shared.  In short, Mrs. Vidrine experienced a genuine loss of felicity and a radical shift in her life with her chosen life partner.

---

[218]The only other time she had taken anti-depressants was in 1993 or 1994, for about two years, after an automobile accident which "caused a lot of pain and depression."

In light of the evidence presented as to Mrs. Vidrine's loss of consortium, the Court hereby awards $200,000.00 in compensatory damages.

Accordingly, the total recovery in this matter is as follows:

A.     Lost income.........................................................................................$50,000.00

B.     Loss of earning capacity....................................................................$900,000.00

C.     Costs and attorneys fees incurred in
defending the original criminal prosecution.........................................$127,000.00

D     General Damages..............................................................................$400,000.00

E.     Loss of consortium............................................................................$200,000.00

      Total Award:                              $1,677,000.00

## VIII.   Note of Evidence

This Court leaves open the note of evidence and resolution of plaintiffs' oral motion for sanctions and costs, based upon the government's response to plaintiffs' Request for Admission. Plaintiffs are ORDERED to submit a memorandum in support of their oral motion (as well as an affidavit) within thirty days of issuance of this ruling. Should the government wish to oppose the motion and affidavit, it is to submit a memorandum in opposition within fifteen days after receipt of plaintiffs' memorandum.

## IX.   Conclusion

Rather than finding Agent Phillips conduct and testimony supportive of a finding of the existence of probable cause, this court finds Agent Phillips testimony, conduct and documentation illustrate a deliberate patten of disregard for oaths taken, truth of the matter involved, wholly lacking in intellectual honesty, and exhibiting a deliberate intent to mislead all involved, particularly the prosecutors with whom he worked and who were relying upon his investigation and technical

expertise in order to evaluate their case.  Agent Phillips has displayed the very worst example of abuse and misuse of the power and trust bestowed upon a governmental agent, and has brought great shame upon the agency which had entrusted him with that power, responsibility, and authority.

The AUSA relied upon Phillips to gather, analyze, and present the evidence fully and fairly to him and to the grand jury - Agent Phillips did not.  Agent Phillips had been the technical and regulatory expert of the case before his promotion, thus, the AUSA relied upon Phillips to fairly explain and guide the way through the complex, technical data and regulations - Agent Phillips did not.  In short, as the primary witness before the grand jury, Phillips painted a frightening picture of Hubert Vidrine, as a hazardous waste polluter of the magnitude "of Love Canal," someone who associated with a "known environmental terrorist," and someone who was inflicting the risk of cancer upon his fellow citizens in his quest for cheap alternative feedstock - all allegations wholly ungrounded in fact or law. While any witness can be expected to make a few errors regarding details, Phillips' testimony was replete with misrepresentations, falsehoods, omissions, hyperbole, and inflammatory statements.  Furthermore, the errors and omissions were not random in nature; they consistently served to strengthen the criminal case against Vidrine which Phillips was constructing. This Court finds probable cause did not exist to indict Hubert Vidrine, nor to doggedly pursue him for close to four years.  Further, this Court finds Keith Phillips acted with malice in his actions, for the reasons noted.

This Court finds Keith Phillips, for his own purposes, set out with intent and reckless and callous disregard for anyone's rights other than his own, and reckless disregard for the processes and power which had been bestowed him, to effectively destroy another man's life - conduct which cannot go unaddressed, or unrecognized.  This Court is acutely aware punitive damages are not

allowed in cases brought against the government, and, this Court has in no way awarded punitive

damages.  However, given the egregious conduct displayed by an agent of the government and the

devastation wrought on otherwise law-abiding citizens, had punitive damages been allowable, this

Court would have awarded punitive damages in the hope of deterring such reckless and damaging

conduct and abuse of power in the future.

THUS DONE AND SIGNED this 26 day of January, 2012.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE